No. 2014-1409

IN THE

# UNITED STATES COURT OF APPEALS

## FOR THE FEDERAL CIRCUIT

———————————

EDWARDS LIFESCIENCES AG and
EDWARDS LIFESCIENCES, LLC,

*Plaintiffs-Appellees,*

v.

COREVALVE, INC. and
MEDTRONIC COREVALVE, LLC,

*Defendants-Appellants,*

———————————

Appeal from the United States District Court for the District of Delaware,
Case No. 08-CV-0091, Chief Judge Gregory M. Sleet.

———————————

**BRIEF OF APPELLANTS**

NONCONFIDENTIAL

Edward R. Reines
Derek C. Walter
Brian Chang
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

*Counsel for Appellants*
May 12, 2014

Robert A. Van Nest
Brian L. Ferrall
Simona A. Agnolucci
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400

*Counsel for Appellants*

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellants certify the following:

1.    **The full name of every party or amicus represented by me is:**

CoreValve, Inc. and Medtronic CoreValve, LLC.

2.    **The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

N/A

3.    **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

Medtronic, Inc.

4.    **The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:**

**Weil, Gotshal & Manges LLP** – Edward R. Reines, Derek C. Walter, Brian Chang
**Shaw Keller LLP** – John W. Shaw, Karen E. Keller, David M. Fry
**Keker & Van Nest LLP** – Robert A. Van Nest, Brian L. Ferrall, Dan Jackson, Simona A. Agnolucci, Ashok Ramani, Kate E. Lazarus, Michael Gadeberg, Nikki Khanh Vo
**DLA Piper** – Laura D. Hatcher
**Knobbe Martens Olson & Bear, LLP** – J. David Evered, Joseph F. Jennings, Joseph R. Re, Joseph S. Cianfrani, Karen V. Weil, William J. Blonigan
**Richards Layton & Finger, P.A**. – Chad M. Shandler, Frederick L. Cottrell, III, Laura D. Hatcher
**Shaw LLC** – John W. Shaw
**Young Conaway Stargatt & Taylor, LLP** – John W. Shaw, Karen E. Keller, Pilar G. Kraman

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ....................................................................2

PRELIMINARY STATEMENT ........................................................................2

STATEMENT OF THE ISSUES ......................................................................6

STATEMENT OF THE CASE .........................................................................7

   A. PROCEDURAL HISTORY ......................................................................7

   B. THE MCS IS A REVOLUTIONARY, LIFE-SAVING DEVICE ...................................9

   C. DEPLOYMENT AND OPERATION OF MCS ....................................................10

   D. MCS IS RADICALLY DIFFERENT FROM EDWARDS' SAPIEN DEVICE AND NOT INTERCHANGEABLE WITH IT ......................................................................12

   E. THE NATURAL TERM OF THE '552 PATENT EXPIRED ON MAY 2, 2012 ...........14

   F. THE PRELIMINARY INJUNCTION HEARING AND THE DISTRICT COURT'S ORDER 14

SUMMARY OF ARGUMENT ........................................................................16

ARGUMENT ...........................................................................................19

   I. LEGAL STANDARD GOVERNING THIS APPEAL ....................................................19

   II. EDWARDS DID NOT SHOW IT WAS LIKELY TO SUCCEED ON THE MERITS .......19

     A. THE DISTRICT COURT INCORRECTLY FOUND THAT EDWARDS' RIGHTS IN THE '552 PATENT EXTEND TO MCS ......................................................................20

      1. THE PLAIN LANGUAGE OF § 156 LIMITS TERM EXTENSIONS TO THE APPROVED PRODUCT ......................................................................20

      2. THIS COURT'S PRECEDENT ESTABLISHES THAT § 156 LIMITS TERM EXTENSIONS TO A PARTICULAR APPROVED PRODUCT ......................................................................22

      3. THE LEGISLATIVE HISTORY CONFIRMS THAT TERM EXTENSIONS UNDER § 156 ARE LIMITED TO THE APPROVED PRODUCT ......................................................................30

      4. THE PATENT OFFICE'S INTERPRETATION OF § 156 ALSO CONFIRMS THAT TERM EXTENSIONS ARE LIMITED TO THE APPROVED PRODUCT ......................................................................34

      5. EDWARDS' ARGUMENT IMPERMISSIBLY TREATS PHARMACEUTICAL TERM EXTENSIONS DIFFERENTLY FROM MEDICAL DEVICE TERM EXTENSIONS .........34

6. UNDER THE PROPER CONSTITUTION OF § 156, THE '552 PATENT'S EXTENDED TERM IS LIMITED TO EDWARDS' SAPIEN 9000TFX............................................37

(i) "A COLLAPSIBLE ELASTICAL VALVE"........................................37

(ii) "AN ELASTICAL STENT"...............................................38

(iii) "CYLINDRICAL SUPPORT MEANS"......................................38

(iv) "A PLURALITY OF COMMISSURAL SUPPORTS"..........................39

B. EVEN UNDER THE DISTRICT COURT'S INCORRECT INTERPRETATION OF § 156, THE INJUNCTION IS UNJUSTIFIABLY OVERBROAD .................................40

1. THE DISTRICT COURT ENJOINED USES THAT THE FDA DID *NOT* APPROVE FOR SAPIEN BEFORE THE '552 PATENT EXPIRED ..............................40

2. THE DISTRICT COURT ENJOINED NON-INFRINGING CLINICAL TRIAL ACTIVITIES ............................................................42

III. THE INJUNCTION WOULD HARM THE PUBLIC INTEREST IN LIFESAVING CURES THUS REQUIRING REVERSAL .................................................44

A. THERE IS A VITAL PUBLIC INTEREST IN THE AVAILABILITY OF IMPORTANT AND UNIQUE MEDICAL TREATMENTS ...........................................44

B. EVEN FOR THOSE PATIENTS WHO CAN BE TREATED BY BOTH DEVICES, MCS IS PROVEN SAFER THAN SAPIEN.............................................47

C. THE DISTRICT COURT'S DIRECTIVE TO NEGOTIATE IS INSUFFICIENT TO PROTECT THE PUBLIC INTEREST...........................................50

D. THE PARTIES HAVE NOT REACHED AGREEMENT ON A MECHANISM TO PROVIDE MCS TO PATIENTS ...............................................51

1. LIMITING MCS TO CURRENTLY TRAINED HOSPITALS HARMS THE PUBLIC INTEREST ............................................................52

2. EDWARDS' DEMAND FOR *NON-REFUNDABLE* PAYMENT FOR EACH MCS SALE HAS NO BASIS ...........................................................52

IV. EDWARDS WILL NOT SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.53

A. EDWARDS WILL NOT SUFFER IRREPARABLE HARM THAT COULD JUSTIFY AN INJUNCTION ............................................................53

B. MONEY DAMAGES ARE ADEQUATE TO COMPENSATE EDWARDS ...............55

C. MEDTRONIC DID NOT MISREPRESENT THE STATUS OF ITS MEXICO MANUFACTURING TRANSITION ...........................................56

V. THE BALANCE OF HARDSHIPS DOES NOT TIP IN EDWARDS' FAVOR ...............59

CONCLUSION ................................................................................................................60

CONFIDENTIAL MATERIAL OMITTED

The material omitted on page 56 contains the terms of a confidential license agreement.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Cardiovascular Systems, Inc. v. Medtronic Vascular, Inc.*,
  579 F. Supp. 2d 554 (D. Del. 2008) .................................................... 44

*Apple Inc. v. Samsung Elecs. Co.*,
  678 F.3d 1314 (Fed. Cir. 2012) ......................................................... 55

*Bard Peripheral Vascular Inc. v. W.L. Gore & Associates, Inc.*,
  2009 U.S. Dist. LEXIS 31328 (D. Az. 2009) .................................... 44

*Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*,
  592 F.3d 1340 (Fed. Cir. 2010) ....................................... 22, 24, 25, 26

*Conceptus, Inc. v. Hologic*,
  No. C 09-02280 WHA, 2012 U.S. Dist. LEXIS 2239 (N.D. Cal. Jan. 9, 2012) 44

*Datascope Corp. v. Kontron Inc.*,
  786 F.2d 398 (Fed. Cir. 1986) ........................................................... 43

*Edwards Lifesciences AG, v. CoreValve Inc.*,
  Nos. 2011-1215 and 2011-1257, 699 F.3d 1305 (Fed. Cir. 2012) ....... 1, 7, 56, 57

*Eli Lilly & Co. v. Medtronic, Inc.*,
  496 U.S. 661 (1990) .......................................................................... 35

*Ethicon Endo-Surgery v. United States Surgical Corp.*,
  855 F. Supp. 1500 ............................................................................. 44

*Glaxo Operations UK, Ltd. v. Quigg*,
  894 F.2d 392 (Fed. Cir. 1990) ........................................................... 29

*Hoechst-Roussel Pharms. v. Lehman*,
  109 F.3d 756 (Fed. Cir. 1997) ........................................................... 29

*Int'l Rectifier Corp. v. IXYS Corp.*,
  383 F.3d 1312 (Fed. Cir. 2004) ......................................................... 50

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
  712 F. Supp. 2d 1285 (M.D. Fla. 2010)........................................44, 46

*Kimberly-Clark Worldwide, Inc. v. Tyco Healthcare Group LP*,
  635 F. Supp. 2d 870 (E.D. Wis. 2009) ................................................44

*Merck & Co., Inc. v. Kessler*,
  80 F.3d 1543 (Fed. Cir. 1996) ........................................3, 22, 23, 33

*Pfizer, Inc. v. Dr. Reddy's Labs, Ltd.*,
  359 F.3d 1361 (Fed. Cir. 2004) ...........................................26, 27, 28

*PhotoCure ASA v. Kappos*,
  603 F.3d 1372 (Fed. Cir. 2010) .......................................................29

*Schmidt v. Lessard*,
  414 U.S. 473 (1974)........................................................................50

*Sciele Pharma Inc. v. Lupin Ltd.*,
  684 F.3d 1253 (Fed. Cir. 2012) ......................................................19

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008).............................................................................43

## Statutes

28 U.S.C. § 1292(c)(1) .......................................................................2

28 U.S.C § 1295(a)(1)..........................................................................2

28 U.S.C. § 1331 .................................................................................2

28 U.S.C. § 1338(a) ............................................................................2

35 U.S.C. § 156.........................................................................*passim*

35 U.S.C. § 156(b) ......................................... 3, 4, 20, 21, 37, 40, *passim*

35 U.S.C. § 156(f)..............................................................28, 34, 35

35 U.S.C. § 271(e)(1)........................................................................42, 43

## Other Authorities

37 C.F.R. § 1.777(c)-(d) ................................................................................8

Alan D. Lourie, Patent Term Restoration – The First Two Years, 68 J. Pat. & Trademark Off. Soc'y 538 (1986) ...................................................31, 32

Alan D. Lourie, Patent Term Restoration, 66 J. Pat. Off. Soc'y 526 (1984) ..........31

Fed. R. Civ. P. 65 ......................................................................................50

H.R. 1937 (1981) ..............................................................................31, 36

H.R. 6444 (1982) ........................................................................31, 32, 36

H.R. 7952 (1980) ........................................................................30, 32, 36

H.R. Rep. No. 97-696 (1982) ..................................................................31

H.R. Rep. No. 98-857, Part I (1984) ................................................32, 33

*Pfizer, Inc. v. Dr. Reddy's Labs, Ltd.*, Case Nos. 03-1227, 03-1258, Brief for Defendant-Appellee Dr. Reddy's Labs ..............................................27

*Pfizer, Inc. v. Dr. Reddy's Labs, Ltd.*, Case Nos. 03-1227, 03-1258, Brief for Plaintiff-Appellant Pfizer Inc ..........................................................28

S. 255 (1981) ......................................................................................31, 36

S. 2892 (1980) ....................................................................................30, 36

S. Rep. No. 97-138 (1981) ......................................................................31

**STATEMENT OF RELATED CASES**

In 2012, this Court resolved cross-appeals in this case following a jury verdict finding that Medtronic infringed the '552 patent and the district court's subsequent denial of Edwards' permanent injunction request. This Court upheld the verdict, but remanded for the permanent injunction ruling to be reconsidered "in light of ensuing events and any other relevant factors." *Edwards Lifesciences AG, et al. v. CoreValve Inc., et al.*, Nos. 2011-1215 and 2011-1257, 699 F.3d 1305, 1315-16 (Fed. Cir. 2012) (Newman, J., joined by Rader, C.J.; concurring opinion by Prost, J.). This appeal stems from the preliminary injunction entered after remand on April 11, 2014.

The parties have three cases currently pending between them that relate to this technology:

1. *Edwards Lifesciences AG v. CoreValve, Inc.*, No. 08-cv-91 (D. Del.)

2. *Edwards Lifesciences AG v. Medtronic Inc.*, No. 09-cv-873 (D. Del.)

3. *Edwards Lifesciences LLC v. Medtronic CoreValve LLC*, No. 1:12-cv-23 (D. Del.).

In the last listed case, a permanent injunction motion is pending involving the same products as this case. See JA1068.

## JURISDICTIONAL STATEMENT

The district court (Sleet, C.J.) has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction over this appeal from the preliminary injunction pursuant to 28 U.S.C. §§ 1292(c)(1) and 1295(a)(1). Medtronic filed a timely notice of appeal on April 11, 2014. JA710.

## PRELIMINARY STATEMENT

The district court's preliminary injunction should be reversed. If the injunction (which this Court stayed pending appeal) were permitted to take effect, treatable patients would unnecessarily die in the name of patent rights that have already expired. Put simply, the calamity to public health that would result from the injunction is premised on a legally improper extension of patent rights.

The injunction bans the sale of Medtronic's life-saving CoreValve system ("MCS") and absolutely precludes the training of additional hospitals and clinics in the use of MCS – leaving large regions of the country without access to this important new medical device. MCS is a unique and revolutionary minimally-invasive aortic heart valve replacement system that is fundamentally different than the only other transcatheter aortic heart valve on the U.S. market, Edwards' Sapien product. The parties were directed to try to negotiate a mechanism to allow sales to hospitals and clinics that are already trained for patients who would be better served by MCS. The parties have been unable to agree to acceptable terms.

Regardless, the injunction prevents MCS sales to any additional hospitals and clinics, leaving large areas of the country without access.

The injunction should never have issued because the patent rights on which it is based expired on May 2, 2012. The district court's decision to the contrary is based on an overly expansive interpretation of 35 U.S.C. § 156, which authorizes ***limited*** patent term extensions. Pursuant to §156, Edwards has applied for a term extension based on the time it took the FDA to approve Sapien, but thus far has only received "interim" term extensions. Importantly, under §156, the scope of the patent right that is extended is ***not*** the full scope of the patent claims. Rather, by statute, the scope of an extended patent is limited to the particular embodiment of the claim that corresponds to the patent holder's product that was the subject of the FDA review, and is also limited to that product's FDA-***approved*** use. 35 U.S.C. §156(b)(1); *Merck & Co., Inc. v. Kessler*, 80 F.3d 1543, 1547 (Fed. Cir. 1996) (Under §156, "the restoration period of the patent does not extend to all products protected by the patent but only to the ***product*** on which the extension was based.").[1] Thus, if a patent claim covers multiple embodiments, but only one such embodiment was the subject of an FDA approval process, the claim scope during the extension is limited to that embodiment and the particular uses approved by the FDA for that embodiment as of the natural expiration date of the patent.

---

[1] Emphasis supplied throughout this brief unless otherwise specified.

Here, the extended term of Claim 1 of the '552 patent is limited to the *embodiment* of the claim as reflected in Edwards' FDA-approved Sapien and the FDA-approved *use* for Sapien as of May 2, 2012. The district court erred by ignoring the *product* restriction altogether, and further erred by ignoring the very limited *use* the FDA had approved for Sapien as of May 2012. JA775 at 261:2-4 ("Section 156(b)(1)(a) makes clear that it applies to *uses of devices*, not merely the actual devices and copies thereof."); JA5-6. This misinterpretation flies in the face of the statutory text (the extension is "limited to any use approved for the *product*") and clear statements of Congressional intent found in the legislative history. It also cannot be reconciled with this Court's precedent applying this statute, which routinely limits the extension to *both* the FDA-approved product and the approved use for that product.

Because the extended term of claim 1 can be no broader than the FDA-approved Sapien embodiment, and because Medtronic's MCS is radically different from Sapien, there is no ongoing infringement to enjoin. Even if the extended term could somehow cover embodiments different from Sapien, because the district court's injunction grants Edwards exclusivity beyond the FDA-approved uses as of May 2012, it is fatally overbroad in all events.

An injunction also would be incompatible with the public interest in life-saving medical remedies. The district court recognized that the enjoined MCS "is

a safer device and that patients in whom it is implanted have better outcomes with a lower risk of death" compared to Edwards' Sapien device.  JA775 at 263:6-8.  In addition, the record establishes beyond serious question that there are large categories of patients for whom Edwards' Sapien is either not indicated at all or much less efficacious.  JA389, 391-392, § IV ¶¶ 1, 2, 9, § V ¶ 11; JA411, ¶ 5; JA371, ¶ 13; JA473-74, ¶ 5; JA657, JA659, ¶¶ 13, 19-21.  And, where both devices are plausible treatment options for a patient, the evidence shows that a team of doctors should make a case-by-case judgment to determine whether MCS is better medically.  JA473, ¶ 4; JA743 at 134:25-135:18.  These life or death medical decisions simply are not susceptible to *a priori* judicial classification that can be imposed by an injunction.

The remaining preliminary injunction factors also support reversal.  The district court erroneously concluded that Edwards would suffer irreparable harm if Medtronic is allowed to sell MCS, to such an extent that the public interest in life-saving medical treatment should be sacrificed.  Even if the patent were somehow found enforceable against MCS after its original expiration, Edwards would collect substantial damages from Medtronic for post-verdict sales.  Having awarded lost profit damages, the district court implicitly found that Edwards' harm from infringement of the '552 patent is reasonably quantifiable, such that an injunction is not warranted under these circumstances.  Given Edwards' multi-year head start

in the U.S. market, Edwards is not irreparably harmed by Medtronic's MCS sales. Similarly, the balance of hardships does not favor Edwards.

When Edwards' §156 term extension is properly limited so it is commensurate with the Sapien device, and to its specific FDA-approved uses, no infringement can exist and no injunction is proper. Moreover, the preliminary injunction factors do not support entry of an injunction – especially in view of the strong public interest in the availability of life-saving medical therapies such as MCS.

## STATEMENT OF THE ISSUES

1. Whether, pursuant to 35 U.S.C. §156, the rights in the extended term of the '552 patent are limited to the Sapien embodiment approved by the FDA, such that there is no ongoing infringement by MCS subsequent to the expiration on May 2, 2012 of the natural life of the '552 Patent?

2. Whether, pursuant to §156, the rights in the extended term of the '552 patent are limited to the particular uses for Sapien approved by the FDA at the expiration of the natural life of the patent on May 2, 2012, such that the injunction is fatally overbroad because it precludes the sale of MCS for uses different from Sapien's then-approved uses?

3. Whether the district court committed a clear error of judgment by concluding that the public interest in injunctive relief outweighed the public interest in the availability of a unique life-saving device?

4. Whether the district court committed a clear error of judgment in balancing all the relevant factors to conclude that it was proper to enter a preliminary injunction?

## STATEMENT OF THE CASE

### A.  PROCEDURAL HISTORY

Edwards filed suit on February 12, 2008.  On April 1, 2010, the jury found Medtronic infringed claim 1 of the '552 patent, awarding $72,645,555 in lost profits and an additional $1,284,861 in royalties.  JA93-97.  The district court denied Edwards' permanent injunction motion.  JA252-257.  On appeal, this Court affirmed the verdict and damages award, but remanded Edwards' permanent injunction motion for further consideration in view of "ensuing circumstances and all relevant factors."  *Edwards Lifesciences AG v. CoreValve Inc.*, 699 F.3d 1305, 1315-16 (Fed. Cir. 2012).

The '552 patent expired in May 2012.  JA279.  Edwards applied for a patent term extension under §156.  *Id*.  The Patent Office has granted three interim term extensions, although it has yet to issue a final extension on the merits.  JA261; JA262; JA1067.

After remand, Edwards filed a renewed permanent injunction motion on April 24, 2013. JA80 at Dkt. 464. On November 26, 2013, Edwards filed a preliminary injunction motion while its permanent injunction motion was still pending.[2] JA504-505. Edwards' preliminary injunction motion alleged that Medtronic's introduction of its MCS product following its anticipated FDA approval would harm the market for Edwards' products. JA524-529. The FDA approved sale of MCS for extreme risk patients on January 17, 2014 and Medtronic began the roll out of MCS to the market for that purpose. JA703. On March 4, 2014, the district court ordered a limited evidentiary hearing on the potential impact of an injunction on the public interest. JA709. That hearing was held on April 11, 2014 and at the end the district court granted the preliminary injunction from the bench banning MCS sales. JA775 at 263:15-264:5.

Because the district court was unable to identify a way to tailor the injunction to allow MCS treatment when doctors believed it would lead to an improved outcome, it instead ordered the parties to negotiate the scope of the injunction while making clear that the blanket injunction against the MCS would

---

[2] The district court has technically not adjudicated the permanent injunction. JA774 at 258:16-259:16. As a practical matter, this preliminary injunction will function as a permanent injunction because the Order states that Medtronic is enjoined from selling MCS until "the date on which the extended term of the '552 patent ends." JA23, ¶ 2. Edwards has requested a patent term extension to February 22, 2017. JA304. The FDA has performed calculations suggesting the extension will last until March 22, 2016. JA1178; *see* 37 C.F.R. § 1.777(c)-(d).

be in full force during any such negotiation. *Id.* After stating the injunction would go into effect immediately, the district court granted Medtronic's request to stay the injunction for seven business days, until April 22, 2014, to allow Medtronic to seek an emergency stay of the injunction pending appeal. JA775-776 at 264:9-265:11. Medtronic sought to expedite this appeal and requested a stay pending appeal, while also attempting to negotiate an interim mechanism to provide access to MCS if the injunction were in place. The parties have not reached agreement on such a mechanism. On April 14, 2014 this Court expedited the appeal, with briefing to be complete by June 19. D.I. 7. The Court granted Medtronic's request for an emergency stay of the injunction pending appeal on April 21, 2014. D.I. 25. On May 7, 2014, the Court withdrew its prior decision, but again ordered the injunction to be stayed pending appeal and expedited the appeal again with briefing to be complete by June 19. D.I. 39. No hearing date has yet been set. *Id.*

## B. THE MCS IS A REVOLUTIONARY, LIFE-SAVING DEVICE

MCS is poised to revolutionize the treatment of aortic valve stenosis, a life-threatening medical condition in which the patient's aortic valve no longer functions properly. JA821. Aortic valve stenosis is now the most common form of valvular heart disease in developed countries. JA921. The traditional treatment for aortic valve stenosis has been open-heart surgery to replace the malfunctioning valve. JA831; JA921; JA1015; JA1024. Even though open-heart surgery is

incredibly invasive and requires the heart to be stopped and cut open, it is still considered the standard of care for aortic valve stenosis patients. *Id.* Some patients, however, cannot endure the trauma of open-heart surgery because their medical condition places them at extreme risk of death from surgery. *Id.* In January 2014, the FDA approved MCS to treat these extreme risk patients. JA703-707. In addition, the FDA is currently considering approval of MCS for use with patients who could tolerate surgery, but nonetheless have a relatively high risk of not surviving surgery.

In a landmark clinical study announced this March and published in the New England Journal of Medicine, clinical investigators found that, among high risk patients, MCS is the first ever non-invasive, non-surgical, aortic valve replacement device to demonstrate ***superior*** rates of mortality and stroke compared to open-heart surgery. JA1014-1022; JA998-1001. Remarkably, MCS yielded better results than surgery for all patient groups – results did not vary by gender, age, disease condition, weight, or any other factor. JA1009-1010; JA756 at 187:17-188:16. Edwards' Sapien device has ***never*** made such a showing. JA728 at 69:2-20.

### C.    DEPLOYMENT AND OPERATION OF MCS

MCS differs from traditional heart valve replacements because, among other things, implantation does not require open-heart surgery. JA474, ¶ 6. MCS can be

introduced into the heart through a blood vessel; common insertion sites include the femoral artery ("transfemoral"), subclavian artery, or ascending aorta ("transaortic"). JA473-474, ¶¶ 5, 11. Of these approaches, the transfemoral approach is generally recommended by physicians because it is the least invasive, poses the least risk, and allows patients shorter recovery times. JA732 at 88:4-12, JA734 at 95:13-96:8. MCS can be deployed transfemorally as long as the femoral artery has a diameter of 6mm or greater. JA473-474, ¶ 5. In addition, the MCS valve comes in four different sizes—23, 26, 29, and 31mm—making it suitable for patients with aortic annuli ranging in diameter from 18 to 29mm. *Id*.; JA737 at 105:20-23; JA657, ¶ 10.

The MCS self-expanding frame is made of nitinol, a "shape memory" alloy that returns to its original shape after being deformed. JA379, ¶ 15; JA946-947. Once MCS is introduced into the heart, the nitinol frame expands to anchor the replacement valve in place. JA946. Once in position, the MCS's three porcine valve leaflets act as a replacement for the patient's original, faulty heart valve. *Id*.

Physicians must undergo training before performing an MCS procedure without a proctor present. JA664, ¶¶ 5-6. Because of these training requirements, and because the FDA only recently approved this new device, only 60 hospitals in 26 states could implant MCS without a proctor as of April 11, 2014, the date that the district court granted the injunction. JA1132, ¶ 14. As of that date, an

additional 14 hospitals could implant MCS only with a proctor.  20 states in the country had *no* hospital that could implant MCS – even with a proctor present.  *Id.* at ¶ 15.

### D.   MCS IS RADICALLY DIFFERENT FROM EDWARDS' SAPIEN DEVICE AND NOT INTERCHANGEABLE WITH IT

MCS is different from Edwards' product, the Sapien Transcatheter Heart Valve Model 9000TFX, both in structure and use.  Unlike MCS, which has a self-expanding nitinol frame, Sapien's frame is composed of stainless steel.  JA1078.  Because stainless steel is not a shape memory metal, Sapien uses a balloon to force the frame into its final size and shape after it is in place in the patient's heart.  JA1078, JA1104.  Rather than *porcine* valve leaflets, Sapien uses *bovine* tissue to form the replacement valve.  JA1078.  Unlike MCS, which has a 6mm delivery system for small femoral arteries, Sapien uses either a 7mm or 8mm delivery system.  JA411-412, ¶¶ 5, 9.  Consequently it cannot be used via transfemoral implantation in patients with femoral arteries smaller than 7mm, many of whom are women with smaller anatomies.  *Id.*  Sapien is also limited to two valve sizes— 23mm and 26mm—which can only treat patients with aortic annuli ranging from 18 to 25mm.   JA411, ¶ 5; JA473, ¶ 5; JA657, ¶ 10; JA1078.  MCS can treat patients with annuli up to 29mm.

A significant percentage of aortic stenosis patients have aortic annuli too large to be treated with Sapien.  Dr. Jeffrey Popma, an interventional cardiologist,

initially estimated that at least 20 to 30 percent of aortic stenosis patients have an aortic annular diameter larger than 25mm. JA389, § IV ¶ 2. The Continued Access arm of the MCS clinical trial later showed that the number was even higher, and that approximately 50% of the Continued Access patients had an annular diameter of greater than 25mm and could not have been treated with Sapien. JA657, ¶ 11. At the preliminary injunction hearing, Medtronic also proffered testimony from cardiothoracic surgeon Dr. Michael Reardon (which the district court decided not to hear) that 40 to 50 percent of patients have an annular diameter greater than 25mm. JA773 at 256:3-15; JA716 at 23:17-24:23. Additionally, approximately 20 percent of patients have femoral arteries smaller than 7mm, meaning they too would not be treatable with Sapien according to the approved transfemoral approach. JA391, ¶ 8. Edwards' follow-on to Sapien, the Sapien XT, is not yet FDA approved. JA736 at 103:19-104:5. But even the Sapien XT would not be able to treat at minimum, 10% of the aortic stenosis patients that Dr. Jeffrey Popma initially estimated have annular diameter larger than 27mm. JA392, § V ¶ 11. Indeed, the Continued Access arm of the MCS clinical trial later showed that 38% of patients had an annulus size between 27mm and 29mm and could not have been treated with the Sapien XT if it were available. JA657, ¶ 12.

Unlike MCS implantation, Sapien implantation requires rapid pacing of the patient's heart. Rapid pacing interrupts the function of the heart by causing the heart to race so rapidly it effectively ceases to pump blood at all. JA1103; JA474, ¶ 8. MCS does not require rapid pacing. JA474, ¶ 8. As summarized by Dr. Deeb, MCS and Sapien "are not interchangeable. These valves perform the same thing. But clearly, in the hands of the user, they are not interchangeable." JA745 at 142:12-14.

### E.   THE NATURAL TERM OF THE '552 PATENT EXPIRED ON MAY 2, 2012

The natural term of Edwards' '552 patent ended on May 2, 2012. JA279. On December 22, 2011, Edwards sought a patent term extension under § 156. JA276. Edwards' term extension application papers identified the Sapien Transcatheter Heart Valve 9000TFX as the FDA-approved product upon which the extension request was based. JA277. The Patent Office has since granted three, one-year interim term extensions, but has not yet issued a final determination on Edwards' term extension application. JA261; JA262; JA1067.

### F.   THE PRELIMINARY INJUNCTION HEARING AND THE DISTRICT COURT'S ORDER

On April 11, 2014, the district court held a limited evidentiary hearing to address the public interest factor of the four-factor test for preliminary injunctions. JA709. Edwards presented three witnesses: two doctors testified about their

experience treating patients with Edwards' Sapien product, and Larry Wood, general manager of Edwards' transcatheter heart valve business, testified regarding approved uses of Sapien to date, including approvals after May 2, 2012.

Medtronic presented testimony from three physicians—Drs. Michael Deeb, Jeffrey Popma, and Julie Swain. They testified about the differences between MCS and Sapien, the different factors that physicians consider when choosing one product over the other to treat aortic stenosis patients, and the public health benefits of having multiple transcatheter heart valve treatment options available on the market. Medtronic had also planned to call a fourth physician, Dr. Michael Reardon, to testify regarding the percentage of aortic stenosis patients with aortic annuli too large to be treated with Sapien and the high rate of paravalvular leakage in Sapien XT, Edwards' follow-on product. JA773-774 at 256:3-257:12. However, the district court ruled that it would not hear Dr. Reardon's testimony. JA773-774 at 256:3-257:19.

The district court was "persuaded that there are patients who cannot be served by either the Sapien or Sapien XT and who need" MCS. JA775 at 263:2-5. The court was also "convinced" that MCS "is a safer device and that patients in whom it is implanted have better outcomes with a lower risk of death." *Id*. at 263:5-8. Based on these findings, the court concluded that "Medtronic must be

allowed to sell its devices to those patients who cannot be helped by Edwards' devices." *Id*. at 263:12-14.

Notwithstanding these findings, the district court entered a sweeping injunction from the bench that barred Medtronic from "selling and/or offering to sell in the United States the [MCS] and any device not more than colorably different from it." *Id*. at 263:15-264:5. Without providing any exception to protect the public interest in patient survival, the district court ordered the parties to begin "discussions to determine if they can agree on a mechanism that will enable a sufficient number of devices to be provided to hospitals and clinics currently trained on use of the to enable physicians to make a clinical judgment as to whether to implant a [MCS] or Edwards device without regard to whether sufficient numbers of the devices are available," and set a conference for May 21, 2014 to discuss the status of the discussions. *Id*. at 263:23-264:7. The carve-out contemplated by the district court was restricted to the limited number of hospitals and clinics that were already trained. *Id.* at 263:23-264:5.

The district court entered a written order on April 15, 2014. JA1-24.

## SUMMARY OF ARGUMENT

The district court erred as a matter of law by finding that Edwards had demonstrated a likelihood of success on the merits. The district court misinterpreted § 156 to grant an inappropriately broad term extension. The

language of the statute, this Court's precedent, and the legislative history all show that the scope of coverage during an extended patent term under § 156 is limited by the FDA-approved product that forms the basis of the term extension request **and** that product's FDA-approved use. It is undisputed that Medtronic's MCS is not a copy of Edwards' Sapien, and therefore, under a proper interpretation of § 156, Edwards cannot show any likelihood of success on the merits because the extended term of the '552 patent covers only the Sapien embodiment of the claims.

The district court further erred by failing to properly restrict the extended term of the '552 patent to the **_FDA-approved uses_** for Sapien as of the natural expiration date of the patent. The term extension here is limited to the FDA approved use of the Sapien embodiment as of the May 2, 2012 patent expiration. On May 2, 2012, the only FDA-approved uses for Sapien were for transfemoral procedures in patients with an annulus between 18mm and 25mm, and who were determined to be inoperable for open-heart aortic valve replacement, among other significant limitations.[3] Because MCS can be used for a broader range of patients

---

[3] As set forth more fully in Section II.B.1 of this brief, _infra_, the actual use approved by the FDA as of May 2012 is far narrower than Edwards has stated, and is limited to "transfemoral delivery in patients with severe symptomatic native aortic valve stenosis who have been determined by a cardiac surgeon to be inoperable for open aortic valve replacement and in whom existing co-morbidities would not preclude the expected benefit from correction of the aortic stenosis." JA263. Additionally, the product labeling that Edwards submitted to the FDA for consideration as part of its application for premarket approval explicitly limits the use of Sapien to patients with aortic annulus diameters between 18 and 25mm, and

than these 2012 FDA-approved uses for Sapien, the district court's injunction is fatally overbroad even under the district court's erroneous interpretation of § 156. Although Sapien has received additional FDA approvals for high risk patients and transapical procedures subsequent to the May 2, 2012 expiration of the '552 patent's natural term, pursuant to § 156 these post-expiration approved uses are not properly part of the extended patent term.

In addition, the district court abused its discretion in holding that the public interest in life-saving medical devices was outweighed by Edwards' preference for exclusive market share rather than monetary damages. Human lives are at risk from an injunction, and that risk is not outweighed by Edwards' claims that money damages cannot compensate it for any market share losses. Edwards has steadfastly insisted that Medtronic should be enjoined from expanding the limited number of hospitals that are trained to use MCS and the district court enjoined Medtronic from doing so. That means over twenty states have no hospitals that can treat patients with MCS, and the injunction prevents them from doing so – even though the district court found that MCS leads to better patient outcomes and reduced mortality.

---

states that safety and effectiveness have not been established for patients with illiofemoral vessel characteristics "that would preclude safe placement of 22F or 24F introducer sheath such as severe obstructive calcification, severe tortuosity or vessels size less than 7mm in diameter." JA1078, JA1080.

Finally, the district court erred in finding that Edwards had demonstrated irreparable harm or that the balance of equities favored Edwards. The district court expressed factually unsupported negative opinions towards Medtronic, citing Medtronic's alleged "history of making representations to the court that are of demonstrably questionable veracity." JA11. The district court's findings regarding this "history" are clearly erroneous.

The preliminary injunction should be reversed.

## ARGUMENT

### I. LEGAL STANDARD GOVERNING THIS APPEAL

This Court reviews a decision to grant a preliminary injunction for abuse of discretion. *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012). "To constitute an abuse of discretion, a district court decision must either make a clear error of judgment in weighing relevant factors or exercise discretion based upon an error of law." *Id*. This Court evaluates legal rulings *de novo. Id.*

### II. EDWARDS DID NOT SHOW IT WAS LIKELY TO SUCCEED ON THE MERITS

The district court found that Edwards was likely to succeed on the merits based upon its misinterpretation of § 156. It held that, during the extended term, Edwards is entitled to enforce the full scope of '552 patent claims without being limited to the Sapien embodiment, and effectively held that it can enforce those claims against all uses regardless of whether the FDA approved those uses for the

original Sapien device. Because both of these are legal errors, the finding of likelihood of success should be reversed.

### A. THE DISTRICT COURT INCORRECTLY FOUND THAT EDWARDS' RIGHTS IN THE '552 PATENT EXTEND TO MCS

Edwards' rights under the interim-extended '552 patent, and any future, permanent extensions, are limited to the FDA-approved product on which the patent term extension was based: Sapien model 9000TFX, sizes 23mm and 26mm. *See* JA263 (approving the Sapien "model 9000TFX, *sizes 23mm and 26mm* and accessories"); JA1078 (specifying only 23mm and 26mm bioprosthesis sizes). Section 156(b) is clear that "the rights derived from any patent the term of which is extended under this section shall during the period during which the term of the patent is extended . . . in the case of a patent which claims a product, be limited to any use approved for the product. . . before the expiration of the term of the patent." (internal numbering omitted). Edwards' rights during the '552 patent's extended term do ***not*** cover MCS and thus Edwards failed to demonstrate that it was likely to succeed on the merits.

### 1. THE PLAIN LANGUAGE OF § 156 LIMITS TERM EXTENSIONS TO THE APPROVED PRODUCT

The district court misinterpreted §156 by ruling that term-extended patent rights are ***not*** confined by the scope of the FDA-approved product on which the extension is based. JA775 at 261:2-4 ("Section 156(b)(1)(a) makes clear that it

applies to uses of devices, not merely the actual devices and copies thereof."); JA5. Edwards led the district court to this error, and now argues for this Court to perpetuate it. JA694 ("Accordingly, the scope of the '552 Patent, as extended, is limited only by the approved 'use' of Edwards' SAPIEN product, which is aortic valve replacement in patients with severe symptomatic native aortic valve stenosis, as more fully set forth below. The ReValving products have the same use, and thus infringe the '552 Patent after extension, just as they did before.") (internal citations omitted); *see also* D.I. 20 at 11 (same).

The district court's decoupling of the FDA-approved product from the FDA-approved use is inconsistent with the express language of the statute:

> (b) Except as provided in subsection (d)(5)(F), the rights derived from any patent the term of which is extended under this section shall during the period during which the term of the patent is extended—
>> (1) in the case of a patent which claims a product, be limited to any use approved for the product—
>>> (A) before the expiration of the term of the patent—
>>>> (i) under the provision of law under which the applicable regulatory review occurred, or
>>>> (ii) under the provision of law under which any regulatory review described in paragraph (1), (4), or (5) of subsection (g) occurred, and
>>> (B) on or after the expiration of the regulatory review period upon which the extension of the patent was based.

35 U.S.C. § 156(b). The term extension is limited to ***both*** the specific approved product ***and*** the approved use of that product. Indeed, the statute makes clear that to be eligible for an extension the "***product*** [must have] been subject to a

regulatory review period before its commercial marketing or use." *Id.* at §156(a)(4) . Subsection (b) refers to the same product as subsection (a) and states that the extension is "limited to any use approved for the ***product.***" *Id.* at § 156(b).

### 2.    THIS COURT'S PRECEDENT ESTABLISHES THAT § 156 LIMITS TERM EXTENSIONS TO A PARTICULAR APPROVED PRODUCT

This Court's precedent confirms conclusively that the term-extended patent rights under § 156(b) are limited to the particular FDA-approved ***product*** within the claim. Under § 156, "the rights of a patentee during a term extension are limited in ways that do not normally apply to granted patents." *Boehringer Ingelheim Int'l GmbH v. Barr Labs.*, *Inc.*, 592 F.3d 1340, 1349 (Fed. Cir. 2010). This Court has specifically rejected "the faulty premise that the rights enjoyed by a patentee during the term of a patent are the same as the rights enjoyed by a patentee during the term of an extension under § 156." *Id.*

The Court's precedents applying § 156 conclusively establish that the scope of the extended term is limited to the particular ***product*** approved by the FDA and on which the extension request was based, not just its use.

In *Merck & Co., Inc. v. Kessler*, 80 F.3d 1543, 1547 (Fed. Cir. 1996), this Court explained that, under § 156, "the restoration period of the patent does not extend to all products protected by the patent but only to the ***product*** on which the extension was based." This conclusion is flatly inconsistent with the district

court's misinterpretation of § 156 as supposedly *not* limited to the product on which the extension was based.

Edwards has suggested that this Court's conclusion in *Merck* that a § 156 extension is limited to the approved *product* is *dicta* that can be disregarded. *See, e.g.*, D.I. 20 (Edwards' Opp. to Medtronic's Mtn. to Stay) at 11 n.9. This is wrong. *Merck* addressed the interplay between the GATT extension of § 154 and the Hatch-Waxman extension of § 156. It studied both statutory term-extension regimes. Based on this review, it specifically relied on the narrow single "product" term extension of § 156 for its holding. It concluded that a patent extended until June 1995 as a result of a § 156 term extension is not eligible for an additional GATT extension under § 154 because the scope of extended patent rights would bizarrely toggle between the single product scope of § 156 and the full claim scope extension of § 154. *Merck,* 80 F.3d at 1553 ("The restriction of enforcement to one product [under § 156] had already occurred before URAA took effect. To follow this period of limited enforcement with enforcement for all products covered by the patent [under § 154] and then return to one product enforcement again can only be characterized as bizarre.") (parenthetical omitted). This is a studied conclusion that is a key part of the case holding, not dispensable *dicta*, as Edwards has argued.

23

*Boehringer* is equally inconsistent with the district court's interpretation of §

156. In *Boehringer*, the Court found that the term extension was limited to the

particular drug compound pramipexole, which is only one chemical compound in

the general class of chemical compounds that are within the scope of the many

allegedly extended patent claims. *Boehringer Ingelheim*, 592 F.3d at 1349

(Boehringer only had the right to exclude "the use *of pramipexole* for the treatment

of the 'signs and symptoms of idiopathic Parkinson's disease.'").

This Court did not find that Boehringer was entitled to a term-extension for

all the compounds that might fall within the claims merely because they treated the

FDA-approved use for "signs and symptoms of idiopathic Parkinson's disease."

*Id.* In particular, the primary independent claim at issue in *Boehringer*, claim 3 of

U.S. Patent No. 4,886,812, claimed a broad class of tetrahydro-benzthiazoles of the

general formula:



(Ia)

JA1047, Claim 3.  There are a total of at least 720 different possible compounds within the scope of the claim.[4] *Id.*  Nonetheless, this Court found that, under the patent term extension, the '812 patent was expressly limited to just **one** of these 720 compounds—pramipexole—because that was the FDA-approved product upon which Boehringer's patent term extension was based.

Furthermore, notwithstanding that claim 8, a dependent claim of claim 3, recites the use of a compound according to claim 3 to treat any one of high blood pressure, tachycardia, Parkinson's disease, Parkinsonism, and schizophrenia, this Court also expressly limited the scope of the term extension to "signs and symptoms of idiopathic Parkinson's disease," because that was the use for which the specific product, pramipexole, had been approved by the FDA.  *Boehringer*, 592 F.3d at 1349.

This Court's holding that Boehringer's patent claims during the term extension covered far less than the many compounds within the scope of the claim conclusively demonstrates that the district court's interpretation of § 156 was incorrect.  The scope of patent claims during a patent term extension must be

---

[4] The total number of different possible compounds is, in fact, innumerably larger than 720, as many of the types of structures identified in the claim are themselves classes comprised of multiple possible chemical structures.  As just one example, the claim states that $R_3$ could be "an alkyl group with 1 to 6 carbon atoms," which is itself a sub-group of 6 different structures.  JA1047, Claim 3.

limited to both the FDA-approved *product*, and the uses for which the FDA approved *that particular product*.

Although Edwards attempted to summarily dismiss *Boehringer* in a footnote in its response to Medtronic's Motion to Stay, *see* D.I. 020 at 11 n.9, Edwards' criticism that *Boehringer* does not "alter[] the 'rights derived' provision of § 156" ignores that the scope of the "rights derived" during Boehringer's term extension was critical to the question before the Court—namely whether Boehringer's retroactive terminal disclaimer filed after the expiration of the original term of the '812 patent was sufficient to overcome obviousness-type double patenting. The Court held that it was not, citing the difference that the timing of the terminal disclaimer made with respect to the notice function of whether the patent was limited to the use of pramipexole: "Thus, if Boehringer had disclaimed the terminal portion of the '812 patent prior to the expiration of the '086 patent, then a competitor would have been placed on notice that, during the § 156 extension period following June 27, 2006, Boehringer only had the right to exclude the 'use then under regulatory review' – namely, *the use of pramipexole* for the treatment of the 'signs and symptoms of idiopathic Parkinson's disease.'" *Boehringer*, 592 F.3d at 1349.

Indeed, in patent term extension cases, this Court has consistently focused on the scope of the *product* upon which the extension is based, not solely the

decoupled *use* of that product.  In *Pfizer, Inc. v. Dr. Reddy's Labs, Ltd.*, 359 F.3d

1361 (Fed. Cir. 2004), the independent claim of the patent at issue, U.S. Patent No.

4,572,909, claimed a class of dihydropyridine compounds and their

pharmaceutically acceptable acid addition salts, with the compounds having the

following formula:



JA1064 at Claim 1.  The claim further recited variations on the compound such

that at least $832^5$ possible compounds would be within the scope of the claim.  The

compound at issue, amlodipine, was but one of these 832 possible compounds.

The dispute in *Pfizer* revolved around whether amlodipine maleate, a salt of

amlodipine, was within the scope of Pfizer's patent term extension, which was

based on a different amlodipine salt, amlodipine besylate.  Pfizer had urged the

Court—as Edwards does now—to construe § 156(b) as limiting term extensions

---

[5] Here again, the number of compounds covered by the claim is likely innumerably greater, because many of the possible structures recited for Y, R, $R^1$, $R^2$, and $R^3$ are themselves classes each comprising multiple possible structures.  Indeed, the appellee in *Pfizer* estimated the number of unique compounds as being in excess of 1 million.  *Pfizer, Inc. v. Dr. Reddy's Labs, Ltd.*, Case Nos. 03-1227, 03-1258, Brief for Defendant-Appellee Dr. Reddy's Labs., at p. 39.

only by the uses approved for the product upon which the extension was based, which would have resulted in Pfizer retaining claim coverage for the full spectrum of over 800 compounds and their pharmaceutically acceptable salts during its patent term extension. *See Pfizer, Inc. v. Dr. Reddy's Labs, Ltd*., Case Nos. 03-1227, 03-1258, Brief for Plaintiff-Appellant Pfizer Inc., at pp. 29-30.

Had the Court agreed with Pfizer's position, it could have readily concluded that amlodipine maleate was a "pharmaceutically acceptable acid addition salt" of the claimed compound amlodipine and was being marketed for the same FDA-approved use as amlodipine besylate, and resolved the case on that basis alone. Instead, the Court turned to § 156(f), which further explains that where the "approved product" recited in § 156(b) is a drug, the "approved product" also includes any salt or ester of the active ingredient. *See* 35 U.S.C. § 156(f). Because the active ingredient of the approved product in *Pfizer* was amlodipine, the Court concluded that amlodipine maleate, which is a salt of amlodipine, was within the scope of Pfizer's term extension. If Pfizer—and here, Edwards—were correct that the identity of the "approved product" is irrelevant to determining the scope of a patent term extension, there would have been no reason for the Court even to look to § 156(f), a provision defining the scope of the approved product in drug patents, because it was undisputed in *Pfizer* that amlodipine maleate was within the

original, non-extended claim scope of the '909 patent and that it was being marketed for the same use the FDA had approved for Pfizer's patented product.

Likewise, this Court's precedents addressing aspects of § 156 other than the "rights restored" provision of subsection (b) are consistent with the statute's focus on the identity of the approved product. *See, e.g.*, *Glaxo Operations UK, Ltd. v. Quigg*, 894 F.2d 392 (Fed. Cir. 1990) (analyzing whether Glaxo's Ceftin drug is a different "product" from previously-approved Zinacef and Kefurox drugs); *Hoechst-Roussel Pharms. v. Lehman*, 109 F.3d 756 (Fed. Cir. 1997) (analyzing whether a particular product, tacrine hydrochloride, could serve as basis for term extension where patent claimed precursor to tacrine hydrochloride but not tacrine hydrochloride itself); *PhotoCure ASA v. Kappos*, 603 F.3d 1372 (Fed. Cir. 2010) (analyzing whether PhotoCure's Metvixia drug is a different "product" from previously approved ALA hydrochloride).

If, as Edwards contends, the only limitation on the scope of an extended patent is the general ***use*** of a product under review and not the specific product itself, or the specific approved use, it would make no sense for the Federal Circuit to repeatedly focus on the product rather than the use in determining the confines of the term extension under § 156.

### 3. THE LEGISLATIVE HISTORY CONFIRMS THAT TERM EXTENSIONS UNDER § 156 ARE LIMITED TO THE APPROVED PRODUCT

The legislative history of the Hatch-Waxman statutory scheme confirms that Congress intended for patent term extensions granted under § 156 to be limited in patent scope to the approved product that formed the basis for the extension. This makes sense because the only FDA "delay" for which a patent term extension compensates is the period of regulatory review of the particular device for particular uses. There is no delay for embodiments of the claim which are not involved in the FDA review and thus an extension of rights for such embodiments is not warranted.

The first bills aimed at restoring patent rights for time spent in regulatory approval were H.R. 7952 and S. 2892, introduced in 1980. Both bills included provisions stating that rights during a term extension "shall be limited in scope during the period of extension ***to the chemical product or device subject to the regulatory review period*** and to the statutory use for which regulatory review was required." S. 2892 (1980); H.R. 7952 (1980). As Judge Lourie of this Court, then in-house counsel for SmithKline Beecham Corporation and one of several pharmaceutical industry patent lawyers who worked on the original drafts of the legislation, explained in a 1986 retrospective article, the original drafters of the legislation recognized that "a claim often covers more than the one compound

subject to regulatory review and approval," and thus one purpose of the legislation "was to limit the extension *to that compound*." Alan D. Lourie, Patent Term Restoration – The First Two Years, 68 J. Pat. & Trademark Off. Soc'y 538, 555 (1986). In an earlier article published the year that the Hatch-Waxman Act was enacted, Judge Lourie also explained that the original drafters of the legislation felt "it was important not to press for elements of patent extension not genuinely needed and thereby provoke opposition to the bill." Alan D. Lourie, Patent Term Restoration, 66 J. Pat. Off. Soc'y 526, 528 (1984). For this reason, they purposely limited the term extension provisions in the original drafts to "extend only *to the particular product under development*, not to all the compounds of the involved patent or claim." *Id*.

In 1981, after the initial term restoration bills failed to pass, Congress introduced H.R. 1937, H.R. 6444, and S. 255. The Senate Judiciary Committee reported that under S. 255's term extension provisions, "if a claim of the patent covers a generic group of chemicals, the extension would apply *only to the chemical of the group which has undergone the regulatory review*." S. Rep. No. 97-138 at 6 (1981). Similarly, the same report stated that the "patent right available during the restoration period is limited in scope to the specific claimed invention *which has been subject to the regulatory review* period." *Id*. at 13. The House Judiciary Committee, reporting on H.R. 6444, likewise stated that, "the

31

rights to be derived from the restoration of a patent term are limited in scope to the product or method *subject to the regulatory review period* and to the specific use for which regulatory review was required by federal statute."  H.R. Rep. No. 97-696 at 10 (1982).

In 1984, during consideration of H.R. 3605, one of several bills that together would eventually become the Hatch-Waxman Act, the House Committee on Energy and Commerce similarly reported that, when "a product patent claiming the approved product is extended, the holder's rights are limited to any use *of the approved product* which was approved before the expiration of the extended term of the patent under the provision of law under which the applicable regulatory review period occurred."  H.R. Rep. No. 98-857, Part I, at 39 (1984).  As Judge Lourie wrote, "it is clear that (1) the 'rights derived' language [of the Hatch-Waxman Act] possesses a direct lineage back to the original patent term restoration bills," including H.R. 7952, S. 2892, S. 255 and H.R. 6444, and "(2) the original bills were intended to limit the scope of extension *to an approved product and to extend to all uses* of that product governed by the chapter of the statue under which the product was approved."  Alan D. Lourie, Patent Term Restoration – The First Two Years, 68 J. Pat. & Trademark Off. Soc'y 538, 559 (1986) (bold emphasis supplied; italic emphasis in original).

Thus, the legislative history of § 156 makes clear that Congress consistently intended to limit patent term extensions according to both the approved product and the approved uses for that product, starting with the first drafts of patent term restoration legislation in 1980 and continuing through to the passage of the Hatch-Waxman Act in 1984. The district court's incorrect holding that § 156 only limits term extensions according to the approved uses—independent of the product—flatly contradicts this clear and consistent evidence of Congressional intent.

As this Court recognized in *Merck*, Congress's purpose for providing patent term extensions under the Hatch-Waxman Act was to "ameliorate the loss incurred when patent terms tick away while the patented product is awaiting regulatory approval for marketing." *Merck*, 80 F.3d at 1547; *see also* H.R. Rep. No. 98-857, Part 1, at 15 (1984). Thus, Congress intended to limit term extensions to only the product that was subject to regulatory approval, because the temporal compensation being provided by the term extension is specifically for the time that product awaited ***regulatory approval***. If a patent claim broadly covers multiple different embodiments of the same invention, and only one of those embodiments was subject to a regulatory approval period, the appropriate compensation for the regulatory approval period is a term extension on the specific embodiment that was tied up in regulatory approval, not an extension for all of the other embodiments within the scope of the claim.

4.    **THE PATENT OFFICE'S INTERPRETATION OF § 156 ALSO CONFIRMS THAT TERM EXTENSIONS ARE LIMITED TO THE APPROVED PRODUCT**

The construction of § 156 mandated by statute and this Court's precedent is also supported by the Patent Office's interpretation.  In the Manual of Patent Examining Procedure, the Patent Office states that a patent term extension under § 156 "is a limited extension of the patent rights ***associated with the approved product*** that is attached onto the original term of the patent."  MPEP § 2751.  This interpretation by the Patent Office, the agency charged with administering the patent term extension provisions of the Hatch-Waxman Act, further confirms that § 156, properly construed, limits term extensions to the approved product.

5.    **EDWARDS' ARGUMENT IMPERMISSIBLY TREATS PHARMACEUTICAL TERM EXTENSIONS DIFFERENTLY FROM MEDICAL DEVICE TERM EXTENSIONS**

At its core, Edwards' argument is that pharmaceutical patents should be treated differently for purposes of § 156 than medical device patents.  Edwards admitted as much in briefing to the district court: "Medtronic CoreValve improperly relies on pharmaceutical cases in arguing that patent term extensions cannot apply to products that 'differ in their biological properties' from the patentee's approved product.  Unlike pharmaceuticals that require the same biological properties to be used in the same way, medical devices are not so

formulaic." JA497 (internal citations omitted). Edwards' position is contrary to the plain language of the statute, judicial precedent, and the legislative history.

Section 156(b) does not distinguish between pharmaceutical products and medical device products. That section plainly states that the extended term is limited to any use approved for "the product." Further reinforcing that "the product" may be either a pharmaceutical product or a medical device, § 156(f) defines the term "product" to mean either a "drug product" or any "medical device, food additive, or color additive subject to regulation under the Federal Food, Drug, and Cosmetic Act." 35 U.S.C. § 156(f). Thus, the statute makes plain that pharmaceuticals and medical devices are to be treated the same for purposes of patent term extensions. To the extent that § 156 evinces any intent to treat pharmaceuticals differently from medical devices, subsection (f)(2) provides that pharmaceutical patent term extensions, but *not* medical device term extensions, have a scope slightly broader than the approved product because the statute also includes salts and esters of the approved active ingredient within the definition of "drug product." 35 U.S.C. § 156(f)(2).

This is also consistent with the Supreme Court's decision in *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661 (1990). In *Lilly*, the Court rejected an argument that Medtronic's testing and marketing of an implantable cardiac defibrillator was unprotected by the Hatch-Waxman Act's safe-harbor provisions for activities

"reasonably related to the development and submission of information" under the Food, Drug, and Cosmetic Act, stating that it "would take strong evidence to persuade" the Court that Congress had intended to provide a safe harbor for drug products but not medical devices, and that there was "no such evidence here." *Eli Lilly & Co. v. Medtronic, Inc.*, 496 US 661, 673 (1990). Although the Court in *Eli Lilly* was not addressing § 156, its analysis of the Hatch-Waxman statutory scheme makes clear that Congress intended for pharmaceuticals and medical devices to be treated the same. *See id.*

The legislative history of § 156 also confirms this. As discussed previously, the first bills to introduce patent term restoration, S. 2892 and H.R. 7952, both contained language stating that patent term extensions were limited in scope "to the chemical product or device subject to the regulatory review period." S. 2892 (1980); H.R. 7952 (1980). After those bills failed to pass, Congress introduced H.R. 1937, H.R. 6444, and S. 255, in which the phrase "chemical product or device" was replaced with "product or method." H.R. 1937 (1981); H.R. 6444 (1982); S. 255 (1981). If, as Edwards contends, pharmaceuticals and medical devices were truly meant to be treated differently under the term extension provisions, Congress would not have replaced the term "chemical product or device" with the broader term "product or method," which contemplates that both pharmaceuticals and medical devices are equal under the term extension laws.

### 6.    UNDER THE PROPER CONSTRUCTION OF § 156, THE '522 PATENT'S EXTENDED TERM IS LIMITED TO EDWARDS' SAPIEN 9000TFX

Under the proper interpretation of § 156, the claim scope for the extended term can be no broader than necessary to cover the Sapien 9000TFX (sizes 23mm and 26mm), or copies of that particular design, because that is the embodiment that was delayed by the FDA approval process and upon which the application for extension was based. Further, even if Edwards' next-generation Sapien XT receives FDA approval, § 156 does ***not*** allow broadening the scope of the extended term to include the Sapien XT embodiment. Any FDA approval granted for Sapien XT would not have been granted "before the expiration of the term of the patent," § 156(b)(1)(A), and Sapien XT is not "the approved product" identified by Edwards in its term extension application. JA277. Applying § 156 to Claim 1, at least four claim elements must be narrowed to limit the claim to the sole approved product, the Sapien 9000TFX (sizes 23 mm and 26 mm). Any one of those limitations excludes MCS from the claim scope.

#### (i)    "A COLLAPSIBLE ELASTICAL VALVE"

Claim 1 recites an "elastical valve," which Edwards told the Patent Office was embodied in Sapien by "three bovine pericardium leaflets." JA280; JA1078. MCS, on the other hand, uses porcine valve tissue. JA946. Edwards neither

sought nor received approval for a porcine valve, and has no extended patent rights in such a device.

### (ii)    "AN ELASTICAL STENT"

Claim 1 recites "an elastical stent." As Edwards explained to the Patent Office in its application for a term extension, Sapien embodies the elastical stent by way of "the stainless steel frame of SAPIEN." JA280. This stainless steel frame requires a balloon to expand into shape. JA1078, JA1104. MCS, by contrast, has a self-expanding nitinol frame, which is a fundamentally different material. JA946. Edwards neither sought nor received FDA approval for a self-expanding, nitinol, elastical stent, and has no extended term patent rights in such a device. Additionally, the only approved valve sizes for Sapien at the time that the '552 patent originally expired were 23mm and 26mm valves. JA1078; JA263. MCS, by contrast, is currently available in 23, 26, 29, and 31mm valve sizes. JA473-474, ¶ 5; JA737 at 105:20-23; JA657, ¶ 10.

### (iii)    "CYLINDRICAL SUPPORT MEANS"

Claim 1 also requires a "cylindrical support means" that is "radially expandable." JA106, claim 1. Sapien is balloon-expandable, and as Edwards stated in its application for a term extension, the cylindrical support means is embodied in the "stainless steel frame of SAPIEN," and therefore is embodied as stainless steel. JA280; JA1078; JA379, ¶ 15. MCS, by contrast, is self-expanding

and the frame is nitinol.  JA946; JA379, ¶ 15.  Edwards has no extended patent term rights in embodiments that are not stainless steel and balloon expandable, and MCS is therefore not covered during the term extension.

### (iv)    "A PLURALITY OF COMMISSURAL SUPPORTS"

Claim 1 also requires "a plurality of commissural supports."  As Edwards explained to the Patent Office, the "stainless steel frame of SAPIEN includes a plurality of commissural supports," and Sapien reflects a stainless steel embodiment of the claimed supports.  JA281.  As discussed above, MCS uses a nitinol frame, and therefore is a different embodiment—nickel titanium alloy, rather than stainless steel—of the claimed supports, and is not covered during the extended term of the '552 patent.  JA946; JA379, ¶ 15.

In sum, MCS is physically and functionally very different from Sapien, separately patented, and the subject of full and independent FDA review, without use or reliance on any Sapien FDA filings or procedures.  JA384, ¶¶ 3, 4; JA376-380, ¶¶ 3-11, 14, 16.  It is undisputed that the MCS is not a copy of Sapien, as the district court itself has held.  JA250.  The Sapien and MCS frames are made of different materials and the products are deployed in different manners.  JA379, ¶ 15; *see also* JA277.  MCS also offers 29mm and 31mm sizes, neither of which is available in Sapien 9000TFX.  JA379, ¶¶ 13, 15.  Accordingly, Edwards is not entitled to any injunctive relief as to MCS based upon the extended term of the

'552 patent, and the district court erred as a matter of law in concluding to the contrary.

**B.    EVEN UNDER THE DISTRICT COURT'S INCORRECT INTERPRETATION OF § 156, THE INJUNCTION IS UNJUSTIFIABLY OVERBROAD**

Even if the district court were correct that § 156 limits patent scope during term extensions only by the approved *use* of a patented and FDA-approved product, the injunction entered by the district court is still fatally overbroad because it enjoins non-infringing activity.

**1.    THE DISTRICT COURT ENJOINED USES THAT THE FDA DID *NOT* APPROVE FOR SAPIEN BEFORE THE '552 PATENT EXPIRED**

The only uses that can be captured in an extended patent term are those approved "*before* the expiration of the term of the patent."    35 U.S.C. § 156(b)(1)(A).    The district court, citing § 156(b), explicitly acknowledged this law.  JA5.

The use approved by the FDA for Sapien as of May 2, 2012 was limited to "transfemoral delivery in patients with severe symptomatic native aortic valve stenosis who have been determined by a cardiac surgeon to be inoperable for open aortic valve replacement and in whom existing co-morbidities would not preclude the expected benefit from correction of the aortic stenosis."    JA263; *see also* JA1079.  Additionally, as set forth in the product labeling that Edwards submitted

to the FDA as part of its application for approval, as of May 2, 2012 Sapien could only treat patients with aortic annulus diameter between 18 and 25mm.  JA1078. Although Sapien is now FDA-approved for other uses, it did not receive any other approvals until October 19, 2012—over five months *after* the natural term of the '552 patent expired.  JA270-271 (approving use for high risk patients who are candidates for open heart surgery but have an increased risk of mortality).

Additionally, as of May 2012, safety and effectiveness for Sapien had *not* been established to the FDA's satisfaction for, among other attributes, patients with characteristics "that would preclude safe placement of 22F or 24F introducer sheath . . . such as vessel size less than 7mm in diameter."  JA1079-1080; *see also* JA15-17.

Both the district court and Edwards overlook these important legal limitations on the FDA-approved uses for Sapien.  Despite acknowledging the statutory limitation to approved uses, JA5, the district court's injunction flatly bans *all* uses of MCS, even in procedures beyond the approved uses of Sapien.  The injunction prohibits use of MCS in patients with an annulus greater than 25mm, although the Sapien device could not be used in such patients.  It bans use of MCS delivered by access routes other than the transfemoral route, and in patients with transfemoral arteries less than 7mm, although the FDA-approved Sapien device could not serve these patients.  And when MCS is approved for sale to patients

with a "high risk" from surgery, the order will ban those sales too, although the Sapien device was only approved for patients who are "inoperable" or at "extreme" risk.

Edwards contends that the relevant "use" is broadly "aortic valve replacement in patients with severe symptomatic native aortic valve stenosis." D.I. 20 at 11. This far exceeds the "use approved for the product" by the FDA. The FDA did not come near to approving Sapien for such a broad use in May 2012, and has not approved any Edwards or Medtronic device so broadly even today. By enjoining MCS outside the FDA-approved uses for Sapien as of the '552 patent's original expiration date of May 2, 2012, the injunction is fatally overbroad because it enjoins non-infringing activity.

### 2. THE DISTRICT COURT ENJOINED NON-INFRINGING CLINICAL TRIAL ACTIVITIES

The district court's injunction is also overbroad because it bans clinical trial activity that is non-infringing as a matter of law under § 271(e)(1). That provision allows the sale of a patented invention "solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products." 35 U.S.C. § 271(e)(1). In its order, the district court declined to enter provisions of *Edwards'* proposed preliminary injunction order that would have *allowed* Medtronic to continue selling MCS in the United States to conduct clinical trials

42

required for FDA premarket approval. JA23-24, ¶ 3. In refusing to enter these provisions, the district court stated that they were no longer relevant "in light of the FDA having approved the CoreValve Generation 3." *Id*. at n.19. Although clinical trial activity terminates upon FDA approval for commercial sale, the district court's order ignores that to date the FDA has only approved commercial sale of MCS for ***extreme risk*** patients. JA703. This approval ended enrollment of patients in the extreme risk Continued Access arm of the trial. However, the FDA has not yet approved the commercial sale of MCS for other patient groups, such as high and intermediate risk patients, and therefore Medtronic continues to engage in clinical trial activity in connection with receiving FDA approval for commercial sale to these patient groups. Such clinical trial activity remains non-infringing as a matter of law under § 271(e)(1), and therefore under § 271(e)(3), "no injunctive or other relief may be granted which would prohibit the making, using, offering to sell, or selling within the United States or importing into the United States" of MCS devices for these clinical trial purposes. Because the district court's injunction violates § 271(e)(3), it should be reversed.

## III.   THE INJUNCTION WOULD HARM THE PUBLIC INTEREST IN LIFESAVING CURES THUS REQUIRING REVERSAL

### A.   THERE IS A VITAL PUBLIC INTEREST IN THE AVAILABILITY OF IMPORTANT AND UNIQUE MEDICAL TREATMENTS

The public interest is a critical factor in granting equitable relief that deserves "particular regard." *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) ("In exercising their sound discretion, courts of equity should pay **particular regard** for the public consequences in employing the extraordinary remedy of injunction.").

There is a "strong public interest in maintaining diversity" in life-saving medical devices. *See, e.g.*, *Datascope Corp. v. Kontron Inc.*, 786 F.2d 398, 401 (Fed. Cir. 1986) (affirming denial of injunction where public interest would be harmed in that some physicians prefer defendant's product); *Advanced Cardiovascular Systems, Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 561 (D. Del. 2008) (strong public interest in diversity of market for coronary stents); *Bard Peripheral Vascular Inc. v. W.L. Gore & Associates, Inc.*, 2009 U.S. Dist. LEXIS 31328 at *30 (D. Az. 2009) (public interest factor alone precludes injunction in view of important role that accused products play in aiding vascular surgeons who perform life-saving medical treatments); *see also Kimberly-Clark Worldwide, Inc. v. Tyco Healthcare Group LP*, 635 F. Supp. 2d 870, 882 (E.D. Wis. 2009) (denying injunction); *Conceptus, Inc. v. Hologic,* No. C 09-02280

WHA, 2012 U.S. Dist. LEXIS 2239, *9-10 (N.D. Cal. Jan. 9, 2012) (same); *Ethicon Endo-Surgery v. United States Surgical Corp.*, 855 F. Supp. 1500, 1517 (same); *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 712 F. Supp. 2d 1285, 1292-1293 (M.D. Fla. 2010) (same).

Edwards concedes that Sapien is ***entirely unable*** to serve patients that Medtronic ***can*** serve: patients with aortic annuli larger than 25 mm.  JA1078; JA737 at 105:20-23.  MCS is available in more sizes than Sapien and can be used for patients with up to a 29mm annulus.  *See* JA473-474, ¶ 5; JA737 at 105:20-23; JA657, ¶ 10.  Accordingly, Edwards itself had proposed that these patients be "carved out" from any injunction, so that they could receive life-saving treatment from Medtronic.[6]  *See* JA505.  At the evidentiary hearing, Medtronic intended to call Dr. Michael Reardon to testify that 40-50% of aortic stenosis patients have annulus sizes greater than 25 mm, and therefore can only be treated by MCS.  The district court ultimately did not permit Dr. Reardon to testify, and Medtronic made a proffer of evidence that ***40-50%*** *o*f Americans with aortic stenosis cannot be treated by Sapien.  JA716 at 24:15-23; *see also* JA657, ¶ 11.  Even if the Court considers Edwards' second-generation Sapien XT product, which the FDA has not yet approved and which therefore cannot be the basis for the '552 patent's term

---

[6] For all the reasons discussed in this brief and in Medtronic's Emergency Motion to Stay (D.I. 4), Edwards' proposed "carve out" is also insufficient to protect the public interest.

extension or any valid injunction, Sapien XT cannot be used with an aortic annulus greater than 27mm, which corresponds to approximately 10 to 38 percent of aortic stenosis patients.  JA392, § V ¶ 11; JA657, ¶ 12.

Sapien, unlike MCS, cannot be used in transfemoral procedures for patients with small (less than 7mm) arteries.  JA391, § IV ¶¶ 8-9; JA411-412, ¶¶ 5, 9. Edwards witnesses admitted that doctors almost uniformly recommend the inherently safer transfemoral procedure if at all possible—in which the valve is inserted through an incision to the groin—to any alternative access route, including the transapical procedure which requires incising the chest and cutting through the heart to reach the aorta.  JA732 at 88:4-12, JA734 at 95:13-96:8.  If MCS were enjoined, thousands of American patients with smaller arteries, in particular women with smaller anatomies, would be required to receive a more invasive, inherently higher risk, transapical valve replacement procedure.  *See* JA656-657, ¶ 9; JA412, ¶ 9.

Notwithstanding Edwards' own concession about the limitations of Sapien, the district court entered a blanket injunction precluding all uses of MCS and preventing Medtronic from training any new hospitals and clinics on the use of MCS.  According to the district court's own findings, the injunction would leave no treatment option for many patients on the verge of death due to malfunctioning aortic valves, *see, e.g.*, JA16, JA20, and would cause countless patients to be

deprived of the very care that the district court said was safest simply because they do not live close enough to a previously trained center. Indeed, 24 states do not have a trained MCS center, and 19 of the 50 largest metro service areas in the United States do not have a trained center. JA1077, ¶¶ 3-4. These 19 metro service areas encompass a total population of more than 33 million, 3.8 million of whom are over 65 years of age and thus most in need of MCS. *Id.* Simply put, under the district court's injunction, millions would be left without access to the life-saving MCS device. Edwards sought an injunction preventing such treatment and has ***never*** agreed to allow hospitals in unserved areas to be trained.

### B. EVEN FOR THOSE PATIENTS WHO CAN BE TREATED BY BOTH DEVICES, MCS IS PROVEN SAFER THAN SAPIEN

Following the day-long evidentiary hearing on the public interest, the district court found that large-annulus patients and small vessel size patients are far from the only ones who would be gravely injured by the removal of MCS from the market and an injunction that prevents it from being released to unserved regions of the country. The district court held without qualification that the enjoined MCS "is a safer device and that patients in whom it is implanted have better outcomes with a lower risk of death." JA775 at 263:5-8.

This finding was supported by overwhelming evidence. First, the recent groundbreaking FDA-approved study published in the New England Journal of Medicine found that MCS is the first, and only, transcatheter valve to demonstrate

superior rates of mortality and stroke as compared to surgery. JA1014; JA998-1001. MCS was favored over surgery for all patient groups – results did not vary by gender, age, disease condition, weight, or any other factor. JA1009-1010. In contrast, Edwards' FDA study showed that as compared to surgery, Sapien is simply ***not inferior*** in terms of mortality, but results in a higher rate of stroke. JA827; JA1030.

Additionally, unlike the balloon-expanding Sapien with a stainless steel frame, the self-expanding MCS with a nitinol frame conforms to a patient's anatomy. JA747 at 150:8-151:24. This conformability decreases the risk of annular rupture and stroke, and reduces leakage around and through the valve. *Id.* The leakage factor is particularly significant as compared to Sapien XT, for which an FDA trial showed moderate or severe aortic regurgitation of nearly 30%. JA890. In other words, as the district court found, MCS "is a safer device" and "patients in whom it is implanted have better outcomes with a lower risk of death." JA775 at 263:5-8. MCS's breakthrough superiority finding is extremely important for aortic stenosis patients because MCS recipients can both forego the invasiveness of surgery and achieve better health outcomes.

Second, although some number of aortic stenosis patients can be treated by both Sapien and MCS, the determination of who will be better served by MCS should be a case-by-case physician determination that is not subject to the bright

lines necessary for an administrable injunction.   JA743-744 at 134:25-136:7, 136:18-138:16.  Doctors believe MCS is the safer valve for patients with a variety of medical and anatomical conditions, such as calcified annuli or valve leaflets, a prominent septal bulge within the left ventricular outflow tract, eccentric annuli, marked tortuosity and unfolding of the thoracic aorta, or patients in whom rapid ventricular pacing is a contraindication.   JA389-393, § IV ¶¶ 3-7, 10, § V ¶¶ 12, 13-15; JA371-372, ¶¶ 14-16; JA474, ¶¶ 8, 9, 11; JA412-413, ¶¶ 10, 11; JA466.

These are some of the many diverse factors and possible combinations of factors that a cardiac team comprising an interventional cardiologist and surgeon must consider in determining the correct course of treatment for any particular patient. It is simply not possible to anticipate or enumerate every possible combination in which one treatment or another will provide the best results for a particular patient's health.   In light of this medical reality, any categorical prohibition on the use of MCS will lead to outcomes in which patients suffer death or increased complications that could have been avoided had MCS treatment been available.  JA743-744 at 133:14-138:16.

For this reason, the district court ruled that the injunction must "enable physicians to make a clinical judgment as to whether to implant a MCS or Edwards device" and that "the public interest is well served in permitting at least some number of [MCS] devices to be sold on the market." JA775 at 264:3-4; JA 20.

The district court failed to follow its own findings, however. It enjoined all sales of MCS, granting physicians no ability to exercise their medical judgment. And by requiring Edwards to negotiate future sales of MCS only at hospitals and clinics currently trained in its use, JA775 at 263:23-264:2, the district court arbitrarily limited access and the exercise of physician judgment to those patients who happen to be near the "right" places, excluding millions of individuals in 19 of the 50 largest metro service areas in the U.S. *See* JA1077, ¶¶ 3-4. A reversal of the injunction is therefore necessary to protect the lives and health of the public.

## C. THE DISTRICT COURT'S DIRECTIVE TO NEGOTIATE IS INSUFFICIENT TO PROTECT THE PUBLIC INTEREST

Rather than acting consistent with its own finding that physicians must be allowed "to make a clinical judgment as to whether to implant a [MCS] or Edwards device," JA775 at 264:3-4, the district court ordered the parties to attempt to negotiate a mechanism to provide MCS devices to hospitals that are currently trained in the use of MCS, with no provision in the event that the parties were unable to reach an agreement. JA775 at 263:23-264:5; JA24, ¶ 4. It is improper for the court to allocate responsibility to the parties to create a clear and administrable line as to the enjoined conduct while adequately protecting public health. This allows an adversary to dictate the proper scope of an injunction and violates Fed. R. Civ. P. 65's requirement that the precise conduct prohibited by an injunction be set forth in "reasonable detail" in the injunction itself. *Schmidt v.*

*Lessard*, 414 U.S. 473, 476 (1974) ("Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed"); *see also Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) ("The question before us is not how to deal with enforcement of an overly broad injunction that previously issued, but how to insure that overly broad injunctions do not issue in the first instance.").

### D. THE PARTIES HAVE NOT REACHED AGREEMENT ON A MECHANISM TO PROVIDE MCS TO PATIENTS

Even if it were proper for the district court to delegate responsibility to the parties to negotiate an exception to the injunction—which it is not—the parties have not been able to agree upon a mechanism to provide MCS to hospitals so that physicians can determine whether each patient is best served by MCS or by an Edwards Sapien device. Although the parties have agreed upon the language for a physician certification to be signed each time an MCS is implanted pending the outcome of this appeal, the parties still disagree on several key issues, including whether MCS can be made available in unserved regions. Because no agreement has been reached, the district court's broad, default injunction banning all sales of MCS will take effect if the district court is not reversed. JA23-24. The injunction would prevent cardiac specialists from exercising medical judgment as to whether MCS may be the better or only treatment option for their patients.

### 1. LIMITING MCS TO CURRENTLY TRAINED HOSPITALS HARMS THE PUBLIC INTEREST

The district court limited any negotiated exception to "hospitals and clinics that are currently trained in use of" MCS. JA24, ¶ 4. Edwards contends this means that Medtronic can provide MCS devices only to "hospitals who were active commercial implanters as of April 11, 2014." JA1130, ¶¶ 4-5.

This limitation fails to adequately protect the public interest. Medtronic estimates that at least 3.8 million Americans over age 65 live in areas of the country without access to a hospital that has completed training in the use of MCS. JA1077, ¶ 4; JA1131-1132, ¶¶ 12-15; JA1157-1159. As MCS receives greater clinical validation, Medtronic had planned to train additional implantation centers in 2014 in underserved regions. JA1132, ¶ 16. The geographic limitation is, therefore, directly at odds with the district court's findings on the life-saving nature of the MCS device, and does not accommodate "the considerable public interest at issue." JA21.

### 2. EDWARDS' DEMAND FOR *NON-REFUNDABLE* PAYMENT FOR EACH MCS SALE HAS NO BASIS

Edwards has demanded that for every valve sold under the mechanism to be negotiated under the district court's order, Medtronic make a non-refundable payment to Edwards. JA1131, ¶ 7. The district court order does not mention payments, much less ***non-refundable*** payments. Medtronic fully acknowledges

that, if it were determined—notwithstanding the patent term extension analysis in this brief—that the '552 patent is still enforceable against MCS, Medtronic would be liable in an accounting for lost profits and/or royalties. But, as Medtronic has explained, the extended scope of the patent does not cover MCS, and so no liability exists after May 2, 2012. Thus, Edwards' demand for non-refundable payment is without basis, and further illustrates that Edwards' position with respect to the court-ordered negotiations is insufficient to safeguard the public interest.

## IV. EDWARDS WILL NOT SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

The district court erred in finding that Edwards would suffer irreparable harm if Medtronic is allowed to sell MCS. As set forth below, Edwards will not suffer any harm that is not adequately compensable through money damages. Further, the district court's findings on irreparable harm were impermissibly swayed by negative opinions against Medtronic that lack factual support. *See also* D.I. 4 at 18-19; D.I. 22 at 8-10.

### A. EDWARDS WILL NOT SUFFER IRREPARABLE HARM THAT COULD JUSTIFY AN INJUNCTION

Edwards speculates that it will lose "market opportunities" and its status as "market leader" unless a preliminary injunction prevents a "head-start" by Medtronic. JA525-529. But Edwards ignores that it has been the only seller of transcatheter aortic heart valves in the United States since it received approval in

November 2011. JA536, ¶ 6. Since then, it has used that exclusivity to establish itself in as many hospitals as possible, having reached 284 hospitals in the U.S.—approximately 71 to 81 percent of the 350 to 400 U.S. hospitals that are qualified to perform transcatheter heart valve (THV) procedures. JA674; JA666, ¶ 11. Edwards now speculates that Medtronic will convince these hospitals to abandon Edwards, contradicting its own claim that, "hospitals, once they invest the staff time and resources to begin a THV program, stick with that THV product for an extended period of time, making it much harder to introduce a competing THV program at such hospitals." JA548, JA550, ¶¶ 15, 19; JA526; JA541-542, ¶ 6. Furthermore, the evidence shows that hospitals trained to use Sapien do not simply abandon Sapien once MCS becomes available to them. For example, Dr. Michael Deeb, a cardiac surgeon at the University of Michigan, testified that he uses both Sapien and MCS in his practice. JA742 at 131:2-7, JA744-745 at 139:21-141:2.

Even if a THV-qualified hospital currently offers Sapien, such capability does not give Medtronic a "free ride" on Edwards' training of doctors and staff at that hospital. A hospital already trained on Sapien must nonetheless undergo extensive MCS training procedures before it can implant the MCS. JA665, ¶ 8. The MCS training process requires physicians to complete various steps, including conducting numerous proctor-supervised procedures, before they are qualified to independently implant MCS. JA664-665, ¶ 6. Medtronic cannot, as Edwards

asserts, simply "swoop in" and take advantage of Edwards' Sapien-specific training.

Edwards' own financial projections also contradict its claim that Medtronic will convince hospitals currently trained in Sapien to abandon Sapien altogether. After Medtronic announced its expectation of earlier FDA approval for MCS, Edwards predicted that its 2014 THV sales would be between $700 million and $820 million.   JA596.   This range is essentially identical to Edwards' 2013 projections of THV sales between $710 million and $790 million, made when Edwards and Medtronic believed the MCS would not receive FDA approval until summer 2014.   JA599.   In other words, Edwards' own projections show that Medtronic's earlier than expected entry into the market will have ***no effect whatsoever*** on Edwards' sales, and demonstrate the lack of nexus between Medtronic's entry to the market and any alleged harm to Edwards.  *See Apple Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) (no irreparable harm where sales suffer for reasons other than the alleged infringing conduct).

## B.   MONEY DAMAGES ARE ADEQUATE TO COMPENSATE EDWARDS

Edwards already stands to collect at least $191 million in damages from this case.  *See* JA97 (awarding $72,645,555 in lost profits and $1,284,861 in past royalties); JA314 (Medtronic proposing $117,662,570 for post-trial period through May 1, 2012).  If the '552 patent were somehow deemed to cover the MCS during

the patent's extended term (although it should not, as explained above), Medtronic does not dispute that it would be liable in an accounting for further lost profits and/or reasonable royalties. Thus, if the '552 patent continues to extend to MCS, Edwards has been and will continue to be amply compensated for Medtronic's sales.

REDACTED

### C. MEDTRONIC DID NOT MISREPRESENT THE STATUS OF ITS MEXICO MANUFACTURING TRANSITION

The district court based many of its conclusions regarding irreparable harm on its clearly erroneous finding of "Medtronic's history of making dubious

56

CONFIDENTIAL MATERIAL OMITTED

representations to the Court." JA775 at 262:3-6. The district court's finding is based upon a mistaken belief that Medtronic represented to the court in July 2010 that "its facility in Mexico was fully equipped to take over manufacturing from the Irvine, California facility." JA775 at 262:6-9; *see also* JA11, n.7. Medtronic made no such promise to the court; on the contrary, the document the district court cites for this alleged Medtronic representation is actually an ***Edwards*** brief. *See* JA11, n.7 (citing JA152, Edwards' Reply Brief in Support of Motion for Permanent Injunction). Edwards ***argued*** that Medtronic was prepared to begin manufacturing in Mexico to buttress its argument in 2010 that an injunction would not adversely impact either Medtronic or the public interest. *See, e.g.*, JA163. These were not Medtronic representations at all.

In fact, Medtronic's July 2010 opposition to Edwards' motion for a permanent injunction stated that, although Medtronic was developing manufacturing operations in Mexico, doing so "has proven more difficult than initially anticipated." JA134. Rather than representing that all manufacturing could be moved to Mexico immediately, Medtronic advised that it anticipated that "the Mexico operations will not match its current production in Irvine of 1000 units per month until mid-2011." *Id.* Indeed, that fact was a primary reason Medtronic argued in 2010 that the injunction would have been so harmful: without the right to continue manufacturing at its Irvine, California facility, Medtronic

would not be able to supply valves to physicians and hospitals outside the United States (where there is no infringement) who were relying upon that supply.

Medtronic's actual transition to Mexico was roughly in line with its estimates as of July 2010. By mid-2011, Mexico production was about equal to U.S. production, but not sufficient to meet all demand. JA328-329. Medtronic continued to ramp up Mexico production while winding down Irvine production so that since January 2013, the only commercial production in the United States has been for a very small number of valves for Brazil, Ecuador and Taiwan, countries that had not yet certified the Mexico production facility. JA333. In short, Medtronic has always been candid about its need to produce valves in the United States for some period after 2010 while Mexico production ramped up.

Moreover, the district court knew in 2011 that Medtronic would continue to manufacture in the United States if not enjoined, writing: "[t]he Court fails to see what hardship Edwards would suffer if CoreValve were permitted *to continue manufacturing its product in the United States, as opposed to in Mexico*, that could not be compensated through remedies at law." JA256. These are not the observations of a court misled into believing that Medtronic had already ceased manufacturing in the United States.

Additionally, Edwards misleadingly cited evidence about events from almost one year *before* the April 2010 trial verdict in this case to induce this Court and the

district court into believing Medtronic had not been truthful about *post*-verdict manufacturing. The cited deposition testimony of James Sparks, upon which the district court apparently relied in finding that Medtronic had made alleged misrepresentations, concerns 2009 statements (not made to any court), about Medtronic's plans at the time to develop manufacturing capacity in Mexico. JA1119, JA1121 at 220:3-6, 225:9-12. That exchange had nothing whatsoever to do with representations to the district court or this Court about Medtronic's response to the verdict, the judgment, or appeal, none of which had occurred at that time.

For the reasons discussed above, the district court erred in finding that Medtronic had made misrepresentations to the district court. Likewise, it was an abuse of discretion for the district court to then rely on those improper findings to draw negative inferences against Medtronic in evaluating whether Edwards would be irreparably harmed absent an injunction. Accordingly, the preliminary injunction should be reversed.

## V. THE BALANCE OF HARDSHIPS DOES NOT TIP IN EDWARDS' FAVOR

Edwards has already received over $73 million and will receive another $117 million dollars in damages for sales of MCS in the United States before the '552 patent expired. Edwards has monopolized the market since November 2011 and established itself at 284 TAVR-qualified hospitals in the United States,

roughly 80 percent of the U.S. TAVR market.  *See* JA674.  Any financial harm that Edwards may incur cannot outweigh the hardship that the injunction would impose upon the thousands of aortic stenosis patients who would no longer be able to receive MCS treatment, their *only* treatment option.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the district court's grant of a preliminary injunction should be reversed.


Dated:  May 12, 2014                    Respectfully submitted,

/s/ *Edward R. Reines*_____
Edward R. Reines
Derek C. Walter
Brian Chang
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065

Robert A. Van Nest
Brian L. Ferrall
Simona A. Agnolucci
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111

*Counsel for Defendants-Appellants*
*CoreValve, Inc. and Medtronic CoreValve,*
*LLC*

CASE PARTICIPANTS ONLY

# ADDENDUM

## Table of Contents

| Tab # | Description | JA numbers |
|-------|-------------|------------|
| 1 | Court's Opinion and Order dated April 15, 2014 | JA1-24 |
| 2 | U.S. Patent No. 5,411,552 dated May 2, 1995 | JA98-123 |

# TAB 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EDWARDS LIFESCIENCES AG and <br> EDWARDS LIFESCIENCES LLC, <br><br> Plaintiffs, <br><br> v. <br><br><br> COREVALVE, INC. and <br> MEDTRONIC COREVALVE LLC, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )     C.A. No. 08-91 (GMS) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM

### I.    INTRODUCTION

On February 12, 2008, plaintiffs Edwards Lifesciences AG and Edwards Lifesciences LLC

("Edwards") filed suit against CoreValve, Inc. and Medtronic CoreValve LLC ("Medtronic").

(D.I. 1.) In its complaint, Edwards alleged that Medtronic infringed U.S. Patent No. 5,411,552

("the '552 patent"), U.S. Patent No. 6,168,614 ("the '614 patent"), and U.S. Patent No. 6,582,462

("the '462 patent"). (*Id.*)[1] On March 23, 2010, trial commenced regarding the '552 patent. On

April 1, 2010, a jury returned a judgment in favor of Edwards against Medtronic, finding that the

CoreValve Generation 3 ReValving System ("CoreValve Generation 3"[2]) literally infringed claim

---

[1]     On March 18, 2010, the court approved a stipulation among the parties dismissing with prejudice Edwards' cause of action based on the '614 patent and also dismissing Medtronic's responses, defenses and counterclaims relating to the '614 patent. (D.I. 284.) On March 22, 2010, the court granted Medtronic's motion for summary judgment of invalidity of the '462 patent and thereby ruled that the '462 patent could not be asserted against Medtronic for the conduct at issue in the case. (D.I. 293.) Thus, only the '552 patent remained.

[2]     In some declarations and briefs, the parties refer to the device as the "CoreValve THV", the "CoreValve Generation 3", and the "ReValving". All three names are equivalent.

1 of the '552 patent and that the infringement was willful. (D.I. 313.) The jury awarded Edwards

$72,645,555.00 in lost profits for infringement and $1,284,861.00 as a reasonable royalty.[3] (*Id.*)

On November 26, 2013, Edwards brought a motion for preliminary injunction seeking to

enjoin Medtronic from continuing to infringe claim 1 of the '552 patent by selling the CoreValve

Generation 3 as soon as Medtronic obtained FDA approval. (D.I. 548-49.) On March 4, 2014, the

court ordered an evidentiary hearing "concerning the public interest considerations implicated by

the plaintiffs' motion, as well as the response and reply thereto, and the carve-out proposal in the

plaintiffs' motion". (D.I. 586 (order setting an evidentiary hearing for April 11, 2014).) At the

full-day evidentiary hearing on April 11, 2014, each of the parties engaged in oral argument and

examined and cross-examined witnesses regarding the public interest factor of the preliminary

injunction motion. (D.I. 593 (official transcript of the April 11, 2014 evidentiary hearing).) At

the conclusion of the evidentiary hearing, and after considering both the parties' briefs and the

evidence introduced at the hearing, the court granted in part and denied in part Edwards' motion

for preliminary injunction.[4] (D.I. 593 at 256:1-260:8.) The court's reasoning is provided in greater

detail below.

## II.  BACKGROUND

Both Edwards and Medtronic are in the business of making and selling transcatheter heart

valves ("THV" or "TAVI"). (D.I. 549 at 6; D.I. 560 at 3-4.) Edwards makes the SAPIEN line of

THVs, (D.I. 549 at 2), while Medtronic makes the Medtronic CoreValve System for transcatheter

aortic valve implantation, (D.I. 560 at 1). Medtronic is Edwards' only competitor in the United

---

[3]     Judgment was entered on May 4, 2010. (D.I. 324.) The Federal Circuit affirmed the jury's findings and the Supreme Court of the United States denied Medtronic's petition for writ of certiorari.

[4]     The court also granted Medtronic's request for a stay of seven business days to "seek emergency relief in the Federal Circuit" and "give hospitals some notice of what ha[d] happened". (D.I. 593 at 260:9-265:12.)

2

States. (D.I. 549 at 1.) The '552 patent, of which Edwards AG is the assignee and Edwards LLC the exclusive licensee, (D.I. 1 at ¶ 10), is titled "Valve Prothesis [sic] for Implantation in the Body and a Catheter for Implanting such Valve Prothesis [*sic*]". The '552 patent discloses medical technology for implanting prosthetic valves into patients' aortic annuluses by means of a catheter. (D.I. 52 at 1.) In essence, this invention allows a prosthetic heart valve to be delivered through the skin to patients' aortic annuluses and thereby avoids traditional open heart surgery and its accompanying risks. (*Id.*)

On May 2, 2012, the term of the '552 patent expired. (D.I. 560 at 5.) Subsequently, the U.S. Patent Office ("PTO") granted two one-year extensions, extending the patent's term to May 2, 2014 pursuant to 35 U.S.C. § 156. (D.I. 560 at 5.) Edwards anticipates that the PTO will ultimately extend the term of the '552 patent to March 22, 2016. (D.I. 549 at 12.) Despite the April 2010 verdict in which the jury found that Medtronic was a literal and willful infringer of the '552 patent, Medtronic has continued to make the CoreValve Generation 3. (D.I. 549 at 10.) There is evidence that Medtronic may have sought to stockpile infringing devices in the United States after the verdict as part of a greater plan to overtake Edwards in the THV market. (D.I. 549 at 7, 10.)

Prior to FDA approval of the CoreValve Generation 3, Medtronic was able to make the CoreValve Generation 3 available to extreme risk patients through the FDA-sanctioned Continued Access clinical trial. (D.I. 560 at 9.) In their initial briefing, the parties reported that Medtronic planned to launch the CoreValve Generation 3 in the United States as soon as it received FDA approval for commercial sale of the CoreValve Generation 3 in extreme risk patients. (D.I. 549 at 2, 7; D.I. 560 at 9.) In the time that has elapsed since the parties submitted their briefs, the FDA has approved the CoreValve Generation 3. (D.I. 582-1 (FDA letter dated January 17, 2014 stating

3

that the CoreValve Generation 3 is approved.).)   The FDA approved sale of the CoreValve Generation 3 in the United States without also approving extension of the continued access program through which Medtronic was providing the CoreValve Generation 3 to extreme risk patients.[5] (D.I. 582-1.) Thus, the continued access program must now end and Medtronic claims that the only way that extreme risk patients will be able to access the CoreValve Generation 3 will be if Medtronic makes the device commercially available as soon as possible. (D.I. 560 at 9.)

The parties agree that Edwards will almost certainly gain FDA approval to replace the SAPIEN with a next-generation product, the SAPIEN XT, at any time now.  (D.I. 550 at ¶ 7 (explaining that Edwards expects to gain FDA approval in early 2014); D.I. 560 at 5.)  As a result, Medtronic's CoreValve Generation 3 and Edwards' SAPIEN XT could be entering the market for commercial sales around the same time. (D.I. 550 at ¶ 7.)

## III.    LEGAL STANDARD

To secure a preliminary injunction under Section 283, the movant must establish four factors: "(1) the likelihood of success on the merits of the underlying litigation, (2) whether irreparable harm is likely if the injunction is not granted, (3) the balance of hardships as between the litigants, and (4) factors of the public interest." *Abbott v. Sandoz*, 544 F.3d 1341, 1344 (Fed. Cir. 2008); *see also AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1049 (Fed. Cir. 2010) ("A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.") (Citations omitted).

---

[5]       The letter in which the FDA approved commercial sales of the CoreValve Generation 3 did not state explicitly whether the continued access program would be permitted to continue. (D.I. 582-1.) At the hearing on April 11, 2014, however, counsel for Medtronic represented to the court that the continued access program has been mandatorily discontinued as a result of FDA approval of the CoreValve Generation 3. (D.I. 593 at 25:5-21 (Stating, among other things, that "now that CoreValve has been approved for use in extreme-risk patients, the clinical trial on that phase is over, and you can only get the device commercially. It's not available for extreme-risk patients anymore now that it has been approved.").)

4

The court must balance all four factors, but the court may grant the preliminary injunction where "the weakness of the showing regarding one factor is overborne by the strength of the others." *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990). Although the court has full discretion over the decision to grant a preliminary injunction, "a preliminary injunction is a drastic and extraordinary remedy that is not routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993).

## IV.   DISCUSSION

### A. Likelihood of Success on the Merits

Edwards contends that it has already succeeded on the merits because of the jury verdict in its favor and the conclusion of the appellate process. (D.I. 549 at 12-13.) Medtronic, on the other hand, contends that Edwards has yet to succeed on the merits because the rights on which Edwards motion are based allegedly expired with the '552 patent. (D.I. 560 at 11.) According to Medtronic's reading of 35 U.S.C. § 156, since Edwards based its extension only on the SAPIEN, Edwards' rights are limited to copies of the SAPIEN and do not cover any devices, such as the CoreValve Generation 3, that are not copies of the SAPIEN. (D.I. 560 at 11-12.) In response, Edwards argues that Medtronic's contentions have no basis in the statutory language of Section 156. (D.I. 570 at 3.) The court concludes that Edwards is correct.

Section 156(b)(1)(A) provides that "the rights derived from any patent the term of which is extended under this section shall during the period during which the term of the patent is extended (1) in the case of a patent which claims a product, be limited to any *use* approved for the product (A) before the expiration of the term of the patent[.]" (Emphasis added.) Thus, the language of the statute makes clear that the rights secured by the extension of the '552 patent are limited by the approved *use* of the SAPIEN, not just copies of the SAPIEN. The case law also makes clear that Section 156 applies to uses of devices, not merely the actual devices and copies

5

thereof. *See, e.g., Ortho-McNeil Pharm., Inc. v. Lupin Pharm.*, 603 F.3d 1377, 1382 (Fed. Cir. 2010) (Explaining that the rights secured by Section 156(b) apply to uses of the product.) (Citation omitted); *Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*, 592 F.3d 1340, 1349 (Fed. Cir. 2010) (Explaining that the plaintiff "had the right to exclude the '*use* then under regulatory review"—namely the *use* of pramipexole for the treatment of the 'signs and symptoms of idiopathic Parkinson's disease....'") (Citation omitted).

Ultimately, in order to establish a likelihood of success on the merits, a patentee must show that "it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." *AstraZeneca LP v. Apotex*, 633 F.3d 1042, 1050 (Fed. Cir. 2010) (citations omitted). Since Edwards has outright prevailed in the litigation regarding the '552 patent and the appeals process is over, the court concludes that Edwards has more than demonstrated a likelihood of success on the merits.

## B. Irreparable Harm

The purpose of the irreparable harm inquiry is to "measure harms that no damages payment, however great, could address." *Celsis in Vitro v. CellzDirect*, 664 F.3d 922, 930 (Fed. Cir. 2012) (citations omitted). Of the numerous forms of irreparable harm that Edwards lists in its briefs and declarations in support, the court finds Edwards' arguments regarding price erosion and loss of sales, market share and revenue to be most convincing. Thus, the court concludes that Edwards has sufficiently demonstrated that it will suffer irreparable harm should it not be granted an injunction.

### 1. Loss of Sales, Market Share, and Revenue

In its briefs and through multiple declarations, Edwards argues that it will lose sales, market share, and revenue if Medtronic is permitted to launch the CoreValve Generation 3 in the United

6

States. (*See, e.g.*, D.I. 549 at 14-15; D.I. 550.) As support for its contentions, Edwards points to the fact that Medtronic will be Edwards' only competitor in the United States and will compete directly against Edwards for the same patients. (D.I. 550 at ¶ 5.) Edwards also highlights the drop in its market value and the negative projections regarding Edwards's future that have accompanied Medtronic's announcement in October 2013 that its launch of the CoreValve Generation 3 in the United States would be accelerated.[6] (D.I. 549 at 9; D.I. 550 at ¶ 5.)

Relatedly, Edwards argues that Medtronic will target hospitals that have become TAVI-trained sites through significant expenditures of time and money by Edwards. (D.I. 550 at ¶ 5-6.) According to Edwards, this will have two ramifications that an injunction granted later will not be able to ameliorate. First, Medtronic will be able to build on Edwards' existing relationships and quickly gain accounts that Edwards has not yet secured. (*Id.*) Second, Edwards will lose "immeasurable market opportunities" once Medtronic gains this foothold because of the tendency of doctors and hospitals to remain faithful to a THV product once they begin using it. (D.I. 549 at 15; D.I. 550 at ¶ 6 (describing the THV market's "'sticky' characteristics").)

In response to Edwards' arguments about losses in market share and revenue, Medtronic contends that its entry into the market will not affect Edwards' sales and financial standing and that there is little reason to expect that hospitals will abandon the SAPIEN line of products. Medtronic observes that, in December 2013, after Medtronic had announced that it would likely receive FDA approval sooner than previously expected, Edwards predicted that its 2014 THV sales would be between $700 million and $820 million. (D.I. 560 at 14.) According to Medtronic, the fact that these numbers are very similar to Edwards' 2013 projections of between $710 million and

---

[6]     Specifically, Edwards claims that the very announcement on October 29, 2013 that Medtronic's U.S. launch of the CoreValve Generation 3 would be accelerated was sufficient to cause financial analysts to downgrade Edwards and Edwards' market value to drop by $760 million. (D.I. 549 at 9.)

JA0007

$790 million suggests that Medtronic's earlier than expected entry on the market will not affect Edwards' sales. (*Id.*) Medtronic further contends that experts' increasingly negative projections for Edwards are due more to Edwards' failure to reach about 20-30% of qualified hospitals during its exclusivity period than to Medtronic's impending market entry. (D.I. 560 at 13.) Medtronic also points out that Edwards acknowledges that it has already secured 71-81% of the THV-qualified hospitals in the United States. (D.I. 560 at 13 (citing D.I. 553 at ¶ 12).) Thus, Medtronic reasons, if Edwards' claim that hospitals are prone to fidelity to whichever THV program they first begin is correct, then there is little reason to expect that the hospitals already using the SAPIEN will abandon the product. (D.I. 560 at 13; D.I. 566 at ¶ 10.)

Medtronic further denies that it will seek to "piggyback" off Edwards' investments in enabling hospitals to be TAVI sites. Indeed, Rhonda Robb, the Vice President and General Manager of Catheter-Based Therapies at Medtronic, Inc. claims that "the fact that a site is already trained in implantation of the SAPIEN...does not eliminate or reduce the need for compete training in implantation of the CoreValve THV." (D.I. 566 at ¶ 8.) The reason for this, Ms. Robb claims, is that "the balloon-expanding SAPIEN THV and the self-expanding CoreValve THV are inherently different devices with a different implantation procedure." (*Id.*)

Despite Medtronic's vigorous arguments to the contrary, the court is persuaded that Edwards will suffer a loss of sales and market share. The court is also convinced that Medtronic will indeed not only seek to convert to its own uses hospitals in which Edwards has invested, but also succeed to a degree that a later injunction will not be able to fully address. First, although reasonable minds can differ regarding why experts downgraded Edwards after Medtronic's announcement of earlier FDA approval, there is no dispute that Medtronic will be Edwards sole competitor in the United States should it enter the market. Unless Medtronic is convinced its

8

efforts to sell the CoreValve Generation 3 will be utterly unsuccessful, in which case its vigorous opposition to the instant motion is baffling, it is likely that at least some, if not all of the sales that Medtronic makes will be sales that Edwards could have made. It is implausible that Edwards would not lose market share if forced to compete against a much larger company with far greater resources.

Second, it is noteworthy that Medtronic does not deny Edwards' allegations about the speed with which Medtronic was able to capture a significant segment of the European market as soon as Medtronic entered. (*See, e.g.*, D.I. 560 at 13-16.) The court acknowledges that the European market is not necessarily identical to the American market. Nonetheless, the court would be naïve to believe that having successfully competed against Edwards in selling THV devices in Europe, Medtronic has not learned from those experiences and is not poised to repeat them in the United States.

Third, in her own declaration, Ms. Robb contradicts Medtronic's assertion that it will not take advantage of Edwards' efforts with hospitals. Indeed, Ms. Robb writes that "Medtronic will attempt to sell its product in some of the 284 sites in which Edwards sells its SAPIEN THV....This is due in part to the limited number of available TAVR-qualified sites in the United States." (D.I. 566 at ¶ 11.) The court accepts the representations of Medtronic's own Vice President and concludes that Medtronic will certainly co-opt and turn against Edwards the extensive efforts and investments that Edwards has made to prepare hospitals to be THV-qualified.

There can be no doubt that loss of market share, sales, and business opportunities constitutes irreparable harm. *See Celsis*, 664 F.3d at 930 (Affirming district court's finding that plaintiff would suffer irreparable harm because "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.");

9

*Abbott Labs v. Sandoz,* 544 F.3d 1341, 1362 (Fed. Cir. 2008) (Affirming district court's conclusion that loss of market share and revenue constitutes irreparable harm.); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382-83 (Fed. Cir. 2006) (Affirming district court's finding that "decrease in demand for [the plaintiff's product]" established irreparable harm.). Consequently, the court concludes that Edwards has amply demonstrated that it will suffer irreparable harm without a preliminary injunction.

### 2. Price Erosion

Apart from loss of market share, sales, and business opportunities, there are other reasons to find irreparable harm established here. One such reason is the likelihood of price erosion. Based on Medtronic's history of undercutting Edwards' prices in Europe, Edwards warns that Medtronic's entry into the United States market will cause similar erosion in the price of THVs. (D.I. 549 at 16-17; D.I. 550 at ¶ 8.) Edwards argues that this erosion would not be ameliorated by a later injunction because Edwards' customers would be disgruntled should Edwards attempt to restore the original price. (D.I. 549 at 17; D.I. 550 at ¶ 8.) In response, Medtronic denies that it plans to sell the CoreValve Generation 3 at a lower price than Edwards' own price, referencing a third party report that Edwards charges "approximately $32,500 per commercial device in the US." (D.I. 566 at ¶ 12.) Medtronic does not state what the price is that it will charge for the CoreValve Generation 3, however. (*See, e.g.*, D.I. 566 at ¶ 12 (admitting that it "has not yet determined the list price").) Medtronic claims only that the price "likely will be higher than the $30,000 per device price at which the CoreValve THV system is sold clinically in the US." (*Id.*)

The court finds unconvincing Medtronic's assertion that it will not price the CoreValve Generation 3 at a lower point than the SAPIEN and SAPIEN XT in order to gain a competitive advantage. From a business standpoint alone, Medtronic would hardly be much of a competitor if it did not seek to undercut the opposition. In addition, Edwards' uncontroverted account of the

10

developments in the European market provide strong support for Edwards' concerns about price erosion. The court must also note that Medtronic's history of making representations to the court that are of demonstrably questionable veracity suggests caution is warranted in accepting Medtronic's statements at face value.[7] Ultimately, the likelihood of price erosion should Medtronic enter the market is sufficient to establish irreparable harm. *See Celsis*, 664 F.3d at 930 (Affirming district court's finding that price erosion was one reason plaintiff would suffer irreparable harm.); *Sanofi-Synthelabo*, 470 F.3d at 1382-83 (Affirming district court's finding that potentially "irreversible price erosion" constituted irreparable harm.).

In the end, there can be little doubt in light of the available evidence that Edwards stands to be irreparably injured should Medtronic, a willful infringer, be allowed to commence

---

[7]      For instance, in its opposition to a permanent injunction that Edwards was seeking in July 2010, Medtronic represented to the court that it was moving its manufacturing operations out of the United States to Mexico and that its Mexico facility was fully capable of replacing its facility in Irvine, California. (*See, e.g.*, D.I. 402). Based on this representation, the court concluded that a permanent injunction would not affect the irreparable harm that Edwards was alleging since "CoreValve would be able to move its remaining manufacturing operations to Mexico almost immediately if the court enjoined it from continuing to manufacture its products in the United States." *See Edwards Lifesciences AG v. CoreValve, Inc.*, No. 8-91-GMS, 2011 U.S. Dist. LEXIS 12022, at *47 (D. Del. Feb. 7, 2011).

Later, however, James Sparks, Medtronic's senior director of manufacturing, admitted during a deposition that Medtronic had misrepresented its Mexico operations. (*See* D.I. 552-1, Ex. G, 333:15-339:21 (admitting that he authored document in April 2010 directing employees at the Irvine manufacturing facility to increase production of the infringing products in anticipation of an injunction and acknowledging that Medtronic knew in April 2010 that "manufacturing capacity in Medtronic CoreValve's Mexico facility will not fully match the current output from its Irvine facility until about the middle of 2011.")

In vacating this court's denial of Edwards' motion for permanent injunction, the Federal Circuit recognized that Medtronic's misleading statements about its ability to move its operations to Mexico should it be enjoined in the United States deprived this court of the opportunity to consider the circumstances as they truly were. *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1315-16 (Fed. Cir. 2012). Specifically, the Federal Circuit acknowledged that "[t]he district court's explanation of why it was withholding an injunction placed significant weight on CoreValve's statements that it was immediately moving this manufacturing operation to Mexico, and thus that infringement would terminate." *Id.* at 1315. The Federal Circuit then noted that "Edwards states on this appeal, and CoreValve does not deny, that CoreValve never stopped its infringing manufacture in California. Whether or not that representation was known to be false when made, the situation before us reflects, at least, changed circumstances." *Id.* at 1315-16 (Concluding that "'district courts are in the best position to fashion an injunction tailored to prevent or remedy infringement.' Recognizing that the circumstances have not been fully explored in the record before us, we vacate the denial of the injunction, and remand to the district court for consideration in light of ensuing events and any other relevant factors.") As Dr. Sparks's testimony showed, Medtronic was well aware that its representation was false when made.

11

commercial sales of the CoreValve Generation 3 in the United States. Indeed, the Federal Circuit's observations in *Polymer Technologies, Inc. v. Bridwell* are particularly salient here:

> Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction. Customers may have established relationships with infringers. The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat. Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option.

103 F.3d 970, 975-76 (Fed. Cir. 1996) (reversing district court's denial of a preliminary injunction).[8]

### C. Balance of Hardships

Edwards argues that the balance of hardships weighs in its favor because, without a preliminary injunction, Edwards would effectively be forced to compete against its own patented invention. (D.I. 549 at 18.) In contrast, Edwards argues, any hardship done to Medtronic by an injunction would be due to Medtronic's decision to accelerate FDA approval before a permanent injunction ruling. (*Id.*) Edwards also highlights the fact that THVs are its "lifeblood", constituting more than 70% of its business while constituting less than 7% of Medtronic's business. (*Id.*) For its part, Medtronic argues in conclusory fashion that "[t]he harm to Medtronic of any injunction based on expired patent rights 'is much greater than the harm to plaintiffs should the injunction

---

[8]     An award of an ongoing royalty is not unheard of where the court determines that a party is entitled to an injunction, but the party expresses its willingness to accept a royalty in lieu of an injunction and the court finds that the appropriate amount for such a royalty can be determined. *See, e.g., Boston Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259 (D. Del. 2012). In light of the court's conclusion that Edwards would be irreparably harmed should Medtronic be permitted to commence commercial sales of the CoreValve Generation 3 without any limit at all and Edwards' insistence that a monetary remedy would be insufficient, however, a royalty award would not seem an appropriate and adequate resolution in this matter.

12

not issue at all.'" (D.I. 560 (citation omitted).) Medtronic offers little explanation or support for this contention, however.[9]

The court concludes that the balance of hardships favors granting a preliminary injunction. Without a preliminary injunction, the core right protected by Edwards' patent – the right to exclude – would effectively be rendered meaningless. *See, e.g.*, *Celsis*, 664 F.3d at 931 (Affirming district court's finding that the balance of hardships favored the plaintiff because "[a]bsent a preliminary injunction, [the plaintiff] would lose the value of its patent".) Additionally, any harm to Medtronic is the result of its willful infringement and deliberate flouting of the jury verdict against it, and thus cannot be counted in its favor. *See id.* at 931 (Affirming district court's conclusion that "[the defendant]'s losses were the result of its own calculated risk in selling the product with knowledge of [the plaintiff]'s patent."); *Sanofi-Synthelabo*, 470 F.3d at 1383 (Concluding that the district court "did not clearly err in finding that [the defendant]'s harms were 'almost entirely preventable' and were the result of its own calculated risk to launch its product pre-judgment.")

## D. Public Interest

Edwards contends that the public interest weighs in its favor because of the policy inherent in the patent laws favors protecting a patentee's investment in research and development through exclusive patent rights. (D.I. 549 at 20.) The parties do not disagree that there is a strong policy in favor of enforcing patent rights. Where the parties diverge, however, is regarding whether there exist countervailing considerations sufficient to trump the mandate that patent rights be enforced.

Medtronic argues that enforcing Edwards' patent rights would leave patients so at risk of inferior care or no care at all that the public interest requires Medtronic be allowed to sell the

---

[9]    In addition to its bare assertion regarding harm to itself, Medtronic expands at length on the hardship to patients in the extreme risk category who might be deprived of its device should an injunction issue. (D.I. 560 at 20.) The harm to third parties goes to the public interest factor, however, not the balance of hardships among the litigants.

13

CoreValve Generation 3. (*See, e.g.*, D.I. 560 at 17 (arguing that "the injunction Edwards proposes would leave no treatment option for patients on the verge of death".).) For the most part, Edwards denies Medtronic's assertions. By means of expert declarations and testimony at the evidentiary hearing, both parties have introduced evidence in support of their arguments. The parties' arguments fall into three main categories, each of which the court considers below.

### 1. Extreme Risk Patients with Small Vessel Sizes

Medtronic contends that among extreme risk patients,[10] there are those whose blood vessels are too small to permit the SAPIEN to be implanted in them by the safest means possible – transfemoral catheterization.[11] (*See, e.g.*, D.I. 560 at 7, 16.) Medtronic argues that these extreme risk patients are best served by the CoreValve Generation 3 and would be put at a greater risk of injury and death if the SAPIEN was the only device on the market. (*Id.*) Predictably, Edwards disputes Medtronic's assertions. (D.I. 549 at 8-9.) Edwards argues that the SAPIEN can be used to treat patients with small access vessel sizes because other routes apart from the femoral artery exist through which the device can be introduced into the body. (*See, e.g.*, Direct Examination of Dr. Martyn Thomas, D.I. 593 at 38:1-39:5 (Explaining that other means of access include through the iliac, aortic, subclavian, and carotid arteries.).) Edwards further argues that, once approved, the SAPIEN XT will be able to be passed transfemorally.

---

[10]     As described in the parties' briefs and declarations and during the evidentiary hearing, extreme risk patients are those whose health is so fragile that they are barred from open heart surgery due to doctors' serious doubts about these patients' ability to survive the operation. (*See, e.g.*, Declaration of Blase Carabello, D.I. 564 at ¶ 4 (Explaining that "none of these extreme risk patients are candidates for surgical valve replacement procedure.").)  For these patients, THV implantation is the only treatment option.

[11]     Transfemoral catheterization involves passing the THV through the femoral artery at the top of the leg. (*See, e.g.*, Direct Examination of Dr. Martyn Thomas, D.I. 593 at 38:1-39:5.) It is the most commonly used approach. (*Id.* at 38:1-3.) A second, less desirable option is the transiliac route, in which physicians pass the THV through the left side of the chest when the patient's vasculature is not large enough to permit delivery of the catheter transfemorally. (*See, e.g.*, Direct Examination of Dr. Martyn Thomas, D.I. 593 at 38:1-7, 14-19.) Other methods of catheterization include the aortic, subclavian, and carotid approaches. (*See, e.g.*, Direct Examination of Dr. Martyn Thomas, D.I. 593 at 38:19-39:5.)

14

Expert testimony establishes that the transfemoral route is the preferred method because it is the safest. (*See, e.g.*, Direct Examination of Dr. Martyn Thomas, D.I. 593 at 38:1-3 (Describing transfemoral access as "the most commonly used approach"; Cross Examination of Dr. Martyn Thomas, D.I. 593 at 75:14-21 (Admitting that transfemoral access is his first choice because it is significantly less invasive than all other forms of access); Direct Examination of Dr. Mark Russo, D.I. 593 at 88:4-12 (Explaining that the transfemoral approach is "most commonly used" and "most people prefer it" because "it is the least invasive" and "the patients tend to recover most quickly".).) The evidence also indicates that the SAPIEN is too large to be introduced transfemorally in some extreme risk patients. (*See, e.g.*, Declaration of Blase Carabello,[12] D.I. 564 at ¶ 4 (Explaining that "access vessel size" prevents the SAPIEN from being used in some extreme risk patients.); Declaration of Jeffrey Popma,[13] D.I. 565 at ¶ 9 (Stating that 40% of extreme risk patients in the CoreValve Pivotal Trial had vessel sizes that were too small for the SAPIEN); Direct Examination of Larry Wood, D.I. 593 at 104:6-15.) Expert testimony suggests, however, that, unlike the SAPIEN, the SAPIEN XT can be introduced transfemorally in patients with small vessel sizes. (*See, e.g.*, Cross Examination of Dr. Martyn Thomas, 76:13-16 (Admitting that "one of the big points of developing the Sapien XT was to have something small enough to do more patients transfemorally".); Direct Examination of Larry Wood, D.I. 593 at 104:6-15 (Explaining, regarding the difference between the SAPIEN and the SAPIEN XT, that "The XT is also a lower profile, so the mix between transapical and transfemoral is different between the platforms.").) Thus, inasmuch as the SAPIEN XT will be available for commercial sale very soon, it appears that

---

[12]     Dr. Carabello is a cardiologist.

[13]     Dr. Popma is Director of the Interventional Cardiology Clinical Services at the Beth Israel Deaconess Medical Center. (D.I. 565.)

15

patients with small vessel sizes will be well served even if the CoreValve Generation 3 cannot be sold due to an injunction.

## 2. Extreme Risk Patients with Large Annulus Sizes

Medtronic asserts that, among the same extreme risk group, there are those in whom neither the SAPIEN nor the SAPIEN XT can be implanted because their annulus sizes are larger than 27mm in diameter. (D.I. 560 at 17-19.) Medtronic claims that only the CoreValve Generation 3 can be implanted in these patients and that these patients would outright be denied potentially life-saving implants if its CoreValve Generation 3 was enjoined.[14] (*Id.*) Edwards concedes that neither the SAPIEN nor SAPIEN XT can be used to treat patients with annulus sizes exceeding 27mm. (D.I. 549 at 8-9.) Nonetheless, Edwards argues that the carve-out it proposes in its proposed preliminary injunction order, (D.I. 548 at 3-4), will ensure that these patients have access to the CoreValve Generation 3 by allowing Medtronic to sell no more than 63 units per month to be implanted in these patients.[15] (D.I. 570 at 8.)

As both parties rightly acknowledge, the available evidence confirms that there are extreme risk patients with annulus sizes such that neither the SAPIEN nor the SAPIEN XT can be implanted. (*See, e.g.*, Declaration of Blase Carabello, D.I. 564 at ¶ 4; Declaration of Jeffrey Popma, D.I. 565 at ¶ 10-12 (Stating that 50% of the extreme risk patients treated in the continued access arm of the clinical trial had annular diameter sizes too large for the SAPIEN's 25mm

---

[14] As previously noted, the continuing access program through which extreme risk patients were receiving the CoreValve Generation 3 has now been discontinued because the FDA approved the CoreValve Generation 3 without also approving extension of the continued access program through which Medtronic was providing the CoreValve Generation 3 to extreme risk patients. (D.I. 582-1.)

[15] Edwards does not explain in the briefing and declarations submitted regarding the preliminary injunction motion what the origin is of its 63 unit per month limit. In a declaration submitted in mid-2013 in conjunction with its motion for permanent injunction, however, Dr. Gregory K. Leonard explains that he arrived at the number by estimating that 3.4% of the possibly 18,000 patients in the TAVR market have annulus sizes greater than 27mm. (D.I. 539 at ¶¶ 7-9.) The resulting number is 51 and Edwards added 12 extra implants supposedly out of magnanimity. (*Id.*; D.I. 570 at 8, FN 8 (explaining that "Edwards also allowed 12 extra implants per month, going out of its way to ensure that every TAVR patient can be treated.").)

16

maximum to accommodate, with 38% unable to be treated by the SAPIEN XT also.).) These patients require the CoreValve Generation 3 in order to have any hope of treatment. (*See, e.g.,* Declaration of Dr. Blase Carabello, D.I. 564 at ¶ 4 (Concluding that if the CoreValve Generation 3 was not commercially available upon FDA approval, these extreme risk patients would not be able to receive transcatheter aortic valve replacement at all.).) The court concludes based on this that, despite the three preliminary injunction factors that establish Edwards' entitlement to the injunction, the public interest requires making some accommodation that would grant patients with large annulus sizes access to the CoreValve Generation 3. The assertions regarding the number of these patients and the percentage of the overall population of patients who need THV implants that these patients constitute are contradictory at best, however.[16] (*Compare, e.g.,* D.I. 560 at 6 (estimating that 20-30% of the expected 18,000 candidates for THV in the United States have annulus diameters too large to be treated with the SAPIEN) *with* D.I. 539 at ¶¶ 7-9 (estimating no more than 3.4%) *and* D.I. 593 at 11:2-23 (estimating that, currently 10.4% of patients cannot be treated with the SAPIEN, but that once the SAPIEN XT is approved, that number will be "about 3.4 percent".) Thus, it would be premature to adopt at this time Edwards' proposed 63-unit-a-month cap on how many devices may be sold to serve to serve these patients.

### 3. Best Outcomes Among All Patients

Medtronic contends that for all patients—not just those whose vessel sizes are too small or whose annulus sizes are too large—the CoreValve Generation 3 is safer and leads to a longer and healthier life due to a lower risk of stroke, paravalvular leak, and death, among other things. (*See, e.g.,* D.I. 560 at 17-19.) Edwards argues in response that Medtronic's conclusions are unreliable

---

[16]     Neither counsel for the parties nor the experts provided much detail on this matter during the evidentiary hearing.

17

and skewed. (D.I. 570 at 9-10.) It accuses Medtronic of "hid[ing] the underlying data", "cherry-pick[ing]", and "ignoring the knowledge and skills learned in the past five years", among other things. (*Id.*) Ultimately, Edwards concludes "when Medtronic's own proctors controlled for pretreatment differences in patients, SAPIEN and SAPIEN XT matched or beat ReValving on every measure." (*Id.* at 10.)

It is clear that the SAPIEN, the SAPIEN XT, and the CoreValve Generation 3 are all excellent devices. Indeed, experts on both sides have attested to this. (*See, e.g.*, Direct Examination of Dr. Martyn Thomas, D.I. 593 at 55:4-7 ("When I look at all of this data, I think we have two excellent devices.").) There are not yet any randomized clinical studies available in which the SAPIEN and the CoreValve Generation 3 have been compared head-to-head. (*See, e.g.*, Direct Examination of Dr. George Michael Deeb, D.I. 593 at 173:11-22 ("There has never been a head-to-head randomized prospective clinical trial done that's been adjudicated.").) Rather, both devices have been compared to open heart surgery, which remains a common treatment option for patients who can survive the operation.[17] (*See, e.g.*, Direct Examination of Dr. Mark Russo, D.I. 593 at 85:25-86:14 (Explaining that the clinical trials of one device are being compared to the clinical trial of another device, rather than the two devices being compared directly.); Cross Examination of Dr. George Michael Deeb, D.I. 593 at 163:21-12 (Explaining that "[t]he thing

---

[17]     In his declaration, Dr. Jeffrey Popma made many assertions about the safety of the CoreValve Generation 3 over the SAPIEN. For instance, Dr. Popma explained that rates of mortality, stroke, and paravalvular leak were lower among extreme risk patients who received the CoreValve Generation 3 half that of those who was 25.5%, compared to 50% for those who received the SAPIEN. (D.I. 565 at ¶¶ 8, 14, 16-17.) He further added that 30.7% of patients using the SAPIEN THV died of all-cause mortality after 12 months, as compared to 24% of the extreme risk patients in the pivotal study who used the CoreValve Generation 3. (*Id.* at ¶ 14.) Dr. Popma attributed the CoreValve Generation 3's apparent superiority to its design, which results in "small size and flexibility, minimally invasive method of insertion, greater ease of deployment, and greater accuracy in placement." (*Id.* at ¶ 16.) After reviewing a host of complications and risk factors that are associated with the SAPIEN, Dr. Popma concluded that the clinical data and his experience as a clinician indicate that "there will be a significant adverse public health impact on patients and physicians in the United States if the CoreValve THV device is not commercially available in the United States." (*Id.* at 23.) These conclusions were drawn from comparing the results of one study on the CoreValve Generation 3, the CoreValve Pivotal Trial, to the results of another study on the SAPIEN. There is no indication that Dr. Popma conducted or considered any study that directly compared the two.

18

about these two trials…is that they are both being compared to the gold standard, which is surgery. Their valves are not being compared to one another.").)

The experts' interpretations of the available studies' results are somewhat mixed, varying mostly according to the party for whom they were called to testify. (*Compare, e.g.*, Direct Examination of Dr. Martyn Thomas, D.I. 593 at 55:19-57:18, 58:21-25 (Stating that the outcomes of the CoreValve Generation 3 were similar to those of the SAPIEN for a host of risk factors and characteristics and that "I have never seen an important signal that stroke is higher in one compared to the other") *with* Direct Examination of Dr. George Michael Deeb,[18] D.I. 593 at 140:4-10 (Explaining that annular size and access problems make the CoreValve Generation 3 superior.).) Overall, however, expert testimony does suggest that the CoreValve Generation 3 offers greater advantages over open heart surgery than the SAPIEN does. (*See, e.g.*, Declaration of Jeffrey Popma, D.I. 565 at ¶¶ 8, 14, 16-17 (Summarizing the results of the CoreValve Pivotal Trial); Cross Examination of Dr. Martyn Thomas, D.I. 593 at 68:14-69:7 (Admitting that the results of a fully randomized study published in the New England Journal of Medicine show that "at one year the risk of mortality was higher with surgery than with the CoreValve[]" and that "in the FDA trials that Sapien [*sic*] has conducted, it has never shown that it was superior to surgery."); Cross Examination of Larry Wood, D.I. 593 at 118:13-21 (Admitting that the self-expandable system of the CoreValve Generation 3 was the "gold standard" over the balloon-expandable method of Edwards' devices.); Direct Examination of Dr. George Michael Deeb, D.I. 593 at 143:5-8

---

[18] Although he was called to testify by Medtronic, Dr. George Michael Deeb was not paid for his testimony. (Direct Examination, D.I. 593 at 132:1-6 (Testifying that he was not paid and was present at the hearing because "I am an advocate for patient care and I am advocate for both of the valves.") The court was impressed by the neutrality of Dr. Deeb's testimony. Indeed, his statements about the utility and drawbacks of both the Edwards devices and the CoreValve Generation 3, as well as the importance of not constraining doctors' discretion over their patients' care, were very helpful to the court.

19

("[A]bsolutely, there are times when I believe just based on the deployment technique, it is much safer for a patient population to undergo the CoreValve usage. Same things goes with access.").)

### 4. The Public Interest in Light of All Considerations

The expert testimony suggests that patients with large annulus sizes must be allowed ongoing access to the CoreValve Generation 3. The testimony also indicates that the CoreValve Generation 3 may be to some degree the safer, better option for most patients. In addition, the court found credible the experts' assertions regarding the devastating effect on patient care and outcomes that would result from the CoreValve Generation 3 being banned for the duration of Edwards' patent extension. (*See, e.g.*, Direct Examination of Dr. Michael Deeb, D.I. 593 at 133:14-20 ("I think it would have a distinct negative impact on the patients' outcome if there were to be a restriction of usage of CoreValve for transcatheter aortic valve replacement."); Direct Examination of Dr. Jeffrey Popma, D.I. 593 at 189:19-8 (Stating that removing the CoreValve Generation 3 would have a "devastating effect" and that this "would put at risk a substantial portion of general population with aortic valve disease who are not suitable candidates for surgery.").) As Dr. Deeb passionately emphasized, "these valves are not interchangeable[]", (D.I. 593 at 142:12), and some room must be made for doctors to choose from both devices in determining which one is most suitable for each patient. (*Id.* at 134:17-136:17 (Explaining regarding the possibility of banning the CoreValve Generation 3 that "I think by eliminating the physician, and tying their arm behind their back in deliverance of care, I think that is a huge mistake for the patient population out there that is being treated.").) All of this indicates that the public interest is well served in permitting at least some number of CoreValve Generation 3 devices to be sold on the market.

Nevertheless, the court cannot downplay the strong public interest favoring enforcement of patent rights. *See, e.g., Sanofi-Synthelabo*, 470 F.3d at 1383-84 (Affirming district court's finding that the public interest favored enforcement of the plaintiff's patent over availability of

20

multiple options to patients because "'encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.") (Citation omitted); *Pfizer Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005) (Explaining that the public interest is not promoted by "entirely eliminating the exclusionary rights conveyed by pharmaceutical patents. Nor does the statutory framework encourage or excuse infringement of valid pharmaceutical patents."). Enforcing patent rights is especially important where there is egregious conduct to be addressed and deterred, as there is here. Medtronic disregarded the law in infringing Edwards' patent and boldly continued to thumb its nose at the law by continuing its conduct even after being found to be a willful infringer. The court cannot ignore the fact that it would serve as a reward of sorts to Medtronic and an incentive for onlookers to behave as Medtronic has should the court permit Medtronic to freely commence sales of its device. In light of all the relevant considerations, the court finds that the public interest weighs in favor of granting Edwards a preliminary injunction, subject to an accommodation for Medtronic to sell its devices to those patients who cannot be helped by Edwards' devices.

## V. CONCLUSION

The court concludes that Edwards has demonstrated its entitlement to a preliminary injunction under 35 U.S.C. § 283. The court also concludes, however, that the preliminary injunction must be tailored to the present circumstances and the considerable public interest at issue. Thus, Medtronic must be permitted to sell a number of CoreValve Generation 3 devices sufficient to meet the needs of patients that Edwards concedes cannot be served by Edwards' devices. Thus, the court will grant in part and deny in part Edwards' Motion for a Preliminary Injunction, (D.I. 548).

21

Dated: April 15, 2014

_____
CHIEF, UNITED STATES DISTRICT COURT

22

JA0022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDWARDS LIFESCIENCES AG and )
EDWARDS LIFESCIENCES LLC, )
 )
       Plaintiffs, )
v. )
 )    C.A. No. 08-91 (GMS)
 )
COREVALVE, INC. and )
MEDTRONIC COREVALVE LLC, )
 )
       Defendants. )
                           )

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

1.      Edwards' motion for a preliminary injunction, (D.I. 548), is GRANTED IN PART

         AND DENIED IN PART;

2.      Until the date on which the extended term of the '552 patent ends, Medtronic and

         any of its subsidiaries, affiliates, parent companies, officers, agents, servants,

         employees, and successors are hereby enjoined from infringing claim 1 of the '552

         patent by selling and/or offering to sell in the United States, its territories or

         possessions ("the United States") any of the following products: The CoreValve

         Generation 3 ReValving System ("CoreValve Generation 3"), sold commercially as

         the ReValving System and the Medtronic CoreValve System, and any device not

         more than colorably different from the CoreValve Generation 3 ReValving System;

3.      Since the FDA has approved the CoreValve General 3 for commercial sale,

Paragraphs 2 and 3 of Edwards' proposed preliminary injunction order, (D.I. 548 at 4), are no longer relevant;[19]

4.    The parties shall immediately enter upon discussions to jointly determine a mechanism by which a sufficient number of CoreValve Generation 3 devices can be provided to the hospitals and clinics that are currently already trained in use of the CoreValve Generation 3. The purpose of providing these THV sites with a sufficient number of CoreValve Generation 3 devices shall be to enable physicians to make clinical, patient-by-patient determinations as to whether to implant the CoreValve Generation 3 or Edwards' SAPIEN and SAPIEN XT without being constrained by the number of CoreValve Generation 3 devices available.

5.    On May 21, 2014 at 10:00a.m., the parties shall apprise the court via teleconference of the status of their discussions.

Dated: April 15, 2014

_____
CHIEF, UNITED STATES DISTRICT COURT

---

[19] In paragraph 2, Edwards carved out the number of CoreValve Generation 3 units that Medtronic may continue to sell and/or offer for sale in the United States in order to conduct the pivotal clinical trial for FDA premarket approval. In paragraph 3, Edwards set out the number of CoreValve Generation 3 units that Medtronic may continue to sell and/or offer for sale in the United States in order to carry on continued access implants in extreme risk patients. These paragraphs are no longer relevant in light of the FDA having approved the CoreValve Generation 3 because both the pivotal clinical trial for FDA premarket approval and the continued access program ended upon approval.

CASE PARTICIPANTS ONLY

# TAB 2

# United States Patent [19]

## Andersen et al.

US005411552A

[11] Patent Number: 5,411,552

[45] Date of Patent: May 2, 1995

[54] **VALVE PROTHESIS FOR IMPLANTATION IN THE BODY AND A CATHETER FOR IMPLANTING SUCH VALVE PROTHESIS**

[76] Inventors: **Henning R. Andersen**, Dalvangen 37A, DK-8270 Hoejbjerg; **John M. Hasenkam**, Aprilvej 8, DK-8210 Aarhus V; **Lars L. Knudsen**, Rudolf Wulffsgade 6,4.mf., DK-8000 Aarhus C, all of Denmark

[21] Appl. No.: **261,235**

[22] Filed: **Jun. 14, 1994**

**Related U.S. Application Data**

[63] Continuation of Ser. No. 961,891, Jan. 11, 1993, abandoned.

[30] **Foreign Application Priority Data**

May 18, 1990 [DK] Denmark .............................. 1246/90

[51] Int. Cl.⁶ ................................................. A61F 2/24
[52] U.S. Cl. ......................................... 623/2; 623/900; 137/343; 137/844; 251/358
[58] Field of Search .................. 623/2, 900; 137/343, 137/844, 316; 251/358; 606/108

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 3,671,979 | 6/1972 | Moulopoulos . |
| 4,038,703 | 8/1977 | Bokros ....................... 623/2 |
| 4,056,854 | 11/1977 | Boretos et al. ............... 623/2 |
| 4,106,129 | 8/1978 | Carpentier et al. ........... 623/2 |
| 4,297,749 | 11/1981 | Davis et al. ................. 623/2 |
| 4,343,048 | 8/1982 | Ross . |
| 4,733,665 | 3/1988 | Palmaz ..................... 606/108 |
| 4,856,516 | 8/1989 | Hillstead ................... 604/194 |
| 5,037,434 | 8/1991 | Lane ......................... 623/2 |
| 5,163,953 | 11/1992 | Vince ......................... 623/2 |

**FOREIGN PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 0357003 | 3/1990 | European Pat. Off. ............ | 623/900 |
| 1271508 | 11/1986 | U.S.S.R. .................................. | 623/2 |
| 1371701 | 2/1988 | U.S.S.R. .................................. | 623/2 |

**OTHER PUBLICATIONS**

Derwent Abstract No. 87–190867/27 (1987), SU 1271508 (Gorkii Kirov Medical Ins.).

*Primary Examiner*—David H. Willse
*Attorney, Agent, or Firm*—Watson, Cole, Grindle & Watson

[57] **ABSTRACT**

A valve prosthesis (9) for implantation in the body by use of catheter (11) comprises a stent made from an expandable cylinder-shaped thread structure (2,3) comprising several spaced apices (4). The elastically collapsible valve (4) is mounted on the stent as the commissural points (5) of the valve (6) are secured to the projecting apices (4).

The valve prosthesis (9) can be compressed around the balloon means (13) of the balloon catheter (11) and be inserted in a channel, for instance in the aorta (10). When the valve prosthesis is placed correctly the balloon means (13) is inflated thereby expanding the stent and wedging it against the wall of aorta. The balloon means is provided with beads (14) to ensure a steady fastening of the valve prosthesis on the balloon means during insertion and expansion.

The valve prosthesis (9) and the balloon catheter (11) make it possible to insert a cardiac valve prosthesis without a surgical operation comprising opening the thoracic cavity.

**8 Claims, 4 Drawing Sheets**



JA0098



# FIG. I



# FIG. 2



U.S. Patent

May 2, 1995

Sheet 3 of 4

5,411,552

JA0101

**FIG. 5**

**FIG. 6**

**FIG. 7**

**FIG. 8**

**FIG. 9**

**FIG. 10**

Case: 14-1409 Case: 14-1409 Document: 43 Page: 101 Filed: 05/12/2014 Filed: 05/12/2014



FIG. 11

FIG. 12

5,411,552

1

## VALVE PROTHESIS FOR IMPLANTATION IN THE BODY AND A CATHETER FOR IMPLANTING SUCH VALVE PROTHESIS

### CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of application Ser. No. 961,891, filed Jan. 11, 1993, now abandoned.

### BACKGROUND OF THE INVENTION

The present invention relates to a valve prosthesis, preferably a cardiac valve prosthesis, for implantation in the body and comprising a collapsible elastical valve which is mounted on an elastical stent wherein the commissural points of the elastical collapsible valve are mounted on the cylinder surface of the elastical stent.

Valve prostheses of this type are usually implanted in one of the channels of the body to replace a natural valve. In the present description the invention will be explained in connection with cardiac valve prosthesis for implantation in aorta. However, it will be possible to use a valve prosthesis according to the invention in connection with implantation in other channels in the body by using the same technique as the one used for implantation of cardiac valve prosthesis. Such an implantation may, e.g., comprise the implantation of:

1. a valve (for instance a cardiac valve) in the veins,
2. a valve in the oesophagus and at the stomach,
3. a valve in the ureter and/or the vesica,
4. a valve in the biliary passages,
5. a valve in the lymphatic system, and
6. a valve in the intestines.

An existing natural valve in the body is traditionally replaced with a valve prosthesis by a surgical implantation. However, a surgical implantation is often an exacting operation. Thus, today the implantation of cardiac valves are solely made by surgical technique where the thoracic cavity is opened. The operation calls for the use of a heart and lung machine for external circulation of the blood as the heart is stopped and opened during the surgical intervention and the artificial cardiac valves are subsequently sewed in.

Due to its exacting character, it is impossible to offer such operation to certain people. For instance, this is due to the fact that the person is physically weak because of age or illness. Moreover, the number of heart and lung machines available at a hospital will be a substantially limiting factor.

Cardiac valve prostheses that need no surgical intervention are known as there are used for implantation by means of a technique of catheterization. Examples of such valve prostheses are described in U.S. Pat. Nos. 3,671,979 and 4,056,854. However, both of these valve prostheses are connected to means which lead to the surface of the patient either for a subsequent activation of the valve or for a subsequent reposition or removal of the valve prosthesis. With these valve prostheses it is impossible to make an implantation which makes it possible for the patient to resume a substantially normal life in the same way as it is possible in connection with a surgical implantation of a cardiac valve.

From U.S. Pat. No. 3,755,823 an elastic stent for a cardiac valve prosthesis is known. However, this valve prosthesis is not designed for implantation in the body by catheterization. Even though this patent contains no detailed explanation, the description indicates that this

2

valve prosthesis is designed for implantation and sewering on by a surgical intervention.

Moreover, from U.S. Pat. Nos. 4,856,516 and 4,733,665 different shapes of expandable stents are known. These stents are made to be expanded by impression of a radially outward force coming from a balloon catheter or the like. These stents are made to reinforce the wall when there is a risk that the channel is closed and/or compressed.

The nearest prior art may be that described in GB-A-2,056,023. This document discloses an elastic stent as described by way of introduction. Thus, the stent described comprises an elastic collapsible valve mounted on the cylinder surface of a cylindrical stent. However, the valve prosthesis including the stent is designated for mounting through a surgical intervention. Even though the stent is slightly collapsible, it will not be suited for implantation by a catheterization procedure.

### SUMMARY OF THE INVENTION

It is the object of the present invention to provide a valve prosthesis of the type mentioned in the introductory part, which permits implantation without surgical intervention in the body and by using a catheter technique known per se and which makes it possible for the patient to resume a substantially normal life.

This is achieved according to the invention with a valve prosthesis of the type mentioned in the introductory part, which is characterized in that the stent is made from a radially collapsible and re-expandable cylindrical support means for folding and expanding together with the collapsible valve for implantation in the body by means of a technique of catheterization.

The collapsible elastic valve is mounted on the stent for instance by gluing, welding or by means of a number of suitable sutures.

If the support means are made from a thread structure, this can for instance be grate shaped, loop shaped or helical. This makes it possible to compress the stent and the collapsible valve mounted thereon for placing on the insertion catheter. The use of a non-self-expandable stent may, e.g., be effected by a compression of the stent around the expansion arrangement of the catheter which preferably consists of a balloon. When using a self-expandable stent, a catheter with an expansion arrangement is not used. In this case the stent is compressed and is inserted into an insertion or protection cap from which the stent is eliminated after implantation in order to obtain an expansion due to the stresses in the compressed support means, which for instance may be made from plastics or metal. After the compression the entire outer dimension is relatively small, which makes it possible to introduce the valve prosthesis through a channel in the body.

When the valve prosthesis is introduced and placed correctly, the stent is expanded by self-expansion or by means of the expansion arrangement until the stent is given an outer dimension which is slightly larger than the channel in which it is placed. As the stent is elastic, a contraction of the stent is prevented once it is expanded. The stiffness in the material of the support means contributes to maintain the expanded shape of the stent. After the expansion is made, the expansion arrangement of the catheter is contracted and the catheter can be removed from the channel. The inlet opening can subsequently be closed and the patient will then be able to resume a normal life.

5,411,552

3

The valve prosthesis according to the invention does not require an actual operation but merely a small intervention to optionally expose the body channel, e.g., a vein, through which the insertion takes place. Thus, patients for whom an operation would be associated with high risk can be offered implantation of, for instance, cardiac valves. After the implantation has taken place, the after-treatment will advantageously be shorter than normally, which means fewer hospital days for the patient. Moreover, it is assumed that it will be possible to implantate the valve prosthesis under local anaesthetic.

The valve prosthesis can be used to replace a natural valve or to establish a new valve function in one of the channels in the body which do not naturally contain a valve. For instance this goes for veins (arteries and veins) on a place without natural valves. The function of the valve prosthesis is then to ensure that the blood flows in one direction only. The valve is meant to be used in veins in the legs of persons suffering from varicose veins (varices).

In persons having varicose veins the blood flows in a wrong direction, viz. from the central veins in the centre of the leg towards the superficial veins. Among other things, this is due to the changed pressure in the legs, upright working position and other conditions. A valve prosthesis according to the invention may easily be placed in the veins and prevent the flow of the blood in a wrong direction.

Also, the valve prosthesis can be used in connection with diseases, for instance cancerous tumors, where too much humour is produced. If the humour is able to flow from the cancerous tumor through several channels, it is possible to drain the humour in one desired direction through the channels of the body by an appropriate placing of the valve prosthesis.

When the valve prosthesis is used as a cardiac valve prosthesis in the aorta, it is possible to mount it in three positions, viz., in the descending part of the aorta, in a position between the coronary arteries and the left ventricle of the heart, or in the aorta in a position immediately after the mouth of the coronary arteries.

The cardiac valve prosthesis can also be used in other places than in the aorta. Thus, the valve prosthesis can be used in the pulmonary artery and/or the right ventricle of the heart for replacing the pulmonary valves. Likewise, the cardiac valve prosthesis can be used in the passage between the right auricle of the heart and the right ventricle of the heart (tricuspidalostium) and the passage between the left auricle of the heart and the left ventricle of the heart (mistralostium) for replacing the tricuspidal valve and the mitral valve, respectively.

Even though the cardiac valve preferably is meant to be used for patients suffering from aorta insufficiency and who cannot be offered an open heart surgery, the valve prosthesis can also be used for patients in connection with treatment of aorta stenosis. Several of the patients with aorta stenosis are elderly people who cannot be offered a surgical cardiac operation. The patients are offered balloon dilatation of the aorta stenosis which may result in an aorta insufficiency as a side effect of the treatment.

As to these patients it is possible to insert a valve prosthesis in the descending or ascending part of the aorta thoracalis a few days or weeks before the balloon dilatation. As a result thereof, the left ventricle is protected against weight if the subsequent balloon dilatation of the stenosis results in aorta insufficiency. In

4

certain cases the weight (reflux) on the left ventricle is reduced by up to approximately 75%.

Furthermore, the stent may be made with a relatively great height and with a cylinder surface which is closed by a suitable material. Thus, a vascular prosthesis known per se is formed wherein the valve is mounted. This may facilitate the implantation of the valve prosthesis, for instance in the arcus aorta. Moreover, the great surface which abuts the inner wall of the channel contributes to ensure the securing of the valve prosthesis in the channel. This embodiment is also suitable as valve prothesis which is inserted in veins. As veins have relatively thin and weaker walls than arteries, it is desirable that the valve prothesis has a greater surface to distribute the outward pressure which is necessary to secure the valve prosthesis.

Moreover, the invention relates to a balloon catheter for implantating a valve prosthesis according to the invention and comprising a channel for injection of a fluid for the inflation of the balloon means of the catheter and an insertion cap wherein the balloon means of the catheter and a collapsible valve prosthesis mounted thereon are located during the injection, characterized in that the balloon means are provided with a profiled surface which is made to ensure a steady fastening of the valve prosthesis during the withdrawal of the balloon means from the protection cap and the subsequent inflation for the expansion of the stent.

Different balloon catheters for implantating cores in the body are known. For instance, such balloon catheters are known from U.S. Pat. Nos. 4,856,516, 4,733,665 and 4,796,629 and from DE publication No. 2,246,526. However, the known balloon catheters have a smooth or a slightly wavy surface. The use of such balloon catheter is disadvantageous for mounting a valve prosthesis in a channel having a large flow as for instance the aorta. A large humour flow is able to displace the stent on the smooth surface of the balloon and makes an accurate positioning difficult. This drawback has been remedied with the balloon catheter according to the present invention as the profiled surface prevents a displacement of the valve prosthesis in relation to the balloon means during introduction and the subsequent inflation of the balloon means.

In connection with the implantation, any prior art technique may be used to supervise an accurate introduction and positioning of the valve prosthesis. Thus, guide wires for the catheter, X-ray supervision, injection of X-ray traceable liquids, ultrasonic measuring, etc., may be used.

## DESCRIPTION OF THE DRAWINGS

The invention will now be explained in detail with reference to the accompanying schematical drawing, wherein

FIG. 1 shows a perspective view of a stent without a valve,

FIG. 2 is a perspective view of a valve prosthesis according to the invention made from the stent shown in FIG. 1 having a biological valve mounted thereon,

FIG. 3 is a partial view through the aorta illustrating a partially inflated balloon catheter,

FIG. 4 is a cross section through the embodiment shown in FIG. 9,

FIG. 5-7 are views illustrating the introduction and implantation of a valve prosthesis of the invention in the aorta,

5,411,552

| 5 | 6 |

FIG. 8–10 are views illustrating three possible positions of a cardiac valve prosthesis, and

FIG. 11–12 are perspective views illustrating two further embodiments of a valve prosthesis having a closed cylindrical wall.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 shows a stent 1 made by support means in the form of two 0.55 mm surgical stainless steel wires 2,3. The wires are folded in 15 loops. Three loops 4 are 14 mm in height and are intended to secure the commissural points 5 (see FIG. 2) from a biological cardiac valve 6 which is mounted in the stent 1. The remaining loops have a height of 8 mm. These loops form circumferentially expandable sections 25 between the commissural points 5 forming commissural supports. Each of the two folded wires 2,3 is bent to form rings 7,8 which are closed by welding the ends. The two rings are placed on top of each other as will appear from FIG. 1 and they are mutually secured by means of a number of sutures (not shown). The lower ring is circumferentially expandable at least along sections thereof which correspond to the circumferentially expandable sections 25. By using a substantially cylindrical thread structure with projecting apices, a reduction in weight is obtained as compared to a stent which is exclusively cylindrical with the same loop heights for all the loops.

The biological valve 6 was removed from a slaughtered pig of 100 kg. The valve was cleaned before mounting in the stent 1. The cleaned valve has an outer diameter of 25–27 mm and the height of the three commissural points 5 is 8 mm. The valve 6 is mounted in the stent by means of a suitable number of sutures to form the cardiac valve prosthesis 9 shown in FIG. 2. The valve prosthesis produced is used for performing tests in pigs by implantation of cardiac valve prosthesis. However, the cardiac valve prosthesis for use in human beings has a corresponding form.

FIG. 3 shows a partial view through the aorta 10. A balloon catheter 11 is introduced in the aorta according to the direction of an arrow 12. In the Figure shown the balloon means 13 of the balloon catheter is led out of the protection cap 11A and is partly inflated through a fluid channel 15, which is led to the surface of the patient. The balloon means 13 constitutes a tri-sectional balloon upon which the cardiac valve prosthesis is placed. In the form shown, the cardiac valve prosthesis is expanded exactly to be in contact with the aorta 10. The balloon means 13 is provided with three projecting beads 14 which are engaged with the one side of the cardiac valve prosthesis 9. The blood flowing through the aorta according to the direction of an arrow 16 will thus cause the cardiac valve prosthesis 9 to abut on the beads 14 and the valve cannot be displaced in relation to the balloon means 13. Moreover, the balloon catheter used comprises a central channel 17 to receive a guide wire 18 which is used in a way known per se for supervising the introduction of the catheter through fluoroscopi. In the shown embodiment beads 14 are only used at one side of the valve prosthesis, but, however, it will often be desirable to use the beads in pairs placed along lines parallel to the longitudinal axes 19 through the balloon means 13. In this case the spacing of the pair of beads 14 will correspond to the height of the loops of the stent. This makes it possible to make an effective fastening of a valve prosthesis on balloon means. Moreover, the fastening on the balloon means may be provided by using balloon means with an indentation in the surface (not shown).

FIG. 4 shows a cross section through the embodiment shown in FIG. 3 illustrating the placing of the beads 14 on the tri-sectional balloon means 13.

A balloon catheter of the above-described type which was used in tests of implantating the cardiac valve prosthesis 9 in pigs had the following dimensions. Each of the three balloons was 60 mm in length and 15 mm in diameter. The total diameter for the three inflated balloons was 31 mm and in the balloon catheter used two beads 14 having a height of 3 mm were mounted on each side of the three balloons. The beads had a spacing of 15 mm. The protection cap 11A of the balloon catheter had an outer diameter of 13.6 mm and an inner diameter of 12.5 mm and a length of 75 cm. The balloon catheter was provided with a standard guide wire having a diameter of 0.9 mm and a length of 300 cm.

FIGS. 5–7 show the valve prosthesis 9 at different steps in introducing and implantating in the aorta 10 by means of the catheter 11 having the inflatable balloon means 13. The cardiac valve prosthesis 9 is initially placed above the deflated balloon means 13 and compressed manually around the balloon means (FIG. 5), whereafter the outer diameter for the valve prosthesis is approximately 10 mm. After the introduction and positioning, the balloon means 13 is inflated (FIG. 6), thereby contributing an outer dimension of approximately 30 mm to the cardiac valve prosthesis. To obtain an effective fastening in the aorta, the outer dimension of the cardiac valve prosthesis is greater than the diameter of the aorta. This means that the prosthesis is tight against the inner wall of the aorta with a pressure which is sufficiently large to counteract a detachment due to the flow of the blood. The balloon catheter 11 may subsequently be removed from the aorta 10 (FIG. 7). Due to the stiffness of the metal the valve prosthesis will prevent a contraction. However, smaller contractions may occur (<10% diameter reduction) after the deflation and removal of the balloon catheter 13. When the valve prosthesis is mounted as shown in FIG. 7, the patient will be able to resume a substantially normal life after a few days.

FIGS. 8–10 show the positioning of the valve prosthesis 9 as cardiac valve prosthesis in the aorta 10 in three different positions, i.e., in a position between the coronary arteries 20 and the left ventricle of the heart 21 (FIG. 8), in a position immediately after the mouth of the coronary arteries in the ascending part of the aorta (FIG. 9), and in a position in the descending part of the aorta 10. The positioning of the valve prosthesis is chosen in accordance with the diagnosis of the illness of the patient. By placing the cardiac valve prosthesis as shown in FIG. 8, there is a risk of detachment and/or covering the mouth of the coronary arteries, and therefore it is preferred to use a higher stent which, for instance, comprises several rings 7,8 placed on top of each other. This allows a fixation of the prosthesis at a place after the mouth of coronary arteries even though the valve itself is in the position between the coronary arteries and the left ventricle. FIGS. 8 and 9 show how a contrast medium 23 is injected by means of a so-called pigtail catheter for registration of the tightness of the implanted valve prosthesis 9.

A specific embodiment for a valve prosthesis and a balloon catheter for implantating the valve prosthesis has been explained above. However, it is obvious that it

5,411,552

**7**

is possible to modify the valve prosthesis depending on the desired use, and moreover, it is possible to modify the catheter used in the implantation. Thus, the stent of the valve prosthesis may be made solely of one closed ring folded in a number of loops or with three or more mutually secured loop-rings placed on top of each other. Moreover, it is possible to make the stent having a thread structure which instead of loops is grate shaped, helical or is formed otherwise if only it is ensured that the form of the stent permits the compression and expansion of the stent and fastening of the collapsible valve. Instead of a biological valve it might be possible to use other collapsible valves, such as valves made from synthetic materials, e.g., polyurethane. It is also possible to use valves with more or fewer flaps than three.

It is possible to make the valve prosthesis with a closed cylinder surface as illustrated in FIGS. 11 and 12. In both Figures the support means of the valve prosthesis is made of an elongated tubular means 24 having a closed cylinder surface. This valve prosthesis is intended to expand by self-expansion or by means of a catheter according to the invention. This prosthesis is especially suitable for placing in veins and other channels where only a small pressure is exerted against he wall of the channel. In FIG. 11 the valve 6 is mounted at the end of the tubular means 24. In FIG. 12 an embodiment is shown where the valve 6 is mounted in a central position in the tubular means 24.

An explanation of a method of implantating a valve prosthesis according to the invention is given below:

a valve prosthesis 9 made of a stent 1 and a collapsible valve 6, as described above, is placed on a deflated balloon means and is manually compressed thereon,

the balloon means 13 and the valve prosthesis are drawn into an insertion cover 11A,

a guide wire 18 is inserted into the left ventricle of the heart through the central opening 17 of the balloon catheter under continuous fluoroscopi,

the insertion cover 11A conveys the guide wire 18 to a point in the channel in the immediate vicinity of the desired position of the valve prosthesis,

the balloon means 13 is pushed out of the protection cap 11A and the valve prosthesis is positioned in the desired position if necessary by use of further registration means to ensure an accurate positioning,

the balloon means 13 is inflated with a certain overstretching of the channel,

the balloon means 13 is deflated, and

the balloon means 13, the guide wire 18 and the protection cap 11A are drawn out and the opening in the channel, if any, wherein the valve prosthesis is inserted can be closed.

We claim:

1. A valve prosthesis for implantation in a body channel, the valve prosthesis comprising a collapsible elastical valve which is mounted on an elastical stent, the

**8**

elastical valve having a plurality of commissural points, wherein the stent comprises:

cylindrical support means which is radially collapsible for introduction within the body channel and which has a plurality of circumferentially-expandable sections such that the cylindrical support means is radially expandable for being secured within the body channel; and

a plurality of commissural supports projecting from one side of the cylindrical support means in a direction generally parallel to the longitudinal axis thereof for supporting the commissural points of the collapsible valve, at least one circumferentially-expandable section of the cylindrical support means lying between each of the commissural supports, such that the collapsible valve may be collapsed and expanded together with the cylindrical support means for implantation in the body channel by means of a technique of catheterization.

2. A valve prosthesis according to claim 1, wherein the cylindrical support means is made of a thread structure.

3. A valve prosthesis according to claim 2, wherein the thread structure comprises several spaced apices projecting from the one side of the cylindrical structure and in a direction along the longitudinal axis of the cylinder and that the commissural points of the valve are attached to the projecting apices.

4. A valve prosthesis according to claim 3, wherein the elastically collapsible valve is a biological trilobate valve.

5. A valve prosthesis to claim 4, wherein the stent is made from a stainless steel wire folded in a number of loops and bent into a circle and welded to form a closed ring, wherein the stent comprises two or more such closed rings which are mutually connected end to end to form the cylindrical thread structure, and wherein three of the loops in a ring at an end of said stent are folded with a greater height than the remaining loops to form the apices to which the commissural points of the biological valve are attached.

6. A valve prosthesis according to claim 5, wherein each of the rings of the stent is made from a wire having a diameter of 0.55 mm and a loop height of approximately 8 mm and approximately 14 mm for the three greater loops, and wherein the cylindrical thread structure produced and the collapsible valve mounted thereon in a folded state have an outer diameter of approximately 10 mm and in expanded state an outer diameter of approximately 30 mm.

7. A valve prosthesis according to claim 5, wherein the stent is made to be fixed through the expansion at one point in the channel wherein the valve prosthesis is inserted, which point is different from the point where the valve is mounted in the stent.

8. A valve prosthesis according to claim 1, wherein the cylinder surface of the support means is closed to form a tubular element.

\* \* \* \* \*

US005411552C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8463rd)

# United States Patent
Anderson et al.

(10) **Number:** US 5,411,552 C1

(45) **Certificate Issued:** Aug. 16, 2011

(54) **VALVE PROTHESIS FOR IMPLANTATION IN THE BODY AND A CATHETER FOR IMPLANTING SUCH VALVE PROTHESIS**

(75) Inventors: **Henning R. Anderson**, Hoejbjerg (DK); **John M. Hasenkam**, Aarhus V (DK); **Lars L. Knudsen**, Aarhus C (DK)

(73) Assignee: **Edwards Lifesciences AG**, St.-Prex (CH)

**Reexamination Request:**
No. 90/009,779, Jul. 9, 2010

**Reexamination Certificate for:**
Patent No.: **5,411,552**
Issued: **May 2, 1995**
Appl. No.: **08/261,235**
Filed: **Jun. 14, 1994**

**Related U.S. Application Data**

(63) Continuation of application No. 07/961,891, filed on Jan. 11, 1993, now abandoned.

(51) **Int. Cl.**
*A61F 2/24* (2006.01)

(52) **U.S. Cl.** ...................... **623/2.18**; 137/343; 137/844

(58) **Field of Classification Search** ............ 623/2
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,275,211 | A | 9/1966 | Hirsch et al. |
| 3,409,013 | A | 11/1968 | Berry |
| 3,472,230 | A | 10/1969 | Fogarty et al. |
| 3,548,417 | A | 12/1970 | Kisher |
| 3,587,115 | A | 6/1971 | Shiley |
| 3,657,744 | A | 4/1972 | Ersek |
| 3,671,979 | A | 6/1972 | Moulopoulos |
| 3,714,671 | A | 2/1973 | Edwards et al. |
| 3,755,823 | A | 9/1973 | Hancock |
| 3,799,150 | A | 3/1974 | Bonnet |
| 3,868,956 | A | 3/1975 | Alfidi et al. |

| | | | |
|---|---|---|---|
| 4,035,849 | A | 7/1977 | Angell et al. |
| 4,056,854 | A | 11/1977 | Boretos et al. |
| 4,339,831 | A | 7/1982 | Johnson |
| 4,345,340 | A | 8/1982 | Rosen |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 2246526 | 9/1972 |
| DE | E 60 500 B | 11/1986 |
| DE | 36 40 745 A1 | 11/1986 |
| DE | 691 13 818 T2 | 5/1991 |
| DK | 1246/90 | 7/1968 |

(Continued)

OTHER PUBLICATIONS

First Expert Report of Professor John R. Pepper in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 signed Apr. 28, 2008.

(Continued)

*Primary Examiner*—Cary E Wehner

(57) **ABSTRACT**

A valve prosthesis (9) for implantation in the body by use of catheter (11) comprises a stent made from an expandable cylinder-shaped threaded structure (2,3) comprising several spaced apices (4). The elastically collapsible valve (4) is mounted on the stent as the commissural points (5) of the valve (6) are secured to the projecting apices (4).

The valve prosthesis (9) can be compressed around the balloon means (13) of the balloon catheter (11) and be inserted in a channel, for instance in the aorta (10). When the valve prosthesis is placed correctly the balloon means (13) is inflated thereby expanding the stent and wedging it against the wall of aorta. The balloon means is provided with beads (14) to ensure a steady fastening of the valve prosthesis on the balloon means during insertion and expansion.

The valve prosthesis (9) and the balloon catheter (11) make it possible to insert a cardiac valve prosthesis without a surgical operation comprising opening the thoracic cavity.



**US 5,411,552 C1**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,373,216 A | 2/1983 | Klawitter | |
| 4,406,022 A | 9/1983 | Roy | |
| 4,470,157 A | 9/1984 | Love | |
| 4,535,483 A | 8/1985 | Klawitter et al. | |
| 4,574,803 A | 3/1986 | Storz | |
| 4,592,340 A | 6/1986 | Boyles | |
| 4,605,407 A | 8/1986 | Black et al. | |
| 4,612,011 A | 9/1986 | Kautzky | |
| 4,643,732 A | 2/1987 | Pietsch et al. | |
| 4,655,771 A | 4/1987 | Wallsten | |
| 4,687,483 A | 8/1987 | Fisher et al. | |
| 4,692,164 A | 9/1987 | Dzemeshkevich et al. | |
| 4,759,758 A | 7/1988 | Gabbay | |
| 4,762,128 A | 8/1988 | Rosenbluth | |
| 4,777,951 A | 10/1988 | Cribier et al. | |
| 4,787,899 A | 11/1988 | Lazarus | |
| 4,787,901 A | 11/1988 | Baykut | |
| 4,796,629 A | 1/1989 | Grayzel | |
| 4,829,990 A | 5/1989 | Thuroff et al. | |
| 4,851,001 A | 7/1989 | Taheri | |
| 4,878,495 A | 11/1989 | Grayzel | |
| 4,878,906 A | 11/1989 | Lindemann et al. | |
| 4,883,458 A | 11/1989 | Shiber | |
| 4,913,141 A | 4/1990 | Hillstead | |
| 4,922,905 A | 5/1990 | Strecker | |
| 4,966,604 A | 10/1990 | Reiss | |
| 4,979,939 A | 12/1990 | Shiber | |
| 4,986,830 A | 1/1991 | Owens et al. | |
| 4,994,077 A | 2/1991 | Dobben | |
| 5,007,896 A | 4/1991 | Shiber | |
| 5,026,366 A | 6/1991 | Leckrone | |
| 5,032,128 A | 7/1991 | Alonso | |
| 5,047,041 A | 9/1991 | Sammuels | |
| 5,059,177 A | 10/1991 | Towne et al. | |
| 5,080,668 A | 1/1992 | Bolz et al. | |
| 5,089,015 A | 2/1992 | Ross | |
| 5,135,536 A | 8/1992 | Hillstead | |
| 5,266,073 A | 11/1993 | Wall | |
| 5,411,552 A | 5/1995 | Andersen et al. | |
| 5,607,471 A | 3/1997 | Seguin et al. | |
| 5,840,081 A | 11/1998 | Andersen et al. | |
| 6,461,366 B1 | 10/2002 | Seguin et al. | |
| 6,562,058 B2 | 5/2003 | Seguin et al. | |
| 6,618,614 B1 | 9/2003 | Chance | |
| 6,689,164 B1 | 2/2004 | Seguin et al. | |
| 6,908,481 B2 | 6/2005 | Cribier | |
| 7,018,406 B2 | 3/2006 | Seguin et al. | |
| 7,252,682 B2 | 8/2007 | Seguin | |
| 7,344,556 B2 | 3/2008 | Seguin et al. | |
| 2010/0286769 A1 | 11/2010 | Andersen et al. | |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 221 570 | | 11/1986 |
| EP | 0 292 587 | | 5/1987 |
| EP | 0 592 410 B1 | | 10/1995 |
| GB | 1 268 484 | | 6/1969 |
| GB | 2 056 023 A | | 3/1981 |
| GB | 2 056 023 A | | 8/1997 |
| SU | 158 988 | | 2/1963 |
| SU | 1371400 | | 2/1988 |
| SU | 1457921 | | 2/1989 |
| WO | WO 83/03752 | | 11/1983 |
| WO | 91/17720 | | 11/1991 |
| WO | WO 2006/127765 A1 | | 11/2006 |

## OTHER PUBLICATIONS

Exhibit JRP–1 referred to in the First Expert report of Professor John R. Pepper in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated Apr. 28, 2008.

Exhibit JRP–2 referred to in the First Expert report of Professor John R. Pepper in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated Apr. 28, 2008.

Exhibit JRP–3 referred to in the First Expert report of Professor John R. Pepper in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated Apr. 28, 2008.

Exhibit JRP–4 referred to in the First Expert report of Professor John R. Pepper in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated Apr. 28, 2008.

Exhibit JRP–5 referred to in the First Expert report of Professor John R. Pepper in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated Apr. 28, 2008.

Exhibit JRP–6 referred to in the First Expert report of Professor John R. Pepper in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated Apr. 28, 2008.

Exhibit JRP–7 referred to in the First Expert report of Professor John R. Pepper in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated Apr. 28, 2008.

Second Expert Report of Professor John R. Pepper in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 signed Jun. 20, 2008.

First Expert Report of Dr. Anthony C. Lunn in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 signed May 4, 2008.

Exhibit ACL 1 referred to in the First Expert Report of Dr. Anthony C. Lunn in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated Mar. 24, 2008.

Affidavit by Dr. Anthony C. Lunn, ACL Consulting LLC, 47 Hawthorne Avenue, Princeton, NJ 08540 signed Feb. 13, 2009.

Expert Report of Professor Martin Terry Rothman in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated Apr. 28, 2008 and signed Jun. 9, 2008.

Reply Expert Report of Professor Martin Terry Rothman in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated May 27, 2008 and signed Jun. 9, 2008.

Curriculum Vitae of Martin Terry Rothman.

Reply Expert Report of Richard A. Hillstead in German High Court of Justice Chancery Division Patents Court, HC07 CO1243 dated May 27, 2008 and signed May 27, 2008.

Exhibit RAH 14 referred to in the Reply Expert Report of Richard A. Hillstead dated May 27, 2007.

First Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated Apr. 28, 2008 and signed Apr. 28, 2008.

Exhibit NPB–1 referred to in the First Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated Apr. 28, 2008.

Exhibit NPB–2 referred to in the First Expert Report of Dr. Nigel Pearson Butler in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated Apr. 28, 2008.

Exhibit NPB–3 referred to in the First Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated Apr. 28, 2008.

Exhibit NPB–4 referred to in the First Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated Apr. 28, 2008.

Exhibit NPB–5 referred to in the First Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated Apr. 28, 2008.

Exhibit NPB–6 referred to in the First Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated Apr. 28, 2008.

Exhibit NPB–7 referred to in the First Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated Apr. 28, 2008.

Exhibit NPB–8 referred to in the First Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated Apr. 28, 2008.

Second Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated May 27, 2008 and signed Jun. 18, 2008.

Exhibit NPB–9 referred to in the Second Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated May 27, 2008.

Exhibit NPB–10 referred to in the Second Expert Report of Dr. Nigel Pearson Buller in German High Court of Justice Chancery Division Patents Court, HC 07 C01243 dated May 27, 2008.

Handbook of Coronary Stents, Martin Dunitz Ltd. 1997, pp. 1–10, Exhibit D13 in *Nullity Proceedings Corevalve* v. *Edwards*.

Textbook of Interventional Cardiology, W.B. Saunders Company, 1990, pp. 2–21, Exhibit D14 in *Nullity Proceedings Corevalve* v. *Edwards*.

Ballon Aortic Valbuloplasty, Brice Letac and Alain Cribier, pp. 239–253, Exhibit D15 Exhibit D14 in *Nullity Proceedings Corevalve* v. *Edwards*.

Balloon Expandable Stent Implantation in Stenotic Right Heart Valved Conduits, JACC vol. 16, No. 5, Nov. 1, 1990, pp. 1310–1314, Exhibit D16 in *Nullity Proceedings Corevalve* v. *Edwards*.

Perkutane Implantation von Gefabendoprothesen (Stents) in Becken–und Oberschenkelarterien, DMW 1989, 114, Jg., Nr. 40 pp. 1517–1523, Exhibit D17 in *Nullity Proceedings Corevalve* v. *Edwards*.

Normal and Stenotic Renal Arteries: Experimental Balloon–expandable Intraluminal Stenting, Radiology, Sep. 1987, pp. 705–708, Exhibit D18 in *Nullity Proceedings Corevalve* v. *Edwards*.

The New England Journal of Medicine, vol. 916, No. 12, Mar. 19, 1987, Exhibit D19 in *Nullity Proceedings Corevalve* v. *Edwards*.

Expandable intraluminal vascular graft: A feasiblity study. Surgery, vol. 99, No. 2, Feb. 1986, pp. 199–205, Exhibit D20 in *Nullity Proceedings Corevalve* v. *Edwards*.

Perkutan implantierbare, durch Ballon aufdehnbare GefaBprothese, DMW 1988, 113, Jg., Nr. 14, pp. 538–542, Exhibit D21 in *Nullity Proceedings Corevalve* v. *Edwards*.

Investigative Radiology, Transluminally–placed Coilspring Endarterial Tube Grafts, Charles T. Doiter, MD, Sep.–Oct. 1969, vol. 4: pp. 329–332, Exhibit D22 in *Nullity Proceedings Corevalve* v. *Edwards*.

Perspective, Peripheral Angioplasty and the Newer Circulatory Interventions: Whose Responsibility?, AJR 150, Jun. 1988, pp. 1236–1239, Exhibit D23 in *Nullity Proceedings Corevalve* v. *Edwards*.

Circulation Journal of the American Heart Association, Percutaneous Aortic Valve Implantation Retrograde From the Femoral Artery, Feb. 14, 2006; 113; pp. 842–850.

Interventional Cardiac Catherterization at Duke Medical Center, The American Journal of Cardiology, Oct. 1, 1988, vol. 62.

The New England Journal of Medicine, vol. 316, Mar. 19, 1987, No. 12, Intravascular Stents to Prevent Occlusion and Restenosis After Transluminal Angioplasty.

Laboratory Investigation, Intra–Arterial Stenting in the Atherosclerotic Rabbit, pp. 646–653 with Investigations Concerning the Flexible Coil Stent.

Laboratory Investigation, Early and late results of intracoronary arterial stenting after coronary angioplasty in dogs. vol. 76, No. 4, Oct. 1987, pp. 891–897 with Intracoroany Stenting for Acute Closure Following Percutaneous Transluminal Coronary Angioplasty; Intraluminal Stenting of Iliac Artery Stenosis: Preliminary Report of a Multicenter Trial; Balloon Expandable Intravascular Stents in Human Coronary Arteries: Report of Initial Experience; Reexpansion of Aortic Balloon Expandable Stents Following Growth in Juvenile Swine.

Progress in Radiology, Balloon–Expandable Intravascular Stent, AJR 150, Jun. 1988, pp. 1263–1269.

Intervention, Intravascular Stents for Angioplasty, Reprinted with permission from Cardio, Dec. 1987.

Reprinted from Radiology, vol. 164, No. 3, pp. 705–708, Normal and Stenotic Renal Arteries: Experimental Balloon–expandable Intraluminal Stenting with Report of a New Articulated Balloon Expandable Intravascular Stent: Report of a New Radiopaque Balloon Expandable Intravascular Stent in Canine Coronary Arteries; Balloon Expandable Stent Implantation in Stenotic Right Heart Valved Conduits; Stent Implantation in Vein Grafts, Patency, and Host Response.

Historical Overview, pp. 1–16.

Cath Lab Digest, Percutaneous Aortic Valve Replacement, Apr. 24, 2008, pp. 1–5.

Edwards Lifesciences, Edwards Lifesciences Announces First Human Implants of Next–Generation Transcatheter Heart Valve, pp. 1–2.

CoreValve, News Release, CoreValve announces that more than 500 high–risk patients have been treated with its ReValving System for Percutaneous aortic valve replacement (PAVR).

Catheterization and Cardiovascular Interventions 68: 199–204 (2006), Rapid Pacing to Facilitate Transcatheter Prosthetic Heart Valve Implantation.

Journal of the American College of Cardiology, vol. 50, No. 1, pp. 69–76, Jul. 3, 2007, Percutaneous Aortic Valve Replacement for Severe Aortic Stenosis in High–Risk Patients Using the Second– and Current Third–Generation Self–Expanding CoreValve Prosthesis.

Second International Congress on: Laser and Stent Therapy in Vascular Disease–Scottsdale, Arizona, Corporate Research Trip Report, Rick Hillstead, Feb. 27, 1989, pp. 1–8.

Laser and Stent Therapy In Vascular Surgery, International Congress II, Feb. 10–15, 1989, Scottsdale, Arizona.

A View of Vascular Stents, Richard A. Schatz, MD, pp. 445–457.

Corporate Research Report, A Brief History and Report on Current Clinical Experiences with: Intravascular Stenting in Coronary and peripheral Applications: A Potential New Treatment for the Prevention of Restenosis and Abrupt Closure After Balloon Angioplasty, Rick Hillstead, Apr. 3, 1989.

Radiology, Apr. 1990, Flexible Tantalum Stents Implanted in Aortas and Iliac Arteries: Effects in Normal Canines, pp. 91–96.

International Congress (III), Lasers, Stents and Interventions in Vascular Disease, Feb. 11–16, 1990, Scottsdale, Arizona.

Letter Vossius & Partner (in German) (Cited as Ex. K3 in *Nullity Proceedings CoreValve* v. *Edwards*).

European Heart Journal, 1992 13, pp. 704–708, Transluminal implantation of artificial heart valves. (Cited as Ex. K4 in *Nullity Proceedings CoreValve* v/ *Edwards*).

Expert Report of Professor Martin Terry Rothman (Cited as Ex. K5 in *Nullity Proceedings CoreValve* v. *Edwards*.

Translation of Expert Report of Professor Martin Terry Rothman (Cited as Ex. K5a in *Nullity Proceedings CoreValve* v. *Edwards*.

Expert Report of Richard A. Hillstead (Cited as Ex. K6 in *Nullity Proceedings CoreValve* v. *Edwards*).

Translation of Expert Report of Richard A. Hillstead (Cited as Ex. K6a in Nullity Proceedings *CoreValve*c.*Edwards*).

Translationof Expert Report of Dr. Nigel Pearson Buller (Cited as Ex. K7 in *Nullity Proceedings CoreValve* v. *Edwards*).

First Expert Report of Dr. Nigel Pearson Buller (Cited as Ex. K7a in *Nullity Proceedings CoreValve* v. *Edwards*).

Boards of Appeal of the European Patent Office, Case No. T 0123/06–3.3.10 (Cited as Ex. K8 in *Nullity Proceedings CoreValve* v. *Edwards*).

Exclusive License Agreement between Stanford Surgical Technologies, Inc. and H.R. Andersen, J.M. Hsankam, L.L. Knudsen Marked Exhibit A with Exhibits B, C, D (Cited as Ex. K9 in *Nullity Proceedings CoreValve* v. *Edwards*).

Assignment and License Agreement between H.R. Andersen, J.M. Hasenkam, L.L. Knudsen and Edwards Lifesciences (Cited as Ex. K10 in *Nullity Proceedings CoreValve* v. *Edwards*).

First Expert Report of Professor John R. Pepper (Cited as Ex. K11 in *Nullity Proceedings CoreValve* v. *Edwards*).

Translation of First Expert Report of Professor John R. Pepper (Cited as Ex. K11a in *Nullity Proceedings CoreValve* v. *Edwards*).

CoreValve News Release of November 30, 2006 (Cited as Ex. K13 in *Nullity Proceedings CoreValve* v. *Edwards*).

Erklarung von Drs. U. Schafer and F. Hartmenn (Cited as Ex. K14 in *Nullity Proceedings CoreValve* v. *Edwards*).

Erklarung von Dr. R. Lange (Cited as Ex. K15 in *Nullity Proceedings CoreValve* v. *Edwards*).

Letter addressed to Prof. Dr. Jacques Seguin, MD PhD, dated Apr. 5, 2008 (in German) (Cited as Ex. K16 in *Nullity Proceedings CoreValve* v. *Edwards*).

Article (in German) entitled Neue Herzklappe ohne Op (possibly Cited as Ex. K17 in *Nullity Proceedings CoreValve* v. *Edwards*).

European Journal of Cardio–thoracic Surgery 32 (2007), pp. 291–294, Coronary Flow obstruction in percutaneous aortic valve replacement. (Cited as Ex. K18 in *Nullity Proceedings CoreVlaIve* v. *Edwards*).

Lizenzssatze fur Technische Erfindungen of O. Hellebrand, G. Kaube, Dr. R. von Falckenstein (Cited as Ex. K19 in *Nullity Proceedings CoreValve* v. *Edwards*).

Urteil–Edwards Lifesciences PVT, Inc. and Edwards Lifesciences AG, dated Oct. 16, 2008 (Cited as Ex. K20 in *Nullity Proceedings CoreValve* v. *Edwards*).

Decision of the Technical Board of Appeal 3.2.2, dated Apr. 2, 1996 (Cited as Ex. K21 in *Nullity Proceedings CoreValve* v. *Edwards*).

Eidesstattliche Versicherung, dated Feb. 3, 2009, signed by R. Steiner (Cited as Ex. K23 in *Nullity Proceedings Core Valve* v. *Edwards*).

Correspondence (in German) from Reimann, Osterrieh, Kohler, Haft (Cited as Ex. K24 in *Nullity Proceedings Core Valve* v. *Edwards*).

Correspondence (in German) from Hoffmann–Eitle, dated May 29, 2009 (Cited as Ex. K25 in *Nullity Proceedings Core Valve* v. *Edwards*).

Patent Cooperation Treaty International Preliminary Examination Report (Cited as Ex. K26 in *Nullity Proceedings Core Valve* v. *Edwards*).

Correspondence (in German) from Hoffman–Eitle, dated Jul. 20, 1992 (Cited as Ex. K26a in *Nullity Proceedings CoreValve* v. *Edwards*).

Correspondence from Lehmann & Ree, dated Dec. 14, 1992 (Cited as Ex. K27 in *Nullity Proceedings CoreValve* v. *Edwards*).

Correspondence (in German) from Hoffman–Eitle, dated Dec. 14, 1992 (Cited as Ex. K27a in *Nullity Proceedings CoreValve* v. *Edwards*).

A Valve Prosthesis for Implantation in the Body and a Catheter for Implantating Such Valve Prosthesis. (Cited as Ex. K28 in *Nullity Proceedings CoreValve* v. *Edwards*).

Taschenbuch fur den Maschinenbau (Cited as Ex. K29 in *Nullity Proceedings CoreValve* v. *Edwards*).

Delaware Secretary of State Certificate of Merger, dated Apr. 9, 2009 (Cited as Ex. K30 in *Nullity Proceedings Core Valve* v. *Edwards*).

Delaware Secretary of State Certificate of Conversion, dated Apr. 20, 2009 (Cited as Ex. K30/2 in *Nullity Proceedings CoreValve* v. *Edwards*).

Hoffman & Eitle handwritten in German notes (Cited as Ex. K31 in *Nullity Proceedings CoreValve* v. *Edwards*).

Drawing dated Jan. 19, 2010, Fig. 1B (Cited as Ex. K31 in *Nullity Proceedings CoreValve* v. *Edwards*).

Cardiovascular Medicine, May 2006, vol. 3, No. 5, pp. 256–264, Surgery Insight: current advances in percutaneous heart valve replacement and repair. (Cited as Ex. K32 in *Nullity Proceedings CoreValve* v. *Edwards*).

Convenience Translation to Federal Patent Court, dated Feb. 16, 2009.

Convenience Translation to Federal Patent Court, dated Feb. 16, 2009 from Vossius & Partner.

US 5,411,552 C1

Page 5

Convenience Translation to Federal Patent Court, dated Feb. 16, 2009 regarding Hearing Information.

Convenience Translation to Federal Patent Court, dated Jun. 20, 2007 from Vossius & Partner, regarding Nullity Action.

Correspondence from H.R. Andersen, M.D. to Rick Hillstead, dated Mar. 6, 1989.

European Heart Journal correspondence from D.L. Brutsaert, Basic Cardiology Editor, regarding manuscript submitted to European Heart Journal by H.R. Andersen, L.L. Knudsen and J.M. Hasenkam.

European Heart Journal correspondence from D.L. Brutsaert, Basic Cardiology Editor, dated Oct. 3, 1991, to Dr. Andersen regarding his paper Ms EHJ BC–109 is accepted for publication.

Circulation, University of California San Diego School of Medicine and UCSD Medical Center correspondence, dated Feb. 5, 1991, to H.R. Andersen, MD.

Indian Heart J 2007: Suppl B: B118–B132, Percutaneous Aortic Valves: Emerging.

Circulation, University of California San Diego School of Medicine and UCSD Medical Center correspondence, dated Oct. 9, 1990, to H.R. Andersen, MD.

Journal of the American College of Cardiology correspondence, dated Jul. 26, 1990, from Simon Dack, MD, Editor–in–Chief to R.H. Anderson, MD (marked DD235.001).

Journal of the American College of Cardiology correspondence, dated Jul. 26, 1990, from Simon Dack, MD, Editor–in–Chief to R.H. Anderson, MD (marked DD234.001).

Correspondence from Bird & Bird, dated Aug. 16, 2007, to Federal Patent Court, Complaint because of declaration of nullity of patent EP 0592 410 (DE 691 13 818).

Correspondence to Federal Patent Court, dated Jun. 2, 2008, Reasons for the opposition against the nullity action.

Convenience Translation to Federal Patent Court, dated Jun. 10, 2008, from Bardehle, Pagenberg, Dost, Altenburg, Geissler.

Correspondence to District Court of Dusseldorf, dated Aug. 4, 2008, from Vossius & Partner.

Correspondence from Federal Court, dated Aug. 14, 2008, to Bird & Bird, Summons to oral proceedings.

Correspondence from Federal Patent Court, dated Oct. 2, 2008, from Bird & Bird.

Correspondence to Federal Patent Court, dated Oct. 10, 2008, from Boehmert & Boehmert.

Correspondence to Federal Patent Court, dated Oct. 28, 2008.

Correspondence to Federal Patent Court, dated Nov. 17, 2008, Response to the communication from the Federal Patent Court of 2 Oct. 2008 and the submissions of the plaintiff dated Aug. 4, 2008.

Correspondence to Federal Patent Court, dated Nov. 20, 2008, from Boehmert & Boehmert, Nullity proceedings regarding the German part of European Patent 592 410.

Federal Patent Court, Received date Dec. 22, 2008, Decision.

Correspondence to Federal Patent Court, dated Feb. 5, 2009, from Vossius & Partner.

Correspondence to Federal Patent Court, dated Feb. 11, 2009, Response to the submission by CoreValve dated Feb. 5, 2009.

Correspondence to Federal Patent Court, dated Dec. 24, 2009, from Hoffman–Eitle.

Correspondence to Federal Patent Court, dated Jan. 13, 2010, from Bird & Bird.

German Federal Patent Court, dated Jan. 19, 2010, Judgment.

Federal Patent Court, dated Jan. 19, 2010, Minutes.

Correspondence to Federal Patent Court, dated Mar. 22, 2010, from Hoffmann–Eitle.

Correspondence from Federal Patent Court to Bird & Bird LLP.

German Federal Patent Court, Decision Concerning The Correction.

Correspondence to German Federal Supreme Court, dated Jan. 12, 2011, from Hoffman–Eitle.

Correspondence to Federal Patent Court, dated Aug. 14, 2007, Litigating Intervention and Opposition.

Correspondence to The High Court of Justice, Chancery Division Patents Court, Re–Amended Defence and Counterclaim, from Bird & Bird.

Claim Form in the High Court of Justice, Chancery Division Royal Courts of Justice, Issue Date May 11, 2007.

Correspondence from The Supreme Court of the United Kingdom to Bird & Bird, dated Aug. 2, 2010, permission to appeal with a copy of application, information about the decision being appealed, copy of patent in suit (EP 0 592 410 B1).

High Court of Justice, Chancery Division Patents Court, dated Jan. 9, 2009, Judgment.

High Court of Justice, Chancery Division Patents Court, dated Mar. 28, 2008, Re–Re–Amended Grounds of Invalidity.

High Court of Justice, Chancery Division Patents Court, dated Mar. 28, 2008, Re–Re–Amended Particulars of Claim.

Correspondence to The High Court of Justice, Chancery Division Patents Court, dated Jun. 6, 2008 from Bird & Bird, Amended Particulars of Infringement.

High Court of Justice, Chancery Division Patents Court, dated Jun. 17, 2008, Amended Reply and Defence to Counterclaim.

File History for U.S. Patent No. 5,411,552 (Andersen et al) submitted as Plaintiff Trial Exhibit 3 in C.A. No. 08–091–GMS in the District Court of Delaware.

Danish Patent Application No. 1246/90 (Andersen et al.) submitted as Plaintiff Trial Exhibit 3 in C.A. No. 08–091–GMS in the District Court of Delaware.

Instructions for use enclosed within PX 10 (CoreValve packaged device) submitted as Plaintiff Trial Exhibit 23 in C.A. No. 08–091–GMS in the District Court of Delaware.

Press Release: "CoreValve to be acquired Medtronic for $700 million—Medtronic targets leadership role in high-growth aortic transcatheter valves." submitted as Plantiff Trial Exhibit 49 in C.A. No. 08–091–GMS in the District Court of Delaware.

Manuscript: Kappetein et al., Transapical Implantation of a Self–Expanding Aortic Valve Bioprosthesis—Animal Feasibility Study submitted as Plaintiff Trial Exhibit 56 in C.A. No. 08–091–GMS in the District Court of Delaware.

Photo of the Andersen Prototype Device from the Aarhus University webpage submitted as Plaintiff Trial Exhibit 82 in C.A. No. 08–091–GMS in the District Court of Delaware.

Press Release re: CoreValve Establishes U.S. Operations, Hires Veteran Medical Device Management and Development Team, submitted as Plaintiff Trial Exhibit 109 in C.A. No. 08–091–GMS in the District Court of Delaware.

CoreValve, Inc.'s Objections and Re Designated Responses to Interrogatory Nos. 1–7 & 9–13 of Plaintiffs' First Set of Interrogatories and Supplemental Responses to Interrogatory Nos. 9 and 13 submitted as Plaintiff Trial Exhibit 151 in C.A. No. 08–091–GMS in the District Court of Delaware.

Knudsen et al., Catheter–Implanted Hasenkam Hasenkam Prosthetic Heart Valves—Transluminal Catheter Implantation of a New Expandable Artificial Heart Valve in the Descending Thoracic Aorta in Isolated Vessels and Closed Chest Pigs, The International Journal of Artificial Organs, vol. 16, No. 5, pp. 253–262 (1993), submitted as Plaintiff Trial Exhibit 156 in C.A. No. 08–091–GMS in the District Court of Delaware.

Grube et al., First Report on a Human Percutaneous Transluminal Implantation of a Self Expanding Valve Prosthesis for Interventional Treatment of Aortic Valve Stenosis, Catherization and Cardiovascular Interventions, vol. 66, pp. 465–469 (2005) submitted as Plaintiff Trial Exhibit 158 in C.A. No. 08–091–GMS in the District Court of Delaware.

English Translation of French Patent 00 14028 submitted as Plaintiff Trial Exhibit 165 in C.A. No. 08–091–GMS in the District Court of Delaware.

Transcript of CoreValve analyst update conference call submitted as Plaintiff Trial Exhibit 168 in C.A. No. 08–091–GMS in the District Court of Delaware.

Photo of Edwards Sapien THV submitted as Plaintiff Trial Exhibit 285 in C.A. No. 08–091–GMS in the District Court of Delaware.

EC Design Examination Certificate Medical Device Directive submitted as Plaintiff Trial Exhibit 380 in C.A. No. 08–091–GMS in the District Court of Delaware.

First Witness Statement of Robrecht Michiels submitted as Plaintiff Trial Exhibit 401 in C.A. No. 08–091–GMS in the District Court of Delaware.

Andersen et al., Transluminal Hasenkam Hasenkam Implantation of artificial heart valves. Description of a new expandable aortic valve and initial results with implantation by catheter technique in closed chest pigs, European Heart Journal, vol. 13, pp. 704–708 (1992) submitted as Plaintiff Trial Exhibit 477 in C.A. No. 08–091–GMS in teh District Court of Delaware.

Letter from Henning Rud Andersen to D. L. Brutsaert enclosing manuscript submission for European Heart Journal submitted as Plaintiff Trial Exhibit 523 in C.A. No. 08–091–GMS in the District Court of Delaware.

Andersen et al., Transluminal catheter implantation of a new expandable artificial cardiac valve in the aorta and the beating heart of closed chest pigs, European Heart Journal, vol. 11, pp. 224 (Aug. 1990) submitted as Plaintiff Trial Exhibit 531 in C.A. No. 08–091–GMS in the District Court of Delaware.

Andersen et al., Implantation of Artificial Heart Valves (Manuscript), submitted as Plaintiff Trial Exhibit 532 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Simon Dack of JACC to Henning Andersen enclosing referee comments of manuscript (No. JAC000331) submitted as Plaintiff Trial Exhibit 533 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Simon Dack of JACC to Henning Andersen enclosing referee comments of manuscript (No. JAC000333) submitted as Plaintiff Trial Exhibit 534 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Ruth R. Ohman of JACC to Henning Andersen acknowledging receipt of manuscript (No. JAC000331) submitted as Plaintiff Trial Exhibit 535 in C.A. No. 08–091–GMS in the District Court of Delaware.

Rejection of article titled "Implantation of Artificial Heart Valves" submitted as Plaintiff Trial Exhibit 536 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Knud Tange Rasmussen of DTI to Kenneth H. Levin of C.R. Bard submitted as Plaintiff Trial Exhibit 537 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from H. Anderson to S. Rowe re: developments of U.S. Patent No. 5,411,552 submitted as Plaintiff Trial Exhibit 544 in C.A. No. 08–091–GMS in the District Court of Delaware.

Fax from Anderson to S. Rowe attching letter re: meeting to discuss possibilities for Johnson & Johnson to negotiate license agreement of U.S. Patent No. 5,411,552 submitted as Plaintiff Trial Exhibit 545 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from H. Anderson to S. Rowe re: reimbursement of travel expenses submitted as Plaintiff Trial Exhibit 548 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from H. Anderson to W. Sterman re Sep. 12, 1995 announcement regarding corporation between Heartport and St. Jude submitted as Plaintiff Trial Exhibit 565 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from M. Garrison to H. Anderson re: renewed Heartport effort in endovascular valve replacement submitted as Plaintiff Trial Exhibit 566 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from H. Anderson to M. Garrison re: development of invention by Heartport submitted as Plaintiff Trial Exhibit 567 in C.A. No. 08–091–GMS in the District Court of Delaware.

Edwards Endovascular HVT—Patriot submitted as Plaintiff Trial Exhibit 589 in C.A. No. 08–091–GMS in the District Court of Delaware.

L.L. Knudsen, H.R. Andersen & J.M. Hasenkam, Transluminal Catheter Implantation of a New Expandable Artificial Heart Valve in the Descending Thoracic Aorte in Isolated Vessels and Closed Chest Pigs (Abstract), submitted as Plaintiff Trial Exhibit 647 in C.A. No. 08–091–GMS in the District Court of Delaware.

H.R. Andersen et al., Abstract Submission Form for XII Congress of the European Society of Cardiology, Transluminal catheter implantation of a new expandable artificial cardiac valve (the stent–valve) in the aorta and the beating heart of closed chest pigs submitted as Plaintiff Trial Exhibit 683 in C.A. No. 08–091–GMS in the District Court of Delaware.

Excerpt from Abstracts from the 65th Scientific Sessions New Orleans Convention Center Nov. 16–19, 1992, Supplement to Circulation vol. 86, No. 4, 1–698 (Oct. 1992) submitted as Plaintiff Trial Exhibit 695 in C.A. No. 08–091–GMS in the District Court of Delaware.

Steven R. Bailey, Percutaneous Expandable Prosthetic Valves, Textbook of Interventional Cardiology, 2nd Edition, vol. 2, pp. 1268–1276 (1994) submitted as Plaintiff Trial Exhibit 700 in C.A. No. 08–091–GMS in the District Court of Delaware.

H. R. Andersen, Transluminal Catheter Implanted Prosthetic Heart Valves, Int'l J. of Angiology 7: 102–106 (1998) submitted as Plaintiff Trial Exhibit 708 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 1 submitted as Plaintiff Trial Exhibit 753 n C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 2 submitted as Plaintiff Trial Exhibit 755 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 2 (English Translation) submitted as Plaintiff Trial Exhibit 756 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 3 submitted as Plaintiff Trial Exhibit 757 in C.A. No. 08–091–GMS n the District Court of Delaware with Stent–Valve Pig No. 3 (English Translation) submitted as Plaintiff Trial Exhibit 7586 in C.A. No. 08–091–GMS in the District Court Delaware.

"Stent–Klappen" (Danish) GRIS NR. 4 submitted as Plaintiff Trial Exhibit 759 with Stent–Valve Pig No. 4 (English Translation) submitted as Plaintiff Trial Exhibit 760, "Stent–Klappen" (Danish) GRIS NR. 4 (with handwriting) submitted as Plantiff Trial Exhibit 761 and Stent–Valve Pig No. 4 (English Translation) with handwriting submitted s Paintiff Trial Exhibit 762 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 5 submitted as Plaintiff Trial Exhibit 763 with Stent–Valve Pig No. 5 (English Translation) submitted as Plaintiff Trial Exhibit 764, "Stent–Klappen" (Danish) GRS NR. 5 (with handwriting) submitted as Plantiff Trial Exhibit 765 and Stent–Valve Pig No. 5 (English Translation) with handwriting as Plaintiff Trial Exhibit 766 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 6 submitted as Plaintiff Trial Exhibit 767 with Stent–Valve Pig No. 6 (English Translation submitted as Plaintiff Trial Exhibit 768, "Stent–Klappen" (Danish) GRIS NR. 6 (with handwriting) submitted as Plantiff Trial Exhibit 769 and Stent–Valve Pig No. 6 (English Translation) with handwriting submitted as Plaintiff Trial Exhibit 770 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. No. 7 (English Translation) submitted as Plaintiff 772 in C.A. No. 08–091 GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 8 submitted as Plaintiff Trial Exhibit 773 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 8 (English Translation0 Submitted as Plaintiff Trial Exhibit 774 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 9 submitted as Plaintiff Trial Exhibit 775 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 9 (English Translation) submitted as Plaintiff Trial Exhibit 776 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 10 submitted as Plaintiff Trial Exhibit 777 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 10 (English Translation) submitted as Plaintiff Trial Exhibit 778 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 11 submitted as Plaintiff Trial Exhibit 779 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 11 (English Translation) submitted as Plaintiff Trial Exhibit 780 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 12 submitted as Plaintiff Trial Exhibit 781 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 12 (English Translation) submitted as Plaintiff Trial Exhibit 782 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 13 submitted as Plaintiff Trial Exhibit 783 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 13 (English Translation) submitted as Plaintiff Trial Exhibit 784 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 14 submitted as Plaintiff Trial Exhibit 785 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 14 (English Translation) submitted as plaintiff Trial Exhibit 786 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 15 submitted as Plaintiff Trial Exhibit 787 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 15 (English Translation) submitted as Plaintiff Trial Exhibit 788 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 16 submitted as Plaintiff Trial Exhibit 789 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 16 (English Translation) submitted as Plaintiff Trial Exhibit 790 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 17 submitted as Plaintiff Trial Exhibit 791 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 17 (English Translation) submitted as Plaintiff Trial Exhibit 792 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 18 submitted as Plaintiff Trial Exhibit 793 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 18 (English Translation) submitted as Plaintiff Trial Exhibit 794 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 19 submitted as Plaintiff Trial Exhibit 795 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 19 (English Translation) submitted as Plaintiff Trial Exhibit 796 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 20 submitted as Plaintiff Trial Exhibit 797 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 20 (English Translation) submitted as Plaintiff Trial Exhibit 798 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 21 submitted as Plaintiff Trial Exhibit 799 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 21 (English Translation) submitted as Plaintiff Trial Exhibit 800 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 22 submitted as Plaintiff Trial Exhibit 801 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 22 (English Translation) submitted as Plaintiff Trial Exhibit 802 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 23 submitted as Plaintiff Trial Exhibit 803 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 23 (English Translation) submitted as Plaintiff Trial Exhibit 804 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 24 submitted as Plaintiff Trial Exhibit 805 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 24 (English Translation) submitted as Plaintiff Trial Exhibit 806 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 25 submitted as Plaintiff Trial Exhibit 807 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 25 (English Translation) submitted as Plaintiff Trial Exhibit 808 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) undated GRIS NR. 26 submitted as Plaintiff Trial Exhibit 809 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 26 (English Translation) undated submitted as Plaintiff Trial Exhibit 810 in C.A. No. 08–091–GMS in the District Court of Delaware and "Stent–Klappen" (Danish) GRIS NR. 26 submitted as Plaintiff Trial Exhibit 811 in C.A. No. 08–091 GMS in the District Court of Delaware with Stent–Valve Pig No. 26 (English Translation) submitted as Plaintiff Trial Exhibit 812 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 27 submitted as Plaintiff Trial Exhibit 813 in C.A. No.08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 27 (English Translation) submitted as Plaintiff Trial Exhibit 814 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 28 submitted as Plaintiff Trial Exhibit 815 with Stent–Valve Pig No. 28 (English Translation) submitted as Plaintiff Trial Exhibit 816, "Stent–Klappen" (Danish) GRIS NR. 28 (with handwriting) submitted as Plantiff Trial Exhibit 817 and Stent–Valve Pig No. 28 (English Translation) with handwriting submitted as Plaintiff Trial Exhibit 818 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 29 submitted as Plaintiff Trial Exhibit 819 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 29 (English Translation) submitted as Plaintiff Trial Exhibit 820 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 30 submitted as Plaintiff Trial Exhibit 821 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 30 (English Translation) submitted as Plaintiff Trial Exhibit 822 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 30B submitted as Plaintiff Trial Exhibit 823 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 30B (English Translation) submitted as Plaintiff Trial Exhibit 824 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 31 submitted as Plaintiff Trial Exhibit 825 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 31 (English Translation) submitted as Plaintiff Trial Exhibit 826 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 32 submitted as Plaintiff Trial Exhibit 827 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 32 (English Translation) submitted as Plaintiff Trial Exhibit 828 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 33 submitted as Plaintiff Trial Exhibit 829 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 33 (English Translation) submitted as Trial Exhibit 830 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 34 submitted as Plaintiff Trial Exhibit 831 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–valve Pig No. 34 (English Translation) submitted as Plaintiff Trial Exhibit 832 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 35 submitted as Plaintiff Trial Exhibit 833 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 35 (English Translation) submitted as Plaintiff Trial Exhibit 834 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 36 submitted as Plaintiff Trial Exhibit 835 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 36 (English Translation) submitted as Plaintiff Trial Exhibit 836 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 37 submitted as Plaintiff Trial Exhibit 837 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 37 (English Translation) submitted as Plaintiff Trial Exhibit 838 in C.A. No. 08 091 GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 38 submitted as Plaintiff Trial Exhibit 839 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 38 (English Translation) submitted as Plaintiff Trial Exhibit 840 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 39 submitted as Plaintiff Trial Exhibit 841 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 39 (English Translation) submitted as Plaintiff Trial Exhibit 842 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 40 submitted as Plaintiff Trial Exhibit 843 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 40 (English Translation) submitted as Plaintiff Trial Exhibit 844 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Stent–Klappen" (Danish) GRIS NR. 41 submitted as Plaintiff. Trial Exhibit 845 in C.A. No. 08–091–GMS in the District Court of Delaware with Stent–Valve Pig No. 41 (English Translation) submitted as Plaintiff Trial Exhibit 846 in C.A. No. 08–091–GMS in the District Court of Delaware.

Collection of letters between P. Block, M. Chan, and H.R. Andersen submitted as Plaintiff Trial Exhibit 851 in C.A. No. 08–091–GMS in the District Court of Delaware.

Stent–Klappen (Danish) submitted as Plaintiff Trial Exhibit 852 in C.A. No. 08–091–GMS in the District Court of Delaware.

Stent–Klappen (Danish) submitted as Plaintiff Trial Exhibit 853 in C.A. No. 08–091–GMS in the District Court of Delaware with English translation to be agreed upon by the parties submitted as Plaintiff Trial Exhibit Exhibit 853A in C.A. No. 08–091–GMS in the District Court of Delaware.

"EN NY Kateterbaren Stent–Monterer Kunstig Hjerteklap Til Implantation Uden Aben Hjertekirurgi" (Danish) submitted as Plaintiff Trial Exhibit 860 in C.A. No. 08–091–GMS in the District Court of Delaware with English translation to be agreed upon by the parties submitted as Plaintiff Trial Exhibit 860A in C.A. No. 08–091–GMS in the District Court of Delaware.

Andersen et al., Implantation of Artifical Heart Valves (manuscript) submitted as Plaintiff Trial Exhibit 861 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Knud Tange Rasmussen of DTI (Danish) submitted as Plaintiff Trial Exhibit 863 in C.A. No. 08–091–GMS in the District Court of Delaware English with translation to be agreed upon by the parties submitted as Plaintiff Trial Exhibit 863A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Hans Rasmussen of DTI to Henning Rud Andersen (Danish) submitted as Plaintiff Trial Exhibit 865 in C.A. No. 08–091–GMS in the District Court of Delaware with English translation to be agreed upon by the parties submitted as Plaintiff Trial Exhibit 865A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Knud Tange Rasmussen of DTI (Danish) submitted as Plaintiff Trial Exhibit 866 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 866A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Knud Tange Rasmussen of DTI (Danish) submitted as Plaintiff Trial Exhibit 867 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 867A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Knud Tange Rasmussen of DTI (Danish) submitted as Plaintiff Trial Exhibit 868 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 868A in C.A. No. 08–091–GMS in the District Court of Delaware.

Miscellaneous data sheets from Pig No. 17 (Danish) submitted as Plaintiff Trial Exhibit 869 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Dansk Cardiologisk Selskab's" (Danish) submitted as Plaintiff Trial Exhibit 870 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 870A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Per Holm of Vingmed A/S (Danish) submitted as Plaintiff Trial Exhibit 871 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 871A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Peter De Jong of Baxter submitted as Plaintiff Trial Exhibit 872 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Niels Christiansen of Pfizer (Danish) submitted as Plaintiff Trial Exhibit 873 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 873A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Hans Rasmussen of DTI to Henning Rud Andersen (Danish) submitted as Plaintiff Trial Exhibit 874 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 874A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Kaj Berlich of Baxter (Danish) submitted as Plaintiff Trial Exhibit 875 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 875A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Per Holm on Vingmed A/S to Henning Rud Andersen (Danish) submitted as Plaintiff Trial Exhibit 876 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Exhibit 876A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Niels Christiansen of Pfizer (Danish) submitted as Plaintiff Trial Exhibit 877 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 877A in C.A. No. 08–091–GMS in the District Court of Delaware.

Fax from Per Holm Vingmed A/S to Peter Chevalier of Medtronic, Inc. (Danish) submitted as Plaintiff Trial Exhibit 878 in C.A. No. 08–091–GMS in the District Court of Delaware with English Traslation submitted as Plaintiff Trial Exhibit 878A in C.A. No. 08–091–GMS in the District Court of Delaware.

Fax from Peter Chevalier of Medtronic, Inc. to Per Holm of Vingmed A/S submitted as Plaintiff Trial Exhibit 879 in C.A. No. 08 091 GMS in the District Court of Delaware.

Letter from Bent Holmegand of Meadox Surgimed A/S to Knud Tange Rasmussen of DTI (Danish) submitted as Plaintiff Trial Exhibit 881 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 881A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Knud Tange Rasmussen of DTI to Henning Rud Andersen (Danish) submitted as Plaintiff Trial Exhibit 882 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 882A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Kenneth H. Levin of C.R. Bard, Inc. to Hemming [sic] Andersen submitted as Plaintiff Trial Exhibit 883 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Knud Tange Rasmussen of DTI (Danish) submitted as Plaintiff Trial Exhibit 884 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 884A in C.A. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Kenneth Levin of C.R. Bard, Inc. submitted as Plaintiff Trial Exhibit 885 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Flemming Hoj Sorensen of DTI to Henning Rud Andersen (Danish) submitted as Plaintiff Trial Exhibit 886 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Exhibit 886A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Knud Tange Rasmussen of DTI (Danish) submitted as Plaintiff Trial Exhibit 867 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 867A in C.A. No. 08–091–GMS in the District Court of Delaware.

Miscellaneous date sheets from Pig No. 17 (Danish) sumbitted as Plaintiff Trial Exhibit 869 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Peter De Jong of Baxter submitted as Plaintiff Trial Exhibit 872 in C.A. No. 08–091–GMS in the District Court of Delaware.

Fax from Per Holm of Vingmed A/S to Peter Chevalier of Medtronic, Inc. (Danish) submitted as Plaintiff Trial Exhibit 878 in C.A. No. 08–091–GMS in the District Court of Delaware with English Traslation submitted as Plaintiff Trial Exhibit 878A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Bent Holmegaand of Meadox Surgimed A/S to Knud Tange Rasmussen of DTI (Danish) submitted as Plaintiff Trial Exhibit 881 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 881A in C.A. 08–091–GMS in the District Court of Delaware.

Fax from Kennth H. Levin of C.R. Bard, Inc. to Henning Rud Andersen submitted as Plaintiff Trial Exhibit 887 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Flemming Hoj Sorensen of DTI (Danish) submitted as Plaintiff Trial Exhibit 888 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Exhibit 888A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Flemming Hoj Sorensen and Knud Tange Rasmussen of DTI (Danish) submitted as Plaintiff Trial Exhibit 890 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 890A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to MArcel van den Brand of Erasmus University Hospital submitted as Plaintiff Trial Exhibit 891 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Knud Tange Rasmussen of DTI to Henning Rud Andersen (Danish) submitted as Plaintiff Trial Exhibit 892 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 892A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Knud Tange Rasmussen of DTI to Henning Rud Andersen (Danish) submitted as Plaintiff Trial Exhibit 893 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 893A in C:A. 08–091–GMS in the District Court of Delaware.

Letter from Lars Lyhne Kndusen to Professor P. Sleight enclosing manuscripts for review by Cardiovascular Research submitted as Plaintiff Trial Exhibit 894 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Knud Tange Rasmussen of DTI to Kenneth H. Levin of C.R. Bard submitted as Plaintiff Trial Exhibit 895 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Knud Tange Rasmussen of DTI to Henning Rud Andersen (Danish) submitted as Plaintiff Trial Exhibit 896 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 896A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Marvin P. Loeb of Trimedyne to Henning Rud Andersen submitted as Plaintiff Trial Exhibit 897 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Knud Tange Rasmussen of DTI to Erik Andersen of Boston Scientific (Danish) submitted as Plaintiff Trial Exhibit 898 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 898A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Marvin P. Loeb of Trimedyne, Inc. submitted as Plaintiff Trial Exhibit 899 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to SCIMED submitted as Plaintiff Trial Exhibit 900 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Anderson to Marvin P. Loeb of Trimedyne, Inc. submitted as Plaintiff Trial Exhibit 901 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Erik Andersen of Boston Scientific to Dansk Teknologisk Institut (Danish) submitted as Plaintiff Trial Exhibit 902 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 902A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Marvin P. Loeb of Trimedyne, Inc. to Henning Rud Andersen submitted as Plaintiff Trial Exhibit 903 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Knud Tange Rasmussen of DTI submitted as Plaintiff Trial Exhibit 904 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Knud Tange Rasmussen of DTI to Henning Rud Andersen (Danish) submitted as Plaintiff Trial Exhibit 905 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Tamar J. Preminger of Children's Hospital (Boston) to Henning R. Andersen submitted as Plaintiff Trial Exhibit 906 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Ruder Andersen to Tamar J. Preminger of Children's Hospital submitted as Plaintiff Trial Exhibit 907 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Marvin P. Loeb of Trimedyne, Inc. to Rasmus Offersen of DTI submitted as Plaintiff Trial Exhibit 908 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Rasmus Offersen of DTI to Kurt Anker Jensen of Astra Meditek A/S (Danish) submitted as Plaintiff Trial Exhibit 909 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 909A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Rasmus Offersen of DTI to Henning Rud Andersen (Danish) submitted as Plaintiff Trial Exhibit 910 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 910A in C.A. No. 08–091–GMS in the District Court of Delaware.

Fax from Rasmus Offersen of DTI to Marvin P. Loeb of Trimedyne, Inc. submitted as Plaintiff Trial Exhibit 911 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Rasmus Offersen of DTI to Kurt Anker Jensen of Astra Meditek A/S (Danish) submitted as Plaintiff Trial Exhibit 912 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 912A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Rasmus Offersen of DTI to Peter Selley of Astra Tech AB (Danish) submitted as Plaintiff Trial Exhibit 915 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 915A in C.A. No. 08–091–GMS in the District Court of Delaware.

Fax from Rasmus Offersen of DTI to Peter Selley of Astra Tech AB (Danish) submitted as Plaintiff Trial Exhibit 916 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 916A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from American Heart Association to Henning Rud Andersen concerning poster presentation acceptance submitted as Plaintiff Trial Exhibit 917 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Rasmus Offersen of DTI (Danish) submitted as Plaintiff Trial Exhibit 918 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 918A in C.A. No. 08–091–GMS in the District Court of Delaware.

Fax from Rasmus Offersen of DTI to Wes Sterman of Stanford Surgical Technologies submitted as Plaintiff Trial Exhibit 919 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Rasmus Offersen of DTI to Wesley Sterman of Stanford Surgical Technologies, Inc. submitted as Plaintiff Trial Exhibit 920 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Lars Lyhne Kundsen to Eli A. Friedman of ASAIO Journal enclosing manuscript for review submitted as Plaintiff Trial Exhibit 922 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Rasmus Offersen of DTI to Marvin P. Loeb of Trimedyne, Inc.submitted as Plaintiff Trial Exhibit 923 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Diego Brancaccio of Int'l Journal of Artificial Organs to Lars L. Knudsen concerning publication of manuscript submitted as Plaintiff Trial Exhibit 924 in C.A. No. 08–091–GMS in the District Court of Delaware.

Fax from Rasmus Offersen of DTI to Wesley Sterman of Stanford Surgical Technologies enclosing executed licensing agreement submitted as Plaintiff Trial Exhibit 925 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Wesley D. Sterman of Stanford Surgical Technologies, Inc. submitted as Plaintiff Trial Exhibit 926 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Hanson Giffort of Stanford Surgical Technologies, Inc. submitted as Plaintiff Trial Exhibit 927 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Tamar J. Preminger of Children's Hospital (Boston) to Henning Rud Andersen submitted as Plaintiff Trial Exhibit 929 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Ted Feldman of the University of Chicago to H. Rud Andersen submitted as Plaintiff Trial Exhibit 930 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Tamar J. Preminger of Children's Hospital (Boston) submitted as Plaintiff Trial Exhibit 931 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Robert F. Kuhling of Onset Ventures to Leif Nielsen of Lehman & Ree submitted as Plaintiff Trial Exhibit 932 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Robert F. Kuhling of Onset Ventures to Henning Rud Andersen submitted as Plaintiff Trial Exhibit 933 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Robert F. Kuhling of Onset Ventures submitted as Plaintiff Trial Exhibit 934 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Wesley D. Sterman of Heartport, Inc. submitted as Plaintiff Trial Exhibit 935 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Peter C. Block of St. Vincent's Medical Center to Henning Rud Andersen submitted as Plaintiff Trial Exhibit 936 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Peter C. Block of St. Vincent's Medical Center to Henning Rud Andersen submitted as Plaintiff Trial Exhibit 937 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Peter C. Block of St. Vincent's Medical Center submitted as Plaintiff Trial Exhibit 938 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Peter C. Block of St. Vincent's Medical Center to Henning Rud Andersen submitted as Plaintiff Trial Exhibit 939 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Peter C. Block of St. Vincent's Medical Center submitted as Plaintiff Trial Exhibit 940 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Rasmus Offersen of DTI (Danish) submitted as Plaintiff Trial Exhibit 941 in C.A. No. 08–091–GMS in the District Court of Delaware with English Translation submitted as Plaintiff Trial Exhibit 941A in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Peter C. Block of St. Vincent's Medical Center to Henning Rud Andersen submitted as Plaintiff Trial Exhibit 942 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Dusan Pavenik to Henning Rud Andersen submitted as Plaintiff Trial Exhibit 943 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letetr from HenninG Rud Andersen to George Teitelbaum submitted as Plaintiff Trial Exhibit 944 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Jan Peregrin submitted as Plaintiff Trial Exhibit 945 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Jeffry J. Grainger of Hearport, Inc. to Vibeke Walde of DTI submitted as Plaintiff Trial Exhibit 949 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Henning Rud Andersen to Jeffry Grainger of Heartport, Inc. submitted as Plaintiff Trial Exhibit 951 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from Jan Komtebedde to Andersen et al. re: update on license agreement submitted as Plaintiff Trial Exhibit 953 in C.A. No. 08–091–GMS in the District Court of Delaware.

Consent of Merger Agreement between Heartport, Inc. and Andersen et al. submitted as Plaintiff Trial Exhibit 954 in C.A. No. 08–091–GMS in the District Court of Delaware.

Email chain from Vibeke Wakle to Henning Rud Andersen re: VS: Andersen license (Danish in part) submitted as Plaintiff Trial Exhibit 956 in C.A. No. 08–091–GMS in the District Court of Delaware.

PVT Design Review—1st Design Iteration submitted as Plaintiff Trial Exhibit 1005 in C.A. No. 08–091–GMS in the District Court of Delaware.

Emails from Hanne Rask Hansen to Abi Zakai re: Collaboration submitted as Plaintiff Trial Exhibit 1013 in C.A. No. 08–091–GMS in the District Court of Delaware.

In vivo picture of CoreValve device, excerpted from CoreValve Slide Presentation of Two heart valve prostheses in patients at Albert Einstein Hospital in Sao Paulo, Brazil submitted as Plaintiff Trial Exhibit 1078 in C.A. No. 08–091–GMS in the District Court of Delaware.

French Catheter Scales submitted as Plaintiff Trial Exhibit 1083 in C.A. No. 08–091–GMS in the District Court of Delaware.

PVT, Inc. Series B Convertible Preferred Stock Purchase Agreement b/w PVT and Medtronic submitted as Plaintiff Trial Exhibit 1092 in C.A. No. 08–091–GMS in the District Court of Delaware.

*Edwards Lifesciences AG* v. *Cook Biotech, Inc.* (HC 08C00934)—UK trial transcripts—Days 1–5 submitted as Plaintiff Trial Exhibit 1178 in C.A. No. 08–091–GMS in the District Court of Delaware.

Heartport Consent to Merger with Johnson & Johnson and HP Merger Sub submitted as Plaintiff Trial Exhibit 1556 in C.A. No. 08–091–GMS in the District Court of Delaware.

Disclosure Statement between Edwards and PVT (Dec. 15, 2003) submitted as Plaintiff Trial Exhibit 1563 in C.A. 08–091–GMS in the District Court of Delaware.

Certificate of Merger between PVT and Edwards submitted as Plaintiff Trial Exhibit 1565 in C.A. No. 08–091–GMS in the District Court of Delaware.

PVT Amended and Restated Certificate of Incorporation (Oct. 8, 2004) submitted as Plaintiff Trial Exhibit 1567 in C.A. No. 08–091–GMS in the District Court of Delaware.

Certification of Stanton Rowe (Jun. 15, 2007) submitted as Plaintiff Trial Exhibit 1572 in C.A. No. 08–091–GMS in the District Court of Delaware.

California Statement by Domestic Stock Corporation (Stanford Surgical) submitted as Plaintiff Trial Exhibit 1573 in C.A. No. 08–091–GMS in the District Court of Delaware.

Certifcate of Filing Merger between Stanford Surgical and Hearport submitted as Plaintiff Trial Exhibit 1574 in C.A. No. 08–091–GMS in the District Court of Delaware.

Consent to Assignment between Stanford Surgical and Inventors submitted as Plaintiff Trial Exhibit 1575 in C.A. No. 08–091–GMS in the District Court of Delaware.

Edwards SAPIEN Transcatheter Heart Valve with RetroFlex 3 Transfermoral Kit submitted as Plaintiff Trial Exhibit 1630 in C.A. No. 08–091–GMS in the District Court of Delaware.

Presentation Business Review–Manufacturing submitted as Plaintiff Trial Exhibit 1635 in C.A. No. 08–091–GMS in the District Court of Delaware.

Printout of List of Centers and Country (Excel) submitted as Plaintiff Trial Exhibit 1654A in C.A. No. 08–091–GMS in the District Court of Delaware.

Report—Leading the way to the next frontier of the cardio vascular device industry submitted as Plaintiff Trial Exhibit 1712 in C.A. No. 08–091–GMS in the District Court of Delaware.

Report—Leading the way to the next frontier of the cardio vascular device industry: Percutaneous aortic heart valve replacement submitted as Plaintiff Trial Exhibit 1713 in C.A. No. 08–091–GMS in the District Court of Delaware.

Colin Stewart, How Rob Michiels and Corevalve got where they are today, The Orange County register, submitted as Plaintiff Trial Exhibit 1747 in C.A. No. 08–091–GMS in the District Court of Delaware.

Financial Frontier for the years ending Dec. 21, 2007–2012 submitted as Plaintiff Trial Exhibit 1748 in C.A. No. 08–091–GMS in the District Court of Delaware.

"Edwards Lifesciences: Speed Bumps Ahead for Sapien, Downgrading to Underweight," North America Equity Research submitted as Plaintiff Trial Exhibit 1807 in C.A. No. 08–091–GMS in the District Court of Delaware.

Print out–Corevalve reporting–Apr. 2005–Version 1 (Excel) submitted as Plaintiff Trial Exhibit 1900A in C.A. No. 08–091–GMS in the District Court of Delaware.

PVT Press Release–Hearport Announces Exclusive Licensing Agreement with Percutaneous Valve Technologies submitted as Plaintiff Trial 1968 in C.A. No. 08–091–GMS in the District Court of Delaware.

Medical Device Daily, vol. 10, No. 60 submitted as Plaintiff Trial Exhibit 20303 in C.A. No. 08–091–GMS in the District Court of Delaware.

Corelative press release: CoreValve Completes $24 Million Series B Round of Financing Led by Apax Partners submitted as Plaintiff Trial Exhibit 2031 in C.A. No. 08–091–GMS in the District Court of Delaware.

Corevalve press release: CoreValve Completes $33 Million Private Financing submitted as Plaintiff Trial Exhibit 2032 in C.A. No. 08–091–GMS in the District Court of Delaware.

In Strategy Shift, CoreValve to Manufacture Device in U.S. Facility, Dow Jone VentureWire submitted as Plaintiff Trial Exhibit 2033 in C.A. No. 08–091–GMS in the District Court of Delaware.

CoreValve, Inc. Financial Forecas submitted as Plaintiff Trial Exhibit 2034 in C.A. No. 08–091–GMS in the District Court of Delaware.

Edwards' CE Marking of Conformity Certificate submitted as Plaintiff Trial Exhibit 2059 in C.A. No. 08–091–GMS in the District Court of Delaware.

Edwards' EC–Design Examination Certificate submitted as Plaintiff Trial Exhibit 2060 in C.A. No. 08–091–GMS in the District Court of Delaware.

Patient Selection for the CoreValve ReValving System by Ganesh Manoharan et al. submitted as Plaintiff Trial Exhibit 2090 in C.A. No. 08–091–GMS in the District Court of Delaware.

Presentation—France Registry: French Aortic National Core Valve and Edwards Registry, Helene Eltchaninoff submitted as Plaintiff Trial Exhibit 2123 in C.A. No. 08–091–GMS in the District Court of Delaware.

CE Markings of Conformity issued to Edwards Lifesciences submitted as Plaintiff Trial Exhibit 2124 in C.A. No. 08–091–GMS in the District Court of Delaware.

Color Photographs of Andersen et al. stent valve and related materials submitted as Plaintiff Trial Exhibit 2129 in C.A. No. 08–091–GMS in the District Court of Delaware.

Color Photographs of Andersen et al. stent valve and related materials submitted as Plaintiff Trial Exhibit 2130 in C.A. No. 08–091–GMS in the District Court of Delaware.

Color Photographs of Andersen et al. stent valve and related materials submitted as Plaintiff Trial Exhibit 2131 in C.A. No. 08–091–GMS in the District Court of Delaware.

Color Photographs of Andersen et al. stent valve and related materials submitted as Plaintiff Trial Exhibit 2132 in C.A. No. 06–091–GMS in the District Court of Delaware.

Handwritten notes made by Dr. Buller on CoreValve device during his direct testimony (top view) submitted as Plaintiff Trial Exhibit 2135 in C.A. No. 08–091–GMS in the District Court of Delaware.

Handwritten notes made by Dr. Buller on CoreValve device during his direct testimony (side view) submitted as Plaintiff Trial Exhibit 2136 in C.A. No. 08–091–GMS in the District Court of Delaware.

Handwritten notes made by Dr. Buller on CoreValve device during his direct testimony (side view) submitted as Plaintiff Trial Exhibit 2137 in C.A. No. 08–091–GMS in the District Court of Delaware.

*CoreValve's Timeline: Actual* vs. *No Infringement* submitted as Plaintiff Trial exhibit 2141 in C.A. No. 08–091–GMS in the District Court of Delaware.

*CoreValve's Timeline: Actual* vs. *No Infringement* (Europe) submitted as Plaintiff Trial Exhibit 2142 in C.A. No. 08–091–GMS in the District Court of Delaware.

Edwards' *Damages—Lost Profits Units* vs. *Reasonable Royalty Units* (Europe) submitted as Plaintiff Trial Exhibit 2143 in C.A. No. 08–091–GMS in the District Court of Delaware.

Summary of Edwards' Damages in Europe submitted as Plaintiff Trial Exhibit 2144 in C.A. No. 08–091–GMS in the District Court of Delaware.

Summary of Edwards' Lost Profits Damages submitted as Plaintiff Trial Exhibit 2145 in C.A. 08–091–GMS in the District Court of Delaware.

Summary of Edwards' Total Damages submitted as Plaintiff Trial Exhibit 2146 in C.A. No. 08–091–GMS in the District Court of Delaware.

Reasonable Royalty if No Lost Profits submitted as Plaintiff Trial Exhibit 2147 in C.A. No. 08–091–GMS in the District Court of Delaware.

Translation of Letter from K. Rasmussen to H. Andersen re Novelty Search on Implantable Stent Valve. dated Oct. 25, 1989, submitted as Defendant Trial Exhibit 7 in C.A. No. 08–091–GMS in the District Court of Delaware.

Article: "Transluminal Implantation of Artificial Heart Valves. Description of a New Expandable Aortic Valve and Initial 1992 Results with Implantation by Catheter Technique in Closed Chest Pigs", European Heart Journal, vol. 13, pp. 704–708, by H, Andersen, L. Knudsen and J. Hasenkam, dated 1992 submitted as Defendant Trial Exhibit 14 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from D.L. Brutsaert to H. Andersen re Manuscript Entitled "Transluminal Implantation of Artificial Heart Valves" Accepted for Publication, dated Oct. 3, 1991 submitted as Defendant Trial Exhibit 17 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from J. Fabricius to Danish Institute of Technology re Opinion on "Stent Valve Project" dated Mar. 5, 1990 Letter from H. Andersen to K. Rasmussen re Comments on Written Opinion from J. Fabricius, dated May 15, 1990 submitted as Defendant Trial Exhibit 42 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from S. Dack to H. Andersen re Hasenkam Hasenkam Rejection of Manuscript Entitled "Implantation of Artificial Heart Valves" dated Jul. 26, 1990 submitted as Defendant Trial Exhibit 48 in C.A. No. 08–091–GMS in the District Court of Delaware.

Drawing by Witness of Stent Prototype submitted as Defendant Trial Exhibit 57 in C.A. No. 08–091–GMS in the District Court of Delaware.

Report: "Development, Manufacture, and In Vitro and In Vivo Evaluation of an Artificial Heart Valve for Implantation Using the Catheter Technique with a View to Future Intravasal Treatment of Heart Valve Disorders", by L. Knudsen, dated 1992 submitted as Defendant Trial Exhibit 60 in C.A. No. 08–091–GMS in the District Court of Delaware.

Article: "Catheter–Implanted Prosthetic Heart Valves–Transluminal Catheter Implantation of a New Expandable Artificial Heart Valve in the Descending Thoracic Aorta in Isolated Vessels and Closed Chest Pigs", The International Journal of Artificial Organs, vol. 16, pp. 253–262, by L. Knudsen, H. Andersen, & J. Hasenkam, dated 1993 submitted as Defendant Trial Exhibit 61 in C.A. No. 08–091–GMS in the District Court of Delaware.

Powerpoint Presentation: "Percutaneous Rowe–Rowe–Valve Technologies"by A. Cribier, M. Leon, S. Rabinovich & S. Rowe submitted as Defendant Trial Exhibit 76 in C.A. No. 08–091–GMS in the District Court of Delaware.

Document: "Percutaneous Valve Technologies, Inc. Business Plan," dated Feb. 2000 submitted as Defendant Trial–Exhibit 81 in C.A. No. 08–091–GMS in the District Court of Delaware.

Drawing of CAD Design for the Production of Two Stents, dated Jan. 2, 2000 submitted as Defendent Trial Exhibit 84 in C.A. No. 08–091–GMS in the District Court of Delaware.

Report: "Design Review—Concept Phase," dated May 15, 2000 submitted as Defendant Trial Exhibit 85 in C.A. No. 08–091–GMS in the District Court of Delaware.

Report: "R & D Monthly Report–Jun. 2000," dated Jun. 13, 2000 submitted as Defendant Trial Exhibit 87 in C.A. No. 08–091–GMS in the District Court of Delaware.

Letter from H. Gifford to H. Andersen re Endovascular Valve Replacement Porcedure, dated Sep. 29, 1993 submitted as Defendant Trial Exhibit 97 in C.A. 08–091–GMS in the District Court of Delaware.

PowerPoint Slides of PHV Frame Evolution submitted as Defendant Trial Exhibit 102 in C.A. No. 08–091–GMS in the District Court of Delaware.

Exhibit "SR–7" referred to in the First Witness Statement of Stanton Rowe dated May 27, 2008 submitted as Defendant Trial Exhibit 103 in C.A. No. 08–091–GMS in the District Court of Delaware.

Document: "PVT Stent Follow–Up Table" submitted as Defendant Trial Exhibit 104 in C.A. No. 08–091–GMS in the District Court of Delaware.

Document: "Outlines of a Research Program for the Development of an Implantable Heart Valve (1HV)" submitted as Defendant Trial Exhibit 207 in C.A. No. 08–091–GMS in the District Court of Delaware.

Document: "Non–Surgical Cardiac Valve Implanation" submitted as Defendant Trial Exhibit 211 in C.A. No. 08–091–GMS in the District Court of Delaware.

Document: Conception Review–Prosthesis Design Conception, date May 5, 2004 submitted as Defendant Trial Exhibit 239 in C.A. No. 08–091–GMS in the District Court of Delaware.

U.S. Patent No. 7,018,406 B2, entitled "Prosthetic Valve for Transluminal Delivery" issued to Sequin et al on Mar. 28, 2006 with attached file history, submitted as Defendant Trial Exhibit 289 in C.A. No. 08–091–GMS in the District Court of Delaware.

Pig experiments of Drs. Andersen, Hasenkam, and Knudsen submitted as Defendant Trial Exhibit 294 in C.A. No. 08–091–GMS in the District Court of Delaware.

Color version of Test Report and signature page of #R–2006–006: Frame Deflection and Leaflet Angle–Core Valve Percutaneous Aortic Valve Generation 3, 26 mm (Previously produced black and white image COR674610–674633) submitted as Defendant Trial Exhibit 1313 in C.A. No. 08–091–GMS in the District Court of Delaware.

Color version or Report and signature page for Protocol #R–2006–010: Frame Deflection and Leaflet Angle–Core Valve Percutaneous Aortic Valve Generation 3, 29mm (Previously produced black and white image COR680225–680238) submitted as Defendant Trial Exhibit 1314 in C.A. No. 08–091–GMS in the District Court of Delaware.

Contact Sheet of photographs of CoreValve prototypes taken by Edwards' counsel on Jan. 25, 2010 submitted as Defendant Trial Exhibit 1459 in C.A. No. 08–091–GMS in the District Court of Delaware.

Picture of Physical Device submitted as Defendant Trial Exhibit 1460 in C.A. No. 08–091–GMS in the District Court of Delaware.

Picture of Physical Device submitted as Defendant Trial Exhibit 1462 in C.A. No. 08–091–GMS in the District Court of Delaware.

Picture of Physical Device submitted as Defendant Trial Exhibit 1466 in C.A. No. 08–091–GMS in the District Court of Delaware.

Picture of Physical Device submitted as Defendant Trial Exhibit 1467 in C.A. No. 08–091–GMS in the District Court of Delaware.

Picture of Generation 1 CoreValve device submitted as Defendant Trial Exhibit 1469 in C.A. No. 08–091–GMS in the District Court of Delaware.

Picture of Physical Device submitted as Defendant Trial Exhibit 1471 in C.A. No. 08–091–GMS in the District Court of Delaware.

Picture of Physical Device submitted as Defendant Trial Exhibit 1473 in C.A. No. 08–091–GMS in the District Court of Delaware.

Timeline re CoreValve would have made all its Sales overseas—Fall 2004 start date submitted as Defendant Trial Exhibit 1478 in C.A. No. 08–091–GMS in the District Court of Delaware.

Timeline re CoreValve would have made all its Sales overseas—Spring 2005 start date submitted as Defendant Trial Exhibit 1479 in C.A. No. 08–091–GMS in the District Court of Delaware.

Jeffery Kinrich demonstrative graphic submitted as Defendant Trial Exhibit 1483 in C.A. No. 08–091–GMS in the District Court of Delaware.

Jeffery Kinrich demonstrative graphic submitted as Defendant Trial Exhibit 1484 in C.A. No. 08–091–GMS in the District Court of Delaware.

Jeffery Kinrich demonstrative graphic submitted as Defendant Trial Exhibit 1485 in C.A. No. 08–091–GMS in the District Court of Delaware.

Jeffery Kinrich demonstrative graphic submitted as Defendant Trial Exhibit 1486 in C.A. No. 08–091–GMS in the District Court of Delaware.

Jeffery Kinrich demonstrative graphic submitted as Defendant Trial Exhibit 1487 in C.A. No. 08–091–GMS in the District Court of Delaware.

Final Jury Instructions, *Edwards Lifesciences AG and Edwards Lifesciences, LLC. v. Medtronic CoreValve LLC*, United States District Court for the District of Delaware, Civil Action No. 1:08–CV–00091–GMS, Apr. 1, 2010.

Trial Transcripts, *Edwards Lifesciences AG and Edwards Lifesciences, LLC. v. Medtronic CoreValve LLC*, United States District Court for the District of Delaware, Civil Action No. 1:08–CV–00091–GMS, Mar. 23, 2010–Apr. 1, 2010.

Affidavit of Michael Gadeberg, Jul. 8, 2010.

Slide Deck for Plaintiff's Opening Statement in *Edwards Lifesciences AG and Edwards Lifesciences, LLC. v. Medtronic CoreValve LLC*, United States District Court for the District of Delaware, Civil Action No. 1:08–CV–00091–GMS, Mar. 23, 2010.

Plaintiff's Trial Exhibitexhibit 2135, *Edwards Lifesciences AG and Edwards Lifesciences, LLC. v. Medtronic CoreValve LLC*, United States District Court for the District of Delaware, Civil Action No. 1:08–CV–00091–GMS, Mar. 26, 2010.

Slide Deck for Plaintiff's Closing Arguments in *Edwards Lifesciences AG and Edwards Lifesciences, LLC. v. Medtronic CoreValve LLC*, United States District Court for the District of Delaware, Civil Action No. 1:08–CV–00091–GMS, Apr. 1, 2010.

Revised Slides for Plaintiff's Closing Arguments in *Edwards Lifesciences AG and Edwards Lifesciences, LLC. v. Medtronic CoreValve LLC*, United States District Court for the District of Delaware, Civil Action No. 1:08–CV–00091–GMS, Apr. 1, 2010.

U.S. App. No. 95/001,615, filed May 4, 2011 Andersen et al.

U.S. App. No. 95/001,616, filed May 4, 2011 Andersen et al.

U.S. App. No. 90/009,791, filed Jul. 29, 2010 Andersen et al.

U.S. App. No. 90/009779, filed Jul. 9, 2010 Andersen et al.

Memorandum on post–trial motions and Order, dated Feb. 7, 2011, Edwards Lifesciences AG and Edwards Lifesciences LLC, v. Corevalve, Inc and Medtronic Corevalve, LLC U S District Court for the District of Delaware, CA No 08–91–GMS.

US 5,411,552 C1

**1**

**EX PARTE
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 307**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claim **1** is confirmed.

Claims **2-8** were not reexamined.

\* \* \* \* \*

US005411552C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9546th)

# United States Patent
Andersen et al.

(10) **Number:** US 5,411,552 C2
(45) **Certificate Issued:** Mar. 5, 2013

(54) **VALVE PROSTHESIS FOR IMPLANTATION IN THE BODY AND A CATHETER FOR IMPLANTING SUCH VALVE PROSTHESIS**

(75) Inventors: **Henning R. Andersen**, Hoejbjerg (DK);
**John M. Hasenkam**, Aarhus V (DK);
**Lars L. Knudsen**, Aarhus C (DK)

(73) Assignee: **Edwards Lifesciences AG**, St.-Prex (CH)

**Reexamination Request:**
No. 90/012,277, May 2, 2012

**Reexamination Certificate for:**
Patent No.: **5,411,552**
Issued: **May 2, 1995**
Appl. No.: **08/261,235**
Filed: **Jun. 14, 1994**

Reexamination Certificate C1 5,411,552 issued Aug. 16, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 07/961,891, filed on Jan. 11, 1993, now abandoned.

(30) **Foreign Application Priority Data**

May 18, 1990 (DK) ..................................... 1246/90

(51) **Int. Cl.**
*A61F 2/24* (2006.01)

(52) **U.S. Cl.** ....... **623/2.18**; 623/900; 137/343; 137/844; 251/358
(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,277, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Catherine S. Williams

(57) **ABSTRACT**

A valve prosthesis (**9**) for implantation in the body by use of catheter (**11**) comprises a stent made from an expandable cylinder-shaped threaded structure (**2**,**3**) comprising several spaced apices (**4**). The elastically collapsible valve (**4**) is mounted on the stent as the commissural points (**5**) of the valve (**6**) are secured to the projecting apices (**4**).

The valve prosthesis (**9**) can be compressed around the balloon means (**13**) of the balloon catheter (**11**) and be inserted in a channel, for instance in the aorta (**10**). When the valve prosthesis is placed correctly the balloon means (**13**) is inflated thereby expanding the stent and wedging it against the wall of aorta. The balloon means is provided with beads (**14**) to ensure a steady fastening of the valve prosthesis on the balloon means during insertion and expansion.

The valve prosthesis (**9**) and the balloon catheter (**11**) make it possible to insert a cardiac valve prosthesis without a surgical operation comprising opening the thoracic cavity.



US 5,411,552 C2

**1**

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1-4** and **8** is confirmed.

Claims **5-7** were not reexamined.

* * * * *

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Fed. R. App. P. 25 and Fed. Cir. R. 25, I certify that on May 12, 2014, I served the foregoing via the Court's CM/ECF on the principal attorneys for each party. Additionally, the confidential version of the brief was served via email on the principal counsel for each party. Also, for delivery on the next business day, two true paper copies of the foregoing were sent to counsel for each party.

Jack B. Blumenfeld
Email: jbbefiling@mnat.com
Maryellen Noreika
Email: menefiling@mnat.com
Regina S.E. Murphy
Email: rmurphy@mnat.com
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

Nicholas Groombridge
Email: ngroombridge@paulweiss.com
Brian P. Egan
Email: began@paulweiss.com
Christopher Terranova
Email: cterranova@paulweiss.com
Kripa Raman
Email: kraman@paulweiss.com
Catherine Nyarady
Email: cnyarady@paulweiss.com
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

Dated: May 12, 2014

      /s/ *Irina Khait*
      Irina Khait
      Paralegal
      WEIL GOTSHAL & MANGES LLP
      201 Redwood Shores Parkway
      Redwood Shores, CA 94065
      Telephone: (650) 802-3000

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).  This brief contains 13,697 words as calculated by the "Word Count" feature of Microsoft Word 2010, the word processing program used to create it.

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.


Respectfully submitted,

Dated:  May 12, 2014         By:   */s/ Edward R. Reines*
                                  Edward R. Reines
                                  WEIL GOTSHAL & MANGES LLP
                                  201 Redwood Shores Parkway
                                  Redwood Shores, CA 94065
                                  Telephone: (650) 802-3000